UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

ZORAIDA RIOS-ANDINO,
NEY RIVERA GARCIA,
JASMINE GUADALUPE,
ROSARIO MARTINEZ,

Plaintiffs,

v. Case No. 6:12-CV-1188-ORL-22KRS

ORANGE COUNTY, FLORIDA,

Defendant.
_______________________________________/

**DEFENDANT, ORANGE COUNTY'S DISPOSITIVE MOTION FOR FINAL SUMMARY JUDGMENT**

Defendant, Orange County, Florida, pursuant to Rule 56 of the Federal Rules of Civil Procedure, moves for final summary judgment against Plaintiffs, Zoraida Rios-Andino, Ney Rivera Garcia, Jasmine Guadalupe, and Rosario Martinez, and states:

1. This is an action brought by four Plaintiffs, Zoraida Rios-Andino, Ney Rivera Garcia, Jasmine Guadalupe, and Rosario Martinez, under Section 2 of the Voting Rights Act, codified in 42 U.S.C. Section 1973, arising from the allegation that Orange County's redistricting plan, adopted by the Board of County Commissioners on November 29, 2011, "illegally dilutes the voting rights of Latinos in Orange County." Dkt. 1, Complaint, p.6.

2. There is no genuine dispute as to any material fact and Orange County is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

3. This Motion is based on Plaintiffs' Complaint (Dkt. 1); Orange County's Answer and Affirmative Defenses (Dkt. 23); Ordinance No. 2011-14, attached hereto as

**Exhibit 1**; Expert Report of Peter Morrison, Ph.D., and deposition testimony (Dkt. 59); Expert Report of M.V. ("Trey") Hood, III, Ph.D., and deposition testimony (Dkt. 61); Affidavit of Orange County GIS Analyst (filed separately); Affidavit Regarding Arrington's Proposed Maps (filed separately)**;** Plaintiffs' Answers to Interrogatories, attached as **Exhibits 2 through 5**; the transcripts of the depositions filed simultaneously herewith; and the other materials cited herein.

4. Citations to the deposition transcripts are denoted by the acronym of the witness's name, followed by "Depo, p.", and then the page and line number. The transcripts of the following witnesses have been cited: Zoraida Rios-Andino (ZRA), Jasmine Guadalupe (JG), Ney Rivera Garcia (NRG), Rosario Martinez (RM), Derek Bruce (DB), Pete Johnstone (PJ), Lavon Williams (LW), Whitney Evers (WE), M.V. (Trey) Hood, III, Ph.D. (TH), Peter Morrison, Ph.D. (PM), Beverly Willis (BW), and the Supervisor of Elections Bill Cowles (SOE).

WHEREFORE, Orange County, Florida, pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 3.01, respectfully requests that this Court enter final summary judgment in favor of Orange County and against Plaintiffs, Zoraida Rios-Andino, Ney Rivera Garcia, Jasmine Guadalupe, and Rosario Martinez.

## <u>UNDISPUTED FACTS</u>

1. <u>Orange County</u>. The Board of County Commissioners ("BCC") consists of seven elected officials. Six officials are elected from single-member districts. One is elected countywide as the mayor. DWR Depo, p. 61:11-13. The BCC is the governing body of Orange County.

2. Ordinance. On November 29, 2011, the BCC adopted Ordinance No. 2011-14 revising the boundaries of the six districts for the BCC to account for population changes reflected in the 2010 federal Census.

3. Plaintiff, Zoraida Rios-Andino, lives in District 4, which used to be in District 3. ZRA Depo, p. 6:10-16. She was born in Chicago and speaks both English and Spanish. ZRA Depo, p. 8:25-9:9. She considers herself Puerto Rican. ZRA Depo, p. 8:4-5.

4. Rios-Andino would like District 3 to be redrawn to consist of a majority of voting age Hispanics. ZRA Depo, p. 29:23-30:9.

5. Rios-Andino never tried to create a map for Orange County. ZRA Depo, p. 30:14-25.

6. Neither Rios-Andino nor any of the other Plaintiffs submitted a proposed map to the Redistricting Advisory Committee ("RAC") or the BCC. ZRA Depo, p. 36:25-37:14.

7. She does support Public Proposal E (ZRA Depo, p. 37:15-24) and the map prepared by Latino Justice as part of this lawsuit (ZRA Depo, p. 37:19-38:3).

8. When asked if Orange County should redistrict solely based on race, Rios-Andino said, "If it was a way to help the Hispanic community to a obtain a district, yeah." ZRA Depo, p. 36:5-8. She believes that Orange County needs to treat every citizen the same, regardless of their race or ethnicity, but thought that Hispanics may be treated preferentially depending on the situation. ZRA Depo, p. 110:24-111:19.

9. Because Ms. Rios-Andino did not live in District 3 at the time of the 2012 election, she was unable to vote for a District 3 County Commissioner.

10. She did support Pete Clarke for Commissioner of District 3, encouraged others to support him, and believes he prevailed partly because of the Hispanic vote. ZRA Depo, p. 25:15-26:1; 101:2-22.

