**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

ZORAIDA RIOS-ANDINO,
NEY RIVERA GARCIA,
JASMINE GUADALUPE,
ROSARIO MARTINEZ,

Plaintiffs,

v.

ORANGE COUNTY ,

Defendant.

Case No.: 6:12-cv-1188-Orl-22KRS

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT ORANGE COUNTY'S DAUBERT MOTION TO EXCLUDE THEODORE ARRINGTON'S REPORT AND TESTIMONY**

Plaintiffs, through undersigned counsel, submit this Memorandum of Law and Declaration of Nancy M. Trasande ("Trasande Decl."), annexing materials in support of the arguments set forth below, in Opposition to Defendant Orange County's *Daubert* Motion to Exclude Theodore Arrington's Report and Testimony (Docket Number Entry "Doc." 57).[1]

**PRELIMINARY STATEMENT**

Defendant's attack of Dr. Arrington's expert report misstates the *Daubert* standard as it relates to the population statistics required to challenge a redistricting plan under Section 2 of the Voting Rights Act ("VRA") as well as the benefits and limitations of population data available in assessing *Gingles I* – the subject of Dr. Arrington's report and testimony. To

[1] Please note that all fact citations to items already on the Court's docket will use the original internal page numbering of the source document, not that applied automatically once the document is uploaded to CM/ECF.

properly assess Dr. Arrington's expert report and testimony under *Daubert*, one must review his work in connection with Section 2 VRA requirements and adopt a more nuanced understanding of the population data at play in his *Gingles I* analysis than that presented by Defendant's *Gingles I* rebuttal expert, Dr. Morrison. Doing so reveals that Dr. Arrington has, in fact, reliably established the feasibility of a majority-Hispanic district within Orange County, satisfying Plaintiffs' *Gingles I* burden.

## I. ***Daubert*** and Rule 702 Require Denial of Defendant's Motion

Under *Daubert*, Plaintiffs, as proponents of Dr. Arrington's report and testimony, need only demonstrate that his assessments are reliable by a preponderance of the evidence. The evidentiary requirement of reliability is lower than the merits standard of correctness. *See e.g. Tanner v. Westbrook*, 174 F.3d 542, 547 (5th Cir. 1999). Experts may even testify if they can show that the methods they used were employed by "a recognized minority of scientists in their field." *Daubert v. Merrell Dow Pharmaceuticals*, Inc., 43 F.3d 1311, 1319 (9th Cir. 1995). Trial judges have "broad latitude" in determining whether the specific factors reasonably measure reliability. *Jaurequi v. Carter Mfg. Co.*, 173 F.3d 1076, 1082 (8th Cir.1999). Indeed, "the gatekeeping inquiry must be tied to the facts of a particular case." *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999).

Further, because this case is set for a bench trial, not a jury trial, the danger of admitting unsound expert opinions is lessened. In a nonjury case, "the district court can commit reversible error by excluding evidence but it is almost impossible for it to do so by admitting evidence." 11 Charles Alan Wright & Arthur R. Miller, Federal Practice and

Procedure § 2885 (2d. ed. 1995); *Builders Steel Co. v. Commissioner of Internal Revenue*, 179 F.2d 377, 379 (8th Cir. 1950). Instead, courts should consider that:

> [o]ne who is capable of ruling accurately upon the admissibility of evidence is equally capable of sifting it accurately after it has been received, and, since he will base his findings upon the evidence which he regards as competent, material and convincing, he cannot be injured by the presence in the record of testimony which he does not consider competent or material.
>
> *Builders Steel Co.*, 179 F.2d at 379.

## II. *Gingles I* Requires That Plaintiffs Establish The Feasibility Of A Majority-Hispanic District.

Plaintiffs claim that Orange County diluted the Latino vote in violation of Section 2 of the VRA, 42 U.S.C. § 1973. (Doc. 1.) As set forth in *Thornburg v. Gingles,* 478 U.S. 30, 49 (1986), to establish a claim of vote dilution under Section 2, Plaintiffs must prove three threshold requirements by a preponderance of the evidence: (1) that the minority group is sufficiently large and geographically compact to constitute a majority in the district ("*Gingles I*"); (2) that the minority group is politically cohesive ("*Gingles II*"); and, (3) that the majority group votes sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate ("*Gingles III*"). Once these preconditions are met, the court determines if, based on the "totality of circumstances," minorities have been denied an equal opportunity to participate in the political process and to elect the representatives of their choice. *See Abrams v. Johnson*, 521 U.S. 74 (1997). In analyzing the totality of the circumstances, courts look to the factors enumerated in the Senate Report accompanying the 1982 Amendments to 42 U.S.C. § 1973 ("Senate Factors"). No one factor in assessing the totality of the circumstances is dispositive, and the Senate Factors are not exhaustive. *Gingles,* 478 U.S. at 45-46 (quoting S. Rep. No. 97-417, at 28-29 (1982)).