11. Rios-Andino does not have the time to serve or volunteer to serve on any advisory board. ZRA Depo, p. 109:16-110:13.

12. Plaintiff, Jasmine Guadalupe, has lived in District 3 for about two years. JG Depo, p. 5:24-6:11.

13. She is from New York. JG Depo, p.7-8. She was born in the United States, as were both of her parents, and she considers herself Puerto Rican. JG Depo, p. 9.

14. English is her first language and she speaks Spanish conversationally. JG Depo, p. 9:6-11.

15. When asked to describe the relief that she is seeking, Guadalupe testified that she is asking for a map that would not dilute the Latino vote (JG Depo, p. 41:8-13), but could not describe the proposed map or give any specifics (JG Depo, p. 41-45). She did not know whether the map should be drawn so that the Hispanic population would be maximized (JG Depo, p. 45:14-17) or whether there was a benefit to the creation of two 40% Hispanic districts (JG Depo, p. 45-48).

16. Regarding her involvement with redistricting, Guadalupe does not think she attended any of the RAC meetings. JG Depo, p. 55:15-18. She attended one BCC meeting regarding funding of this lawsuit not too long ago. JG Depo, p. 34-35.

17. Other than Barack Obama for President, Guadalupe could not remember any other candidate she voted for in 2012. JG Depo, p. 26. She did not recall who was running for the BCC (JG Depo, p. 28-30).

18. She could not name any of the commissioners. JG Depo, p. 32:11-13.

19. Although she is not certain of who was running for County Commissioner District 3 in 2012 ((JG Depo, p. 28:23- 29:14), Guadalupe believes that she voted for Pete Clarke over Lui Damiani ((JG Depo, p. 56:18-57:22) and that Commissioner Clark was the Hispanic candidate of choice ((JG Depo, p. 57:13-15).

20. Guadalupe participated in early voting, was able to cast her ballot, and recognized that she could have obtained an absentee ballot. JG Depo, p. 61:19-62:11.

21. Plaintiff, Ney Rivera Garcia ("Garcia"), lives in District 3. NRG Depo, p. 4:17-24. He is from Puerto Rico and has lived here for just over two years. NRG Depo, p. 5.

22. Mr. Garcia explained his demand as follows:

> Q. And the main requirement you're asking for is a majority Hispanic district; correct?
> A. No. What I'm asking is that we go back to using the previous map the way it was.
> Q. Regardless of the percentage of Hispanics or Latinos?
> A. Yes.
> Q. So if the original map had, say, 40-some percent Hispanics, would you be satisfied with a new map with 40-some percent Hispanics?
> A. I would agree if you would conduct a new census to see that the population has increased significantly.
> Q. Now, was there any other reason that you are suing Orange County?
> A. No. It's only this.

NRG Depo, p. 83-84.

23. Mr. Garcia did not attend any of the RAC meetings. NRG Depo, p. 37:15-17. He never met with anyone or contacted his commissioner about redistricting prior to the adoption of the Ordinance. NRG Depo, p. 38:9-24.

24. Mr. Garcia believes that it would be a good goal for redistricting to be completely colorblind, provided that the leader is Latino. NRG Depo, p. 36:6-10.

25. In the 2012 runoff between Pete Clarke and Lui Damiani for Orange County District 3 Commissioner, Garcia supported Pete Clarke, who won the election. NRG Depo, p. 73-75.

26. Garcia is a Democrat (NRG Depo, p. 22:17-18), who supported other Democrats such as Darren Soto, who is half Puerto Rican (NRG Depo, p. 24:22-25); Alan Grayson (NRG Depo, p. 27:10-17); and Bill Nelson (NRG Depo, p. 27:6-9), but not Hispanic Republicans, such as Mildred Fernandez (NRG Depo, p. 22-23), Marco Rubio (NRG Depo, p. 23:10-11), or Marco Pena (NRG Depo, p. 25:14-18).

27. Garcia thinks that more Cubans are Republicans and the majority or more of Puerto Ricans are Democrats. NRG Depo, p. 24:2-10.

28. Plaintiff, Rosario Martinez ("Martinez"), has lived in District 5 since 2007. RM Depo, p. 4. He was born in the Dominican Republic and immigrated to the United States when he was seventeen years old. RM Depo, p. 5:9-6:10.

29. Mr. Martinez claims he is suing Orange County because he believes that District 3 had a larger concentration of Latinos before the redistricting process and he would like to have District 3 remain the way that it was before the redistricting. RM Depo, p.14:1-

15; 53:24 -54:3; 65:20-66:17. Mr. Martinez's "demand . . . pertains to District 3." RM Depo, p. 66-23-25. He is not objecting to District 5 or Districts 1, 2, 4 or 6. RM Depo, p. 67:1-12.

30. Martinez was not involved in the redistricting process and is not able to support one map or the other. RM Depo, p. 74:5-10.

31. When asked about the 2012 General Election for District 3 Commissioner, while Martinez could not vote for either candidate, Martinez did symbolically support Pete Clarke and called on his community to support Clarke, who was successful. He felt the Hispanic vote contributed greatly to Commissioner Clarke's victory. RM Depo, p.60:17-61:17.