The first *Gingles* precondition "require[s] plaintiffs to show that it would be possible to design an electoral district, consistent with traditional districting principles, in which minority voters could successfully elect a minority candidate." *Davis v. Chiles,* 139 F.3d 1414, 1425 (11th Cir. 1998). Accordingly, Plaintiffs' burden under *Gingles I* involves demonstrating a possible remedy, not a remedial plan for immediate implementation. *See Chiles*, 139 F.3d at 1425*; see also Sanchez v. Colorado*, 97 F.3d 1301, 1314-15 (10th Cir. 1996) (noting that plaintiffs must demonstrate the "feasibility" or "possibility" of a section 2 remedy).

Defendant's contention that this Court should strike Dr. Arrington's report because he allegedly aimed only to create a majority-Hispanic district (s*ee* Doc. 57 at 17-21) misstates the criteria that Dr. Arrington considered in drawing his proposed plans. It also misstates the law governing a *Gingles I* analysis and Dr. Arrington's attendant obligations. Even if race had been Dr. Arrington's primary consideration in crafting Proposed District 3 in Illustrative Maps 1 and 2, his work cannot be simply rejected as a racial gerrymander. Doing so would ignore that an equal protection analysis is wholly distinct from *Gingles* and that Section 2 remedial districts have survived strict scrutiny, even where racial considerations predominated. *See Ga. State Conference of the NAACP v. Fayette County Bd. of Comm'rs*, No. 3:11-cv-123-TCB, 2013 U.S. Dist. LEXIS 84191, at *26-*29 (N.D. Ga. May 21, 2013) (declining Defendants' invitation to consider as part of a *Gingles I* inquiry whether Plaintiffs' Illustrative Plan subordinates traditional redistricting principles violating equal protection per *Miller v. Johnson*, 515 U.S. 900, 916 (1995)). Courts "must first determine whether *Gingles*

is met before ensuring that the proposed remedy complies with the Equal Protection Clause." *See id.* at *30.

In preparing his proposed plans for purposes of *Gingles I*, Dr. Arrington assessed "whether Latinos in Orange County are numerous enough and geographically concentrated enough to form a majority in one of the six single member districts for Orange County Commission." (Doc. 58-3 at ¶ 2.) Dr. Arrington also weighed the following factors: (1) the location of enacted plan district lines; (2) the need to maintain an equal population balance across all of the County Commission districts in keeping with the one person, one vote doctrine; (3) the need to avoid the division of incorporated areas, (4) the need to unify geographic communities of interest to the extent possible; and, (5) the need to maintain District 5's status as a Black majority district within proposed plans. (*See* Doc. 58-1 at 38:17-39:20.) Dr. Arrington's analysis resulted in two illustrative district plans, Illustrative Maps 1 and 2, respectively. In part, the plans, presented what percentage of Latinos in District 3 comprise the voting age population as well as the citizen voting age population. (Doc. 58-3 at ¶¶ 20-21, ¶¶ 31-32.) The term "voting age population" ("VAP") refers to the total number of residents at least 18 years of age, while the term "citizen voting age population" ("CVAP") refers the total number of citizens who are at least 18 years of age.

In compliance with *Gingles I*, Dr. Arrington determined that District 3 of his Illustrative Plan 1 contained a Latino 52.7% VAP and District 3 of his Illustrative Plan 2 contained a 54.6% Latino VAP. (Doc. 58-3 at ¶¶ 20-21, ¶¶ 31-32.) Addressing compactness factors, Dr. Arrington compared his Illustrative plans 1 and 2 with the County Commission plan currently in effect in Orange County and presented a variety of comparative analyses

among the three plans. Specifically, Dr. Arrington analyzed total population deviations among the three plans (*id*. at 11¶26, 12¶31) and Polsby Popper and Reock district compactness measures, as well as the number of precincts and incorporated cities or towns split in each of the three plans (*id*. at 15).