32. Martinez has voted by absentee ballot and has never had any trouble casting his ballot. RM Depo, p. 114-115.

33. Martinez voted for Bill Nelson, Alan Grayson, Earl K. Wood, Bill Cowles, and Teresa Jacobs, all of whom won their respective elections. RM Depo, p. 110:12-112; 116:9-117:9. He did not vote for some of the Hispanic candidates running for office, such as Mel Martinez, Marco Rubio, or Leticia Marques for Judge. RM Depo, p. 31-32, 37:4-18; 112.

34. Derek Bruce, Chairman of RAC. Every 10 years, the Redistricting Advisory Committee (RAC) is empaneled by the Board of County Commissioners (BCC) to evaluate maps and make recommendations to the BCC, with input from the public, on any changes that have to be made as a result of population changes or shifts within the county. DB Depo, p. 37. Ultimately, the recommendations go to BCC. Then, the BCC takes public input and has the final saying in approving a revised district map. DB Depo, p. 37.

35. According to Mr. Bruce, the principle redistricting factor is one person, one vote. Other factors include the contiguousness of districts, preserving boundaries and neighborhoods, and not displacing large communities, neighborhoods, or cities. DB Depo, p. 121.

36. The RAC recommended two proposals to the BCC: Committee Proposal 12B and Public Proposal E. Exhibit 3-A.

37. Committee Proposal 12, attached as Exhibit 142, was created by Jose Fernandez. DB Depo, p. 156:9 -19. This proposal had a lot of merit because the maximum population deviation is tight; the districts largely preserve the existing boundaries around major thoroughfares; they are as compact as they can be for six districts; and the Hispanic population was 42% in District 4 and 35% in District 3. DB Depo, p. 156-157.

38. The RAC made changes to Proposal 12 to create Proposal 12A in order to address input from the public. DB Depo, p. 188, 201-202, Exhibit 150. Proposal 12A then became Proposal 12B. DB Depo, p. 200.

39. Public Proposal E is attached to the deposition transcript of Mr. Bruce as Exhibit 143. DB Depo, p. 158. Its weakness is that the entire east side was a re-write. DB Depo, p. 159. This proposal took large communities and moved them to new districts without a lot of consideration for the historical communities of interest or neighborhood alliances. Public Proposal E abandoned the way in which the district boundaries had existed traditionally for years. DB Depo, p. 182-183. "It was literally blowing up the map as it had existed." DB Depo, p. 183:6-7. Changes should be made more incrementally. DB Depo, p. 183:8-14.

40. The RAC worked to insure that there was a significant Hispanic population in two districts allowing Hispanics to elect candidates in two districts, not one. DB Depo, p. 211.

41. The BCC worked to boost the percent of Hispanics in Districts 3 and 4 even further, as shown in Map M3 adopted by the BCC. DB Depo, p. 211; Exhibit 166.

42. Hispanics were not represented by one unified voice. Some members of the Hispanic community expressed that they did not want to be quarantined into one district. DB Depo, p. 210.

43. Pete Johnstone, a Senior GIS Analyst, assisted with the GIS aspects of the redistricting process. PJ Depo, p. 42:13-23 & 48.

44. GIS provided information regarding population and demographics in redistricting proposals. PJ Depo, p. 66-67. The census data included total population, voting age population data, and census designated places. PJ Depo, p. 78-79.

45. GIS indicated whether a census designated place was moved or split and how much was moved and where. PJ Depo, p. 80:18-22.

46. Exhibit 310 to Johnstone's deposition is a PowerPoint presentation dated May 11, 2011 on Census Data. PJ Depo, p. 100-101. Page 3 of that presentation (OC_000259) is a map of the Countywide Census Designated Places. The 2010 Census Data by District on page 4 shows that the populations of Districts 1 and 4 were much larger than the populations of the other four districts.

47. Page 41 (OC_000297) of Exhibit 310 is a 2010 Hispanic Population Density Map. As depicted in this map, areas with high Hispanic population include the University

census designated place, Union Park, some of Alafaya, Rio Pinar, Azalea Park, parts of Orlando south of Azalea Park, Oak Ridge, Sky Lake, Pine Castle, Meadow Woods, South Chase, and Hunters Creek. PJ Depo, p. 101:24-102:6.

48. The Hispanic population is clustered in certain areas. PJ Depo, p. 102:9-12. There are three major clusters. PJ Depo, p. 102:23.

49. From the GIS perspective, Mr. Johnstone does not specifically recall anyone wanting a percentage of over 50% Hispanic. PJ Depo, p. 145:14-16. In response to public input, members would try to increase the percentage of Hispanics in District 3 from, say 35% to something higher. PJ Depo, p. 146.

50. No map was presented that had a voting-age population of Hispanics that exceeded 50%. PJ Depo, p. 207:10-24. The proposals that came close to 50% combined Hispanics areas that were not contiguous and had never been in the same district, and it would appear that those maps were generated purely with ethnicity or race as the primary focus. PJ Depo, p. 207:10-208.