Dr. Morrison ignored the calculations and factors weighed by Dr. Arrington (Doc. 58-1 at 38:17-39:20), concluding that Dr. Arrington's "single-minded purpose in devising District 3 in his Plan 2 was to aggregate the most heavily Hispanic spatial clusters within the County into one block of contiguous territory, in order to boost Hispanics' share of the eligible voters there regardless of how few in number those voting-age citizens might be." (Doc. 59-3 at 20¶38.) Dr. Morrison fails to address how Dr. Arrington's plan runs afoul of compactness, contiguity, conformance with geographic boundaries and respect for political subdivisions or communities. (Doc. 59-1 at 34:3-38:22.) Dr. Morrison offers no compactness analysis in his report. (Docs. 59-3—59-5.)

**III. VAP Statistics Govern the Creation of Proposed Districts Under *Gingles I*.**

In determining the minimum-size minority group necessary to satisfy *Gingles I*, the United States Supreme Court in *Bartlett* held that a minority group must constitute more than 50 percent of the VAP in a proposed majority-minority district. *Bartlett v. Strickland*, 129 S. Ct. 1231, 1242, 1245 (2009) (referring to "voting-age population" fourteen times); *see Broward Citizens for Fair Dists. v. Broward Cnty.*, 12-60317-CIV, 2012 WL 1110053, at *4

(S.D. Fla. April 3, 2012) (citing *Bartlett* for the proposition that voting age population (VAP) is the correct measure for *Gingles I*).[2]

Subsequent to *Bartlett*, the Eleventh Circuit has been silent on whether VAP remains the standard. Even in *Negron v. City of Miami Beach*, 113 F.3d 1563 (11th Cir. 1997) where the Eleventh Circuit considered CVAP data in a *Gingles I* analysis, the Court never said that CVAP data was the correct population measure. The Court only stated that that CVAP data is *relevant* when assessing VAP data where the information: (1) is reasonably accurate; and, (2) demonstrates a significant difference between minority and majority citizenship rates. *Id.* at 1568. In *Negron*, 50.16% of the Hispanic residents of the city of Miami Beach were citizens as opposed to 88.18% of the non-Hispanic residents who were citizens. *Id*. at 1566-1568. Accordingly, a differential of over 38.02 percentage points between Hispanic and non-Hispanic citywide citizenship rates met the threshold of significance required for CVAP to be used in determining whether a proposed plan created a Hispanic majority district under *Gingles I*. *Id.* at 1571. Only once this initial threshold of significance was met, did the Court probe deeper and determine the percentage of Hispanic CVAP for each of the Miami Beach City districts at issue, finding that none had a majority under *Gingles I*. *Id.* at 1566-1568.

Applying *Negron* to the current set of facts does not mandate using CVAP data to assess the viability of Dr. Arringon's Illustrative Map 2. Specifically, at the county-wide level in Orange County, Latinos had a citizenship rate of 76%, compared to a non-Latino

[2] Prior to *Bartlett*, the U.S. Supreme Court in *LULAC v. Perry*, 548 U.S. 399 (2006) determined that the Texas legislature's redrawing of the lines in District 23 violated Section 2 of the Voting Rights Act as it caused the Latino share of the citizen voting-age population to drop from 57.5% to 46%. *Id.* at 447. However, the parties, in that action, did not dispute the use of citizenship data over voting age population data in assessing the viability of proposed plans under *Gingles I*. *Id.* As such, *LULAC*, cannot be read to have created a bright line rule requiring the use of CVAP in assessing the sufficiency of proposed plans under *Gingles I*. *Id.* at 427-428.

citizenship rate of 90.73%. (Doc. 58-3 at 16 (Table 2.)[3] A differential of only 14.73 percentage points between Hispanic and non-Hispanic citizenship rates in Orange County, as compared with a 38.02 percentage point differential in the City of Miami Beach, does not suggest a significant citizenship rate disparity among Latinos and non-Latinos. Therefore, even under the outdated pre-*Bartlett Negron* test, the use of CVAP data is not required to assess the sufficiency of Dr. Arrington's proposed maps under *Gingles I*. Under both *Bartlett* and *Negron*, VAP statistics, not CVAP statistics, govern the creation and analysis of proposed districts under *Gingles I*. *See also Dillard v. Baldwin Cnty. Comm'rs*, 376 F.3d 1260, 1269 (11th Cir. 2004) (applying VAP to assess the first *Gingles* precondition); *Johnson v. DeSoto Cnty. Bd. of Comm'rs*, 204 F.3d 1335, 1338 (11th Cir. 2000) (same); *Johnson v. Hamrick*, 155 F. Supp. 2d 1355, 1367 (N.D. Ga. 2001) *aff'd*, 296 F.3d 1065 (11th Cir. 2002) (finding that VAP was "the population generally accepted as legally relevant."). It is through this lens of *Gingles I* case law that one may appropriately assess Dr. Arrington's report and testimony.