51. Mr. Johnstone does not know if it was an attainable goal in the first place. PJ Depo, p. 208:5-7. Mr. Johnstone explained that you have to find higher density areas of Hispanics and replace them with the lower density areas, regardless of following lines such as roadways and natural boundaries. PJ Depo, p. 208:8-20.

52. Exhibit 326 is Public Proposal E. PJ Depo, p. 208:24-25. Mr. Johnstone shed light onto the complexities of redistricting when he explained the issues involving Public Proposal E. Starting with District 3, he said that it joins “totally different communities”:

> . . . . It's like connecting two opposite sides of the city and just drawing a small sliver down the middle. These areas have nothing in common, have never been together. Union Park, Azalea Park, Meadow Woods, Hunters Creek, they're not alike. They're totally different communities. Some are well established. The northeastern portion of this where --some of the core of District 3 being Azalea Park, Union Park, places like that have been in -- are high Hispanic. They're well-established older communities. And then you go to Meadow Woods area and, I forget the other one, I think it's called Southchase. Meadow Woods and Southchase area that also have a high Hispanic population density. Those are newer areas. They don't have the character of that. They've been in District 4 and they've a part of District 4 for a long time. They're part of the core voters of District 4 as well.
>
> And the other thing about this map is you're taking District 5, and many of the voters in District 5 on the east side came out to express their concern that they wanted to be -- remain in District 5. And District 5 completely changes character. . . .
>
> And then if even we have to go back, we have to go back to the west side of the county, District 2 now has -- we've got cities that are split up on here, District 2. Oakland has been in District 1 and they expressed a desire to stay there, and now they're half, they're 36 percent in District 1, 63.6 percent in District 2. Ocoee winds up being almost wholly in District 1 originally winds up being -- you know, 84 percent in District 2, and it goes on. . . .

PJ Depo, p. 212-213.

53. In addition, Public Proposal E shifts numerous census designated places and communities of interest from one district into another. PJ Depo, p. 211:1-3; Exhibit 326. One of the factors of redistricting is trying to minimize the breakup of related communities, census designated places, and other communities of interest. PJ Depo, p. 211:9-16.

54. Exhibit 325 is a copy of Map M-3, which is the map that was presented to the BCC and eventually adopted. PJ Depo, p. 215:19-216.

55. <u>Lavon Williams is the Manager of Neighborhood Services.</u> LW Depo, p. 35:10-13. Ms. Williams explained the efforts of the Neighborhood Services Department to

inform the community about redistricting. LW Depo, p. 215-219l; LW Depo, p. 218:15-23 (Spanish website); LW Depo, p. 219:1-6 (Spanish-speaking contact).

56. Regarding Orange County's housing programs, there have not been any complaints or concerns raised regarding access to housing by the Hispanic community. LW Depo, p. 212.

57. Regarding Orange County's Health Department or PCAN clinic, there have not been any complaints regarding Hispanic participation or access since 2001. LW Depo, p. 213:20-25.

58. Regarding employment with Orange County, there have not been any complaints about Hispanics not being able to access employment with Orange County over the last 10 years. LW Depo, p. 290-291.

59. Diego ("Woody") Rodriguez, Esq., was involved in the 2001 redistricting process. Mr. Rodriguez testified that the redistricting process in 2011 was very similar to the process utilized by Orange County in 2001. DWR Depo, p. 87:2-17.

60. Mildred Fernandez was elected and reelected after the 2001 redistricting process. She was not a candidate that was a well-known figure. DWR Depo, p. 84:23-85:6. Part of the success of her election can be attributed to the redistricting plan adopted in 2001. DWR Depo, p. 85:1-6; DWR Depo, p. 89:12-17.

61. Educational opportunities regarding Orange County public schools are the same for Hispanics and non-Hispanics. All students are treated the same. There are additional opportunities for Hispanics if they are non-English speakers, including special courses. DWR Depo, p. 89-90.

62. Whitney Evers, Esq., was the legal advisor for the RAC and the BCC.

63. The public, including Hispanics, had sufficient access to RAC. WE Depo, p. 80. RAC made efforts to include the public in the RAC process by holding 18 meetings, six of which were in each of the individual county commission districts, and by providing for a public comment period at every meeting, making sure the public had the ability to email the RAC, and setting up a website. WE Depo, p. 81-82.

64. Based upon election results provided by Beverly Willis, Hispanics have had access to and been elected to office in Orange County, both countywide and within County Commission Districts and in Orlando districts. WE Depo, p. 143-145:2; Exhibit 630.

65. District 3 has been represented by a Hispanic candidate almost continually since the creation of single-member districts in Orange County, which occurred in about 1988. WE Depo, p. 235:14-19.

66. There have been Hispanic members on the Soil and Water Conservation Board.

67. There are judges who are Hispanic. WE Depo, p. 236:1-6.

68. The empirical evidence shows that Hispanic members have been elected to office and shows that Hispanics have had access to and have been elected to office in Orange County. WE Depo, p. 236:9-15.

69. Certain members of the Hispanic community asked for a Hispanic majority district.

70. Other members, who were Hispanic, requested two 40% Hispanic districts. WE Depo, p. 237:17-238:2. Emilio Perez and Bill Negron wanted to draw a map that would be two 40% Hispanic districts. WE Depo, p. 203:6-17.