Because VAP statistics are the standard governing the sufficiency of minority populations under *Gingles I*, Defendant's arguments against Dr. Arrington's report and testimony are without merit. Specifically, Defendant's contention that Dr. Arrington is not qualified to render an opinion about the number of Hispanics who are citizens of voting age in district 3 in his two proposed maps[4] is moot. Similarly, Orange County's attack of Dr.

---

[3] Note that at no point in Dr. Morrison's report or deposition testimony does he dispute the countywide citizenship rate calculated by Dr. Arrington. (*See generally* Docs. 59-1—59-5.)
[4] *See* (Doc. 57 at 5-6) for Defendant's discussion of this point.

Arrington's methodology in calculating the Hispanic CVAP within District 3 of his two proposed maps[5] is irrelevant.

Further, contrary to Defendant's claim that Dr. Arrington has never published in a demographic journal or publication, Dr. Arrington has, in fact, twice published in the leading geographic journal, *Political Geography*. (*See* Doc. 58-3 at 34-35.) Dr. Arrington is an experienced political scientist with a great deal of experience in voting rights cases. He has been called to draw illustrative maps as an expert under *Gingles I* in six cases, qualifying as an expert in each instance. (*See* Doc. 58-26.) To date, Orange County has not challenged Dr. Arrington's calculation of Latino VAP in District 3 within each of his proposed maps. (Doc. 59-1 at 40:11-41:25.) In fact, despite awareness that courts have used several different metrics to ensure compliance with *Gingles I*, Dr. Morrison only addressed Dr. Arrington's CVAP calculations in his own analysis. (*Id*.) This Court should not strike Dr. Arrington's report and testimony under *Daubert;* his analysis will not mislead this Court in its role as the trier of fact.

## IV. VAP Data Suffers None Of The Technical Limitations Posed By CVAP Data.

In order to appropriately assess Dr. Arrington's report and testimony as well as the arguments raised by Defendant in their effort to strike his work under *Daubert*, one must understand the strengths and weaknesses of different population statistics that can be used to construct or challenge a redistricting plan.

### a. CVAP data does not reflect recent Orange County Latino growth as it is based on aggregated small data samples from 2007-2011 2008, 2009, 2010, and 2011 and is only available at the block group level.

[5] *See* (Doc. 57 at 6-9) for Defendant's discussion of this point.

The American Community Survey ("ACS") is a nationwide survey from the U.S. Census Bureau that replaced the long-form portion of the 2000 decennial census, which collected demographic, social, economic, and housing data from certain decennial census respondents. (Doc. 59-14 at iv, 2 (Table 1); Doc. 59-1 at 52:19-67:17.) The ACS, like its long-form predecessor, collects data on citizenship and nationality. (Doc. 59-1 at 58:6-63:11; c*ompare* Doc. 59-10 at 4 (Questions 12-14) *with* Doc. 59-13 at 7 (Questions 7-9).) Four questions from the ACS survey, taken together with a respondent's location and age, are central to Orange County's misguided attack of Dr. Arrington's report and testimony: 1) "what is this person's ancestry or ethnic origin"; (2) "where was this person born?"; (3) "is this person a citizen of the United States?"; (4) "when did this person come to live in the United States?". (*Compare* Doc. 59-10 at 4 (Questions 12-14) *with* Doc. 59-13 at 7 (Questions 7-9).) These questions form the core of CVAP data, which Orange County claims Plaintiffs must use to meet their burden of proof.

While the decennial long form (Docs. 59-10—59-11) collected this CVAP data from roughly 16.7 percent of the population at the time respondents completed the form, the ACS, by contrast, collects a smaller sample size of CVAP data from select respondents on an annual basis, for only about 2.5 percent of the total U.S. population. (Doc. 59-14 at 3; Doc. 59-1 at 53:19-55:2.) This data is aggregated into one, three, and five year files for various uses. (Doc. 59-1 at 64:14-65:23.) The aggregation of individual year files allows data to be released for successively smaller geographic areas without violating privacy and confidentiality criteria, such as census tracts and census block groups but not census blocks