71. Ms. Evers worked with Diana Sen from Latino Justice, who wanted to have a map put on the RAC agenda. They went through multiple dates because the map was not ready. Ultimately, they ended up on the agenda, but no one showed up at the meeting to present that map. WE Depo, p. 203-204.

72. Peter Morrison, Ph.D., who is an applied demographer, correctly tabulated the number of Hispanic citizens of voting age in Arrington's Map 2. According to Morrison's correct calculation, the number of Hispanic citizens of voting age ("CVAP") of District 3 in Arrington's Map 2 is only 48.04%. PM's Report, p. 15. Morrison concluded with a 92.5% confidence level, based upon the estimated margin of error, that Hispanics constitute less than 50% of the CVAP in Arrington's Map 2's District 3. PM's Report, p. 16, ¶28.

73. M.V. Hood, III, Ph.D. As explained by Dr. Hood in his Expert Report, Dr. Hood concludes that in the eight County Commission races analyzed, there was a clear candidate of choice for Hispanic voters in six of the eight elections. In four of the contests, a Hispanic candidate of choice won. TH's Report, p. 20. In 75% of the elections analyzed, there is no evidence of minority vote dilution. TH's Report, p. 20-21. "In sum, Hispanic candidates running for Orange County Commission seats do not usually lose as a result of Anglo bloc voting." TH's Report, p. 21.

74. Beverly Willis is a cartographer with the Supervisor of Elections. Ms. Willis said that the Hispanic population was widely dispersed based upon the census numbers. BW Depo, p. 158:20-23;. 159:1- 22; OC_000297.

75. Exhibit 7 to the transcript of her deposition shows total voters based on the old district lines in 2002 and the new district lines in 2012. BW Depo, p. 173:9-174:3.

76. Early voting is a time period prior to election day when a person can go to a designated early voting location and cast a ballot. BW Depo, p. 175:12-18. Early votes were not counted within a precinct in 2000, 2002, or 2004. BW Depo, p. 175:21- 176:4.

77. An absentee ballot is a ballot that is mailed to the Supervisor of Elections. BW Depo, p. 176:24-177:3. In 2000, 2002, and 2004, absentee ballots were not counted within precincts. BW Depo, p. 177:4-12. The results cannot be put back into the precincts for that period of time. BW Depo, p. 177:15-22.

78. For the last 20 years, the Supervisor of Elections has published the ballots in both English and Spanish. BW Depo, p. 178:24-179:2.

79. Supervisor of Elections Bill Cowles. The prerequisites to voting, such as being a United States citizen and 18 years of age or older, apply to Hispanics and non-Hispanics alike. SOE Depo, p. 235.

80. Both Hispanics and non-Hispanics can register and vote in the same manner. SOE Depo, p. 234-236.

## MEMORANDUM OF LAW

### I. SUMMARY JUDGMENT STANDARD

Summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. Rule 56(c); *see also H & R Block Eastern Enterprises, Inc. v. Morris*, 606 F.3d 1285, 1290 (11th Cir 2010) (same).

The moving party has the initial burden of showing the basis for its summary judgment motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant sufficiently supports its summary judgment motion, the burden shifts to the nonmoving party to go beyond the pleadings and present evidence through affidavits, depositions, answers to interrogatories or admissions on file to show that there is a genuine issue for trial. *Id.* at 324.

The ultimate burden lies with the non-moving party to show the existence of a genuine issue of material fact. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1987). That burden requires the non-moving party to "do more than simply show that there is some metaphysical doubt as to the material facts." *Id*. at 587. The response must "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. Rule 56(e).

## II. <u>OVERVIEW OF THE THREE PRE-CONDITIONS TO A SECTION 2 CLAIM</u>

Section 2 of the Voting Rights Act of 1965 is codified in 42 U.S.C. § 1973. A governmental entity violates Section 2 if:

> based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of [a racial group] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

42 U.S.C. § 1973(b). There are three threshold conditions for establishing Section 2 violation: (1) the racial group must be sufficiently large and geographically compact to constitute a majority in a single-member district; (2) the racial group must be politically cohesive; and (3) the majority must vote sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate. *Thornburg v. Gingles*, 106 S. Ct. 2752, 2766-67 (1986). These conditions are known as the *Gingles* factors. If all three *Gingles* factors are established, then the totality of circumstances must be considered to determine whether members of a racial group have less opportunity than do other members of the electorate. *Johnson v. DeGrandy*, 114 S. Ct. 2647, 2657-58 (1994).

### A. PLAINTIFFS CANNOT ESTABLISH THAT THERE IS A POTENTIAL SINGLE MEMBER DISTRICT IN WHICH A MAJORITY OF THE CITIZEN VOTING AGE POPULATION ("CVAP") IS HISPANIC.