(the smallest geographic unit of data).[6] (Doc. 59-1 at 64:14-25.) The five-year aggregate file refers to smaller samples collected during each year of the five-year sample period. For example, the 2007-2011 five-year ACS sample, used by Dr. Morrison in this case, is made of small samples collected in 2007, 2008, 2009, 2010, and 2011. (*Id.* at 65:8-23.) The five-year sample does not collectively refer to, or provide a complete snapshot of, a particular point in time within that five-year period. It is based on an aggregation of data from several years. (*Id.* at 65:1-7.) "Simply put, there are no data to measure the present (2010) citizen voting age population." (Ex. 2 to Trasande Decl. at 8.) Therefore, using the five-year ACS file could fail to capture recent Latino growth within Orange County – a fact acknowledged by Orange County's own expert as a "limitation of available data." (Doc. 59-1 at 69:15-71:21; Doc. 59-15 at A-2; A-7.) Drs. Morrison and Arrington both agree that the Latino growth within Orange County has been significant with Hispanics comprising "26.9 percent of Orange County residents, up from 18.8 percent in 2000 and 9.6 percent in 1990." (Doc. 59-1 at 67:18-69:14.)

**b. VAP data is complete count data and available at the block level.**

VAP data is not based on aggregated survey data. It presents a complete snapshot of the United States at the smallest geographic block level at the time the decennial census is completed. (Doc. 59-12; Doc. 59-3—59-4 at 17¶¶32-33, 22¶44.) It is more contemporaneous and geographically specific than CVAP data. VAP data is not without drawbacks, however. The Census indisputably fails to count everyone, and the undercount is

[6] For the sake of reference, the smallest geographic unit is the census block. (Doc. 59-3 at 17; Doc. 59-14 at 23-25; Doc. 59-1 at 88:16-89:15.) The next level of geographic data is the census block group, comprising multiple census blocks. (Doc. 59-3 at 17; Doc. 59-14 at 23-25; Doc. 59-1 at 88:16-89:15) Census tracts, in turn, comprise a series of census block groups and census blocks. (Doc. 59-1 at 88:16-89:15.)

greatest in certain subgroups of the population, particularly Hispanics and African-Americans - a fact which Dr. Morrison does not dispute in his report (Doc. 59-4 at ¶ 42; Doc. 59-2 at 193:2-190:4; *see Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 322-23, (1999); *Tucker v. Dep't of Commerce*, 958 F.2d 1411, 1412-13 (7th Cir. 1992); David H. Kaye & David A. Friedman, Reference Guide on Statistics, in Reference Manual on Scientific Evidence 211, 224 n.29 (Federal Judicial Center ed., 3d ed. 2011).

The Census's undercount logically extends to Orange County's Hispanic population. Defendant rejects Plaintiff's application of the national undercount estimate of 1.5 percent to Orange County Hispanics. (Doc. 57 at 10-13.) However, Defendant ignores that the Census' undercount is not available by locality. Moreover, Defendant applies nationwide trends in citizenship over-reporting to localities like Orange County. In an effort to mitigate the census undercount, Dr. Morrison took the rate of citizenship over-reporting from a nationwide study based on a 2010 ACS one-year file and applied it to public use microdata sample ("PUMS") regarding the 2007-2011 five-year ACS file for District 3 within Arrington's Illustrative Map 2. (*See* Doc. 59-4 at 22-23 (Citizenship Misreporting); Doc. 59-2 at 193:2-215:22; Doc. 59-20.)

**c. Using CVAP to determine whether Latinos comprise a majority within District 3 of Dr. Arrington's Illustrative Map 2 transposes data.**

Given the Census Bureau's decision to move away from the long-form and aggregate yearly samples of demographic data, determining the CVAP at the census block level for purposes of assessing the presence of a Latino majority presents "a new problem with the American Community Survey" (Doc. 59-1 at 44:1-44:25). In responding to this problem, Dr. Morrison maintains that to estimate the Hispanic CVAP within District 3 of Dr. Arrington's

Illustrative Map 2, one must integrate the decennial census count of the VAP (the number of persons over the age of eighteen) in each individual census block with the five-year ACS estimate of the percentage of CVAP (citizens over the age of eighteen). (Doc. 59-3 at ¶ 32.) Accordingly, Dr. Morrison asserts that "[w]here a district is composed partly of individual blocks (rather than whole [block groups]), demographers allocate the total CVAP of a parent [block group] to those individual blocks within the district based on the [VAP] (which is complete-count data)." (*Id*. at 17¶33.) As such, to calculate the estimated Hispanic CVAP for District 3, Dr. Morrison used "the fraction of Hispanic VAP in each block of a [block group] to allocate the Hispanic CVAP for a [block group] among its individual blocks." (*Id.* at 17¶33.)