Under the first prong of *Gingles*, Plaintiffs must prove that the Hispanic population in is "sufficiently large and geographically compact to constitute a majority in a single member district." To satisfy this requirement, Plaintiffs must establish that there is a potential single member district in which a majority of the citizen voting age population ("CVAP") is Hispanic. In *Negron v. City of Miami Beach, Florida*, 113 F.3d 1563, 1569 (11th Cir. 1997), the Eleventh Circuit held:

> We agree with the Ninth Circuit that because "a section 2 claim will fail unless the plaintiff can establish that the minority group constitutes an effective voting majority in a single-member district," *Romero*, 883 F.2d at 1426, the proper statistic for deciding whether a minority group is sufficiently large and geographically compact is voting age population as refined by citizenship. *Id.* at 1424–26. Of course, the requirement that voting age population data be further refined by citizenship data applies only where there is reliable information indicating a significant difference in citizenship rates between the majority and minority populations.

*Id. See also League of United Latin American Citizens ("LULAC") v. Perry,* 548 U.S. 399, 428-29 (2006); *Reyes v. City of Farmers Branch, Tex.*, 586 F.3d 1019, 1023 (5th Cir.2009) (holding that only CVAP is relevant in evaluating first prong of *Gingles* ); *United States v. Osceola County, Florida,* 475 F. Supp. 2d 1220 (M.D. Fla. 2006); *Fabela v. City of Farmers Branch, Tex.*, 3:10-CV-1425-D, 2012 WL 3135545 (N.D. Tex. Aug. 2, 2012); *Benavidez v. Irving Indep. Sch. Dist., Tex.*, 690 F. Supp. 2d 451, 456 (N.D. Tex. 2010).

In application, Dr. Morrison correctly tabulated the number of Hispanic citizens of voting age in his table 1 on page 15 of his Report. Dkt. 59. According to Morrison's correct calculation, the Hispanic CVAP of District 3 in Arrington's Map 2 is only 48.04%. PM's Report, p. 15. Morrison concluded with a 92.5% confidence level, based upon the estimated margin of error, that Hispanics constitute less than 50% of the CVAP in Map 2's District 3. PM's Report, p. 16, ¶28.

As described in Orange County's Daubert Motion to Exclude Theodore Arrington's Report and Testimony (Dkt. 57), Arrington's assumption that the Hispanic citizenship rate within all of Orange County was 76% is not based upon the best available data and results in an overly simplistic methodology and an unreliable result. Arrington failed to examine the margin of error in his conclusions, ignored important documented technical limitations, and was oblivious to the limitations as reflected in his deposition. In essence, Arrington's estimated Hispanic CVAP in District 3 is akin to estimating the average temperature of the United States is 65 degrees, but that average temperature does not apply to a particular state. PM's Depo, p. 141:4-20.

## B. THE HISPANIC POPULATION IS NOT GEOGRAPHICALLY COMPACT.

The first *Gingles* factor requiring compactness "refers to the compactness of the minority population, not to the compactness of the contested district." *League of United Latin Am. Citizens v. Perry (LULAC)*, 126 S. Ct. 2594, 2618 (2006) (quoting *Bush v. Vera*, 116 S. Ct. 1941, 1971 (1996) (Kennedy, J., concurring)). In order for a minority group to meet the first *Gingles* factor, the minority group must be geographically compact, taking into account traditional districting principles such as maintaining communities of interest and traditional boundaries. The Supreme Court, in *League of United Latin American Citizens ("LULAC") v. Perry,* 548 U.S. 399, 428-29 (2006), explained:

> While no precise rule has emerged governing § 2 compactness, the "inquiry should take into account 'traditional districting principles such as maintaining communities of interest and traditional boundaries.' " *Abrams, supra,* at 92, 117 S.Ct. 1925 (quoting *Vera,* 517 U.S., at 977, 116 S.Ct. 1941 (plurality opinion)); see also *id.,* at 979, 116 S.Ct. 1941 (A district that "reaches out to grab small and apparently isolated minority communities" is not reasonably compact). **The recognition of nonracial communities of interest reflects the principle that a State may not "assum[e] from a group of voters' race that they 'think alike, share the same political interests, and will prefer the same candidates at the polls.' "** *Miller, supra,* at 920, 115 S.Ct. 2475 (quoting *Shaw v. Reno,* 509 U.S. 630, 647, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993)). In the absence of this prohibited assumption, there is no basis to believe a district that combines two farflung segments of a racial group with disparate interests provides the opportunity that § 2 requires or that the first *Gingles* condition contemplates. **"The purpose of the Voting Rights Act is to prevent discrimination in *434 the exercise of the electoral franchise and to foster our transformation to a society that is no longer fixated on race."** *Georgia v. Ashcroft,* 539 U.S., at 490, 123 S.Ct. 2498, 156 L.Ed.2d 428; cf. *post,* at 2663 (opinion of ROBERTS, C. J.). **We do a disservice to these important goals by failing to account for the differences between people of the same race.**

*Id.* at 433-434 (emphasis added). *See also Bush v. Vera*, 517 U.S. 952, 979, (1996) (plurality) (if, "because of the dispersion of the minority population, a reasonably compact majority-minority district cannot be created, § 2 does not require a majority-minority district").