Dr. Morrison claims that "[a]ccepted demographic practice posits that the distribution of VAP is the one available measure that can closely reflect the distribution of CVAP across the individual blocks of any given [block group]." (*Id*. at 18, n.9.) Yet, Dr. Morrison can cite no scholarly articles in support of his position. (Doc. 59-1 at 44:1-44:25; 110:20-111:12.) Despite the admittedly new nature of this problem (*id*. at 44:1-44:25) and the inability of Orange County's own expert to cite any scholarly support of his methodology (*id*.), Defendant faults Dr. Arrington's methodology as well as his own lack of scholarly support. (*See* Doc. 57 at 13.) Such arguments by Defendant are misleading given the shortcomings presented by Dr. Morrison's own methodology.

Similarly, Defendant's attack of Dr. Arrington's use of the word "probably" in connection with his estimate Hispanic CVAP in District 3 of Illustrative Map 1, misses a larger drawback to CVAP data. Because CVAP is survey data and not complete count data,

like VAP data (Doc. 59-4 at 22¶44), all CVAP calculations are inherently estimates. For this reason, the Census Bureau encourages individuals to "include the MOE [margin of error] along with the estimate when producing reports." (Doc. 59-15 at A-7.) Yet, in faulting Dr. Arrington for not providing the MOE regarding his calculations (Doc. 57 at 15-16), Defendant ignores that Dr. Morrison failed to provide such data regarding his calculations, choosing instead to ascribe a 92.5% confidence level to his conclusions regarding the Hispanic CVAP within District 3 of Dr. Arrington's Illustrative Map 2. (Doc. 59-1 at 112:11-135:12; *see generally* Docs. 59-3—59-5.) Further, Dr. Morrison admitted that there is a 7.5% chance that the Hispanic CVAP within District 3 of Dr. Arrington's Illustrative Map 2 exceeds 50%. (Doc. 59-1 at 135:10-13.)

**d. Dr. Morrison has openly criticized CVAP in past expert testimony.**

Dr. Morrison's position regarding CVAP data in this matter contradicts his position in other cases in which he has testified. In *Committee For A Fair and Balanced Map v. Illinois State Board of Elections*, Case No. 1:11-CV-5065, 835 F. Supp. 2d 563 (N.D. Ill. 2011) ("*Committee For A Fair and Balanced Map*"*)*, Plaintiffs brought Section 2 vote dilution claims regarding the manner in which Latinos have become excessively concentrated among potential voters in Adopted Commission District ("CD") 4 and disproportionately excluded from Adopted CD3 and CD5, which formerly had the second and third largest Latino VAP shares. (Trasande Decl. Ex. 2 at 6-7.) Dr. Morrison's opening report for Plaintiffs compared the concentration of Latinos among potential voters in CD3, CD4, and CD5 within the adopted plan against those proposed by Plaintiffs, asserting that CD3 and CD5 would not have suffered such drastic reductions in VAP had the adopted plan performed more

"ethnically neutral" territorial trades. (*Id*. at 3.) Though Dr. Morrison was not tasked with drawing a *Gingles I* map in *Committee For A Fair and Balanced Map*, the case presented the same issues related to the use of ACS data in determining Orange County CVAP.

Specifically, in his rebuttal report for that case, Dr. Morrison enumerates the recency issues presented by ACS CVAP data already addressed (*see supra* at § IV (A) at 9-11; Trasande Decl. Ex. 2 at 8 (Points 1-2)), while also discussing other factors rendering ACS data inaccurate and unreliable, undermining "one's confidence in them as a basis for estimating CVAP". (Trasande Decl. Ex. 2 at 8; Doc. 59-1 at 71:25-87:11.) Dr. Morrison addresses data suppression; the failure of ACS data to account for the "aging up" of a population; and, the geographic disparities presented by how the 2005-2009 ACS five-year data sample is taken using 2000 Census Geography – such that CVAP data can be reported in "one census tract in 2000 and a different census tract in 2010". (Trasande Decl. Ex. 2 at 8-9 (Points 3-5).)

The failure of ACS data to account for the "aging up" of a population is of special relevance here. Dr. Morrison explains:

> Since the ACS estimates available at smaller geographic units are based on data collected over a five-year period, they likely underestimate the CVAP population in some areas today (or on April 1, 2010 when Census data were collected) because the Census Bureau takes no steps to "update" old ACS data. Most notably, the ACS does not account for aging of the population sampled, but rather reports individuals at the age they were when data were collected. Accordingly, a citizen who was 13 in 2005 when the ACS collected information about her still appears as a 13-year-old today even though in reality she is now over 18 and of voting age. The failure to address aging has a particularly strong impact on the CVAP rates of racial/ethnic groups that have higher rates of citizenship among children than adults, such as Latinos and Asian Americans. Specifically, the failure to "age up" teenage citizens results in five-year aggregated ACS data underestimating Latino and Asian CVAP, in particular.
>
> (*Id*. at 8-9.)