In application, Plaintiffs have not established that the minority group is geographically compact taking into account traditional districting principles such as maintaining communities of interest and traditional boundaries. First, the Hispanic Population Density map shows that the Hispanic population is widely disbursed throughout the county, rather than one compact cluster. BW Depo, p. 158:20-23; PJ Depo, p. 10; 2:23. From a GIS perspective, in response to public input, members would try to increase the percentage of Hispanics in District 3 from 35% to something higher. PJ Depo, p. 146. No map was officially presented that had a voting-age population of Hispanics that exceeded 50%. PJ Depo, p. 207:10-24. In order to have a majority Hispanic district, you have to find higher density areas of Hispanics and replace them with the lower density areas, regardless of following lines such as roadways and natural boundaries. PJ Depo, p. 208:8-20.

Second, as explained in the Affidavit Regarding Arrington's Maps and the Affidavit of the GIS Analyst, Arrington's Maps and Public Proposal E increased the impact to communities of interest and municipalities, thereby failing to preserve the core of Districts 3, 4, and 5; decreased the number of Hispanics in District 4; created oddly shaped or non-linear boundaries; and increased, by almost a factor of two, the number of citizens displaced from their current districts into another district. In essence, Arrington's Maps and Public Proposal

E packed Hispanics into one district, rather than allowing Hispanics to have influence in two districts.

### C. RACE-BASED REDISTRICTING VIOLATES THE EQUAL PROTECTION CLAUSE.

Districts drawn with race as the predominant factor are subject to strict scrutiny. In *Bush v. Vera*, 517 U.S. 952, 958-59 (1996), the Supreme Court struck down three majority-minority districts because they were drawn with race as the predominant factor. Although the Governor attempted to justify the districts with the urban character of the district, incumbency protection, and other factors, the Court found that the predominant reason for the contours was race. *Id.* at 972. For strict scrutiny to apply, the plaintiffs must prove that other, legitimate districting principles were "subordinated" to race.

In application, Plaintiffs' sole purpose is to obtain a majority-Hispanic district without regard to the input for the other members of the public. The proposals that came close to 50% combined Hispanics areas that were not contiguous and had never been in the same district, and it would appear that those maps were generated purely with ethnicity or race as the primary focus. Public Proposal E (which is similar to Arrington's Maps) abandoned the way in which the district boundaries had traditionally been. DB Depo, p. 182-183. Changes should be made more incrementally. DB Depo, p. 183:8-14.

Thus, Plaintiffs' attempt to seek special treatment by forcing Orange County to adopt a district based solely on race or ethnicity, without regard to the traditional districting principles ascribed to by the U.S. Supreme Court, is contrary to the Fourteenth Amendment of the United States Constitution and the purpose of the Voting Rights Act. Section 1973(b)

of Title 42, Subchapter I-A provides "nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population."

### D. THE WHITE MAJORITY BLOC DOES NOT DEFEAT THE HISPANIC VOTE.

To establish the third *Gingles* factor, Plaintiffs must show white bloc voting sufficient to defeat the minority's preferred candidates. *Gingles*, 478 U.S. at 49, 56. This requires that Plaintiffs show: (1) that whites vote as a bloc; (2) that white bloc voting *regularly causes* the candidate preferred by black voters to lose; and (3) that blacks and whites *consistently* prefer different candidates. *Johnson v. Hamrick (III)*, 296 F.3d 1065, 1074 (11th Cir. 2002).

As explained by Dr. Hood in his Expert Report, Dr. Hood analyzed eight endogenous elections. TH's Report, p. 15. Dr. Hood concludes that in the eight County Commission races analyzed, there was a clear candidate of choice for Hispanic voters in six of the eight elections. In four of the contests, a Hispanic candidate of choice won. TH's Report, p. 20. In 75% of the elections analyzed, there is no evidence of minority vote dilution. TH's Report, p. 20-21. "In sum, Hispanic candidates running for Orange County Commission seats do not usually lose as a result of Anglo bloc voting." TH's Report, p. 21.

Dr. Hood explains that in order to establish a vote dilution claim, Plaintiffs must establish that the Hispanic candidate of choice is usually defeated by a bloc of Anglo voters. TH's Report, p. 12. Even if the Hispanic candidate of choice is defeated, one must determine if the defeat is due directly to a majority bloc of Anglo voters favoring another candidate. TH's Report, p. 13. "One must also uncover a pattern of vote dilution across a number of elections, however, in order to establish this scenario as being that prevalent elect oral condition for the geographic area understudy." TH's Report, p. 13.

A district in which minority voters have elected their preferred candidates is considered an effective minority district, even if the district contains less than a majority of the minority population. Jurisdictions are not required to create majority-minority districts in areas where minority voters have been successful in electing their preferred candidates. "Only if apportionment . . . has the effect of denying a protected class the opportunity to elect its candidate of choice does it violate § 2; where such an effect has not been demonstrated, § 2 simply does not speak to the matter." If minority voters were able to elect candidates of their choice from a district, minority plaintiffs would be unable to establish legally significant racial bloc voting that usually defeats the minority's preferred candidate. *Gingles*, 478 U.S. at 50-51.