When questioned during his deposition regarding all of the ACS deficiencies raised in his rebuttal report, Dr. Morrison agreed that all of the points raised therein remain ongoing issues in the use of ACS data. (Doc. 59-1 at 77:25-87:11.)

Dr. Morrison again criticized the use of 5-year ACS data when he served as an expert in *Baldus v. Members of Wisconsin Accountability Bd*., Nos. 11-C-562 JPS-DPW-RMD, 11-CV-1011 JPS-DPW-RMD (E.D Wisc. 2012) ("*Baldus*"). Following a two-day trial, the court concluded that, as drawn, Wisconsin State Assembly Districts 8 and 9 violated Section 2 of the VRA and had to be redrawn. *Baldus,* 849 F. Supp. 2d 840 (E.D. Wisc. 2012). The parties were then directed to submit suggested maps that would correct the Section 2 violation, while also complying with the U.S. Constitution, the Wisconsin Constitution, and associated case law. *Baldus,* 862 F. Supp. 2d 860 (E.D. Wisc. 2012). In connection with two maps presented by Defendants, who objected "to the need to take citizenship into account for the Latino community," Dr. Morrison, determined the non-citizenship rate using "the out-dated one –year 2008 American Community Survey (ACS) 35.75% rate for the state of Wisconsin" rather than the five-year ACS file "'universally considered to produce better estimate than the ACS's annual surveys' for the simple reason that it uses five times as much data." *Baldus,* 862 F. Supp. 2d at 862-863. Dr. Morrison's reasoning becomes apparent in his *Baldus* deposition testimony where he dismisses the validity of the five-year ACS file, stating that: "**the margins of error are so large that it renders the data essentially useless** for measuring anything at the block group level." (Trasande Decl. Ex. 5-11 at 107-108 (emphasis added).) Claiming data suppression as the justification for his disparate approach in analyzing Milwaukee County as compared with Orange County (Doc. 59-1 at 159:10-

162:1), Dr. Morrison ignores that Milwaukee County's size is comparable with that of Orange County, FL. (*Compare* Trasande Decl Ex. 7 *with* Ex. 8.)[7]

**V. Dr. Arrington Timely Disclosed His Data and Calculations.**

At the outset, Defendant's reading of the Case Management Order (Doc. 25) is overbroad. The block allocation or geographic information system ("GIS") file referred to by counsel for Defendant (Doc. 57 at 23) is best described as working notes leading up to the final illustrative maps turned over to Orange County on March 1, 2013 (Doc. 58-3 at 17-19), together with Dr. Arrington's report explaining his methodology as well as his VAP and CVAP findings for District 3 within each of the Illustrative Maps proposed. (Doc. 58-3 at 6-14). Working notes and recordings need not be produced as part of the Fed. R. Civ. P. 26(a)(2)(B) report requirement but rather are subject to document requests or subpoenas. *See e.g. Gillespie v. Sears, Roebuck & Co.*, 386 F.3d 21, 33-34 (1st Cir. 2004) (trial court erred in permitting cross-examination and closing argument concerning expert's "failure" to produce all working notes and videotapes prepared while running tests prior to preparing his report, when no document request or subpoena for notes was issued, because the rules do not contain such a requirement). Relying on this construction of Dr. Arrington's block allocation file, Plaintiffs timely disclosed Dr. Arrington's GIS file on May 1, 2013, in response to Defendant's First and Second Requests for Production of Documents, served on March 29, 2013 and April 16, 2013. (*See* Doc. 58-2 at ¶6-7; Trasande Decl. Exs. 9 at 5-6, Ex. 10, Ex. 11 at 6-11; Doc. 58-4.) Alternatively, even should one broadly construe Fed. R. 26(a)(2)(B) as proposed by Defendant (*see* Doc. 57 at 23), such that Dr. Arrington's block allocation file

[7] Plaintiffs respectfully request that the Court take judicial notice of this publicly available U.S. census data.

should have been included with his expert report, Defendant has not shown, let alone alleged, the prejudice required to strike Dr. Arrington's report.