**III. THE TOTALITY OF THE CIRCUMSTANCES**

Courts should also consider objective factors in determining whether the totality of the circumstances indicate a Section 2 violation. S.R. No. 97–417 at 28–29 (1982); *Gingles*, 478 U.S. at 44–45; *Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1021-22 (8th Cir. 2006).

Regarding election practices, the Supervisor of Elections has published the ballots in both English and Spanish for the last 20 years. BW Depo, p. 178:24-179:2. The prerequisites to voting apply to Hispanics and non-Hispanics alike. SOE Depo, p. 235. Hispanics can register and vote in the same manner as non-Hispanics. SOE Depo, p. 234-236.

Further, based upon election results, Hispanics have had access to and been elected to office in Orange County, both countywide and within County Commission Districts and in Orlando districts. WE Depo, p. 143-145:2; Exhibit 630.

Last, educational opportunities regarding Orange County public schools are the same for Hispanics and non-Hispanics. All students are treated the same. There are additional opportunities for Hispanics if they are non-English speakers, there are special courses that the school provides. DWR Depo, p.s 89-90. Further, Orange County is not aware of any complaints or concerns raised regarding access by Hispanics to Orange County's housing programs (LW Depo, p. 212), to Orange County's Health Department or PCAN clinic (LW Depo, p. 213:20-25), or to employment with Orange County (LW Depo, p. 290-291).

**IV. STANDING.**

To have standing to raise the issues in this lawsuit, the voter must live in the district at issue. In *Bush v. Vera*, 517 U.S. 952 (1996), the court held that a voter who did not live in newly-created majority-minority congressional districts, and who did not allege any specific facts showing that he personally had been subjected to any racial classification, lacked standing to challenge districts as racial gerrymanders in violation of Fourteenth Amendment, but voters who lived in districts had standing.

Because Plaintiff Martinez lives in District 5, he lacks standing to challenge the redistricting plan on behalf of the residents in District 3. RM Depo, p. 4. Similarly, Zoraida Rios-Andino lives in District 4 and lacks standing. ZRA Depo, p. 6:10-16.

**V. CONCLUSION**

Accordingly, this Court should enter a summary final judgment in favor of Orange County and against Plaintiffs. "[T]he Court . . . has made clear that the underlying districting decision is one that ordinarily falls within a legislature's sphere of competence. . . . Hence,

the legislature "must have discretion to exercise the political judgment necessary to balance competing interests," . . . . *Easley v. Cromartie*, 532 U.S. 234, 242 (2001) (citations omitted).

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this _2nd_ day of December 2013, I presented the foregoing to the Clerk of the Court for filing and uploading via the CM/ECF system of the United States District Court, Middle District of Florida.

I HEREBY CERTIFY that on this _2nd_ day of December 2013, a true and correct copy of the foregoing was transmitted **by Email** to:

**Richard C. Lorenzo, Esq.**
Hogan Lovells US LLP
200 South Biscayne Blvd., Suite 400
Miami, Florida 33131
richard.lorenzo@hoganlovells.com;
claudia.pena@hoganlovells.com;

**Maree Sneed, Esq.**
**Renee Erickson, Esq.**
**Kathryn L. Marshall, Esq.**
**Jim Clayton, Esq.**
**Jenny Shen, Esq.**
**Bret Ladine, Esq.**
Hogan Lovells US LLP
555 13th Street, NW
Washington DC, 20004
maree.sneed@hoganlovells.com;
renee.erickson@hoganlovells.com;
kathryn.marshall@hoganlovells.com
jim.clayton@hoganlovells.com;
jenny.shen@hoganlovells.com
bret.ladine@hoganlovells.com

**Juan Cartagena. Esq.**
**Nancy Trasande, Esq.**
LatinoJustice PRLDEF
99 Hudson St., 14th Floor
New York, NY 10013

jcartagena@latinojustice.org;
ntrasande@latinojustice.org;

I HEREBY CERTIFY that this _2nd_ day of December 2013, a true and correct copy of the foregoing was transmitted **by U.S. Mail** to **Juan Cartagena. Esq., and Nancy Trasande, Esq.,** LatinoJustice PRLDEF, at the address listed above.

***/s/ Linda S Brehmer Lanosa***
Linda S. Brehmer Lanosa
Assistant County Attorney
Florida Bar No. 901296
Orange County Attorney's Office
201 S. Rosalind Avenue, 3rd Floor
Orlando, Florida 32801
Telephone:(407) 836-7320
Facsimile: (407) 836-5888
Linda.BrehmerLanosa@ocfl.net

S:\Linda_BL\Cases\Rios v OC\DRAFTS - Court Docs\MSJ\MSJ 2013_Dec_2 v2.doc

## LIST OF ATTACHMENTS

Exhibit 1. Certified Copy of Ordinance No. 2011-14

Exhibit 2. Interrogatory Answers from Plaintiff, Zoraida Rios-Andino

Exhibit 3. Interrogatory Answers from Plaintiff, Jasmine Guadalupe

Exhibit 4. Interrogatory Answers from Plaintiff, Ney Rivera Garcia

Exhibit 5. Interrogatory Answers from Plaintiff, Rosario Martinez