As a general matter, courts "vastly prefer[] to decide cases on their merits," rather than exclude evidence. *Collins v. United States*, 3:08-cv-923-J-32JRK, 2010 U.S. Dist. LEXIS 119095, at *15 (M.D. Fla. Nov. 9, 2010) (internal citation omitted). Moreover, the exclusion of critical evidence is an extreme sanction, which is not normally imposed absent a showing of willful deception or flagrant disregard of a court order by the proponent of the evidence. *Id.* Specifically, Fed. R. Civ. P. 37(c)(1) states that:

> [i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial**, unless the failure was substantially justified or is harmless**. **In addition to or instead of this sanction**, the court, on motion and after giving an opportunity to be heard: (A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure; (B) may inform the jury of the party's failure; and (C) may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)-(vi).

Fed. R. Civ. P. 37(c)(1) (emphasis added). Accordingly, even without substantial justification or a showing of harmlessness, exclusion is not mandatory; it is a last resort. *Collins*, 2010 U.S. Dist. LEXIS 119095, at *15 . A court has discretion to formulate the appropriate remedy or penalty, short of exclusion. *Collins*, 2010 U.S. Dist. LEXIS 119095, at *15; *see also* Fed. R. Civ. P. 37(c)(1).

Notwithstanding, Plaintiffs maintain that Defendant has suffered no harm in the delayed receipt of Dr. Arrington's block allocation file regarding his Illustrative Maps. When determining if a failure to disclose was substantially justified or harmless, courts consider:

> (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence.

*Rembrandt Vision Tech., L.P. v. Johnson & Johnson Vision Care, Inc.*, 282 F.R.D. 655 (M.D. Fla. 2012) (quoting *Mobile Shelter Sys. USA, Inc. v. Grate Pallet Solutions, LLC*, 845 F. Supp. 2d 1241, 2012 U.S. Dist. LEXIS 4535, at *7 (M.D. Fla. Jan. 14, 2012). "The burden of establishing that a failure to disclose was substantially justified or harmless rests on the nondisclosing party." *Mitchell v. Ford Motor Co.*, 318 F. App'x 821, 824 (11th Cir. 2009).

Here, Defendant received Dr. Arrington's GIS file on May 1, 2013 (Doc. 58-4), three months before Orange County's expert deadline of August 1, 2013 (Doc. 25) and six months before the close of discovery on November 1, 2013 - facts conveniently omitted by Defendant in their motion to strike (Doc. 57 at 23.) Accordingly, while Defendant opted to depose Dr. Arrington on July 16, 2013 (Doc. 58-1 at 1), plenty of time remained in the discovery schedule, should the delayed GIS file have posed such a substantive issue in Orange County's preparation. Moreover, none of Defendant's attacks on Dr. Arrington's report to date rely or address the precise contours of his Illustrative Maps – a matter for which Dr. Arrington's GIS file would theoretically be necessary. At no point has Defendant substantively discussed how the shapes of Dr. Arrington's illustrative maps ignore or address traditional redistricting factors. Instead, Defendant's principal attack of Dr. Arrington's report and testimony has centered on the methodology employed in his CVAP calculations on the Hispanic population within District 3 of his Illustrative Map 2. Therefore, any delay on the disclosure of Dr. Arrington's GIS file was harmless to Defendant. There has been no disruption to the trial or discovery schedule. The harmless nature of this error is

demonstrated by the fact that Defendant did not request a continuance or even suggest that additional time would be helpful in light of the delay to the GIS file. As such, Dr. Arrington's report and testimony cannot be excluded on this basis. *See, e.g., McClain v. Metabolife Int'l, Inc.*, 193 F. Supp.2d 1252 (N.D. Ala. 2002) (declining to exclude untimely expert report where Defendant suffered no prejudice and any deficiencies were "harmless" where Defendant deposed expert "and is not now arguing that it was caught in some sort of 'ambush'" nor did appear that Plaintiffs' were attempting to "'hide the ball' in any way").

## VI. CONCLUSION

For the foregoing reasons, the Court should deny Defendant Orange County's *Daubert* Motion to Exclude Theodore Arrington's Report and Testimony (Doc. No. 57).

Dated: December 13, 2013

Respectfully submitted,

s/ Nancy M. Trasande

Nancy M. Trasande (*Pro hac vice*)
Juan Cartagena (*Pro hac vice*)
LatinoJustice PRLDEF
99 Hudson St. - 14th Floor
New York, NY 10013
Tel: (212) 219-3360
Fax: (212) 431-4276
Email: jcartagena@latinojustice.org
Email: ntrasande@latinojustice.org

Octavio Gustavo Padron
Florida Bar # 0012401
517 W. Colonial Dr.
Orlando, FL 32804
Tel: (407) 841-7373, ext. 204
Email: Gpadron@suarezcti.com

*Attorneys for Plaintiffs*