**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

| | | |
|---|---|---|
| ZORAIDA RIOS-ANDINO,<br>NEY RIVERA GARCIA,<br>JASMINE GUADALUPE,<br>ROSARIO MARTINEZ,<br><br>Plaintiffs,<br><br>v.<br><br>ORANGE COUNTY ,<br><br>Defendant. | ) | Case No.: 6:12-cv-1188-Orl-22KRS |

**PLAINTIFFS' OPPOSITION TO DEFENDANT ORANGE COUNTY'S DISPOSITIVE MOTION FOR SUMMARY JUDGMENT**

Plaintiffs submit this Statement of Facts, Legal Memorandum, and Declaration of Nancy M. Trasande ("Decl."), annexing supporting materials, in opposition to *Orange County's Dispositive Motion for Summary Judgment* (Docket Number Entry "Doc." 64).[1]

**STATEMENT OF FACTS**[2]

1. Prior to the 2010 redistricting process, Ms. Zoraida Rios-Andino lived in District 3. Following Ordinance 2011-14's passage, she was moved to District 4. (*Compare* Doc. 64 at ¶3 *with* Doc. 65-1 at 6:11-18; 53:1-24.) In addition to wanting a majority Hispanic District 3

[1] Please note that all fact citations to items already on the Court's docket will use the original internal page numbering of the source document, not that applied automatically once the document is uploaded to CM/ECF.
[2] Plaintiffs categorically deny Defendant's Undisputed Facts ¶¶35, 37, 39, 40, 41, 48; 50, 51, 52, 53, 63, 65, 66, 68, 72, 73, 74 as they state legal conclusions regarding traditional redistricting factors or mischaracterize Section 2 Voting Rights Act ("VRA") standards, rather than present facts-in-evidence; any redistricting or population density maps attached as exhibits speak for themselves. Plaintiffs further object to Defendant's Undisputed Facts ¶¶46, 47, 54, 66, 69 as speculative since Defendant fails to cite any authority or attach corresponding exhibits in derogation of Defendant's evidentiary burden. Plaintiffs admit Defendant's Undisputed Facts ¶¶1-7, 9-11; ¶¶12-20; ¶¶22, 25-27; ¶¶ 28, 30-33; ¶¶34, 36, 38, 42; ¶¶43-45; ¶¶ 55-58; ¶¶ 59-61; ¶¶ 62, 64, 70; ¶¶75, 76, 77, 78; ¶¶79-80, denying all others as stated above and correcting any misstatements or mischaracterizations, not admitted, as stated herein.

(Doc. 65-1 at 29:23-30:9), Ms. Rios-Andino wants her District 4 neighborhood, returned to District 3. (*Id*. at 30:10-13; 71:18-20.) Under Plan E (Decl. Ex. 5), Ms. Rios-Andino resided in District 3, (Doc. 65-1 at 71:3-74:15), which she believed had a majority Hispanic voting age population ("VAP") (*id*. at 50:9-14).

2. Defendant mischaracterizes certain of Ms. Rios-Andino's statements. Regarding race-based redistricting, Defendant omits her statement that any preferential treatment of Hispanics "depends on the situation. Like what we're discussing here with the voting, you know, looking at the history and what's happening, it's not my opinion, but, yeah, in order for Hispanics, I think, to get a fair representation on their issues, you need to have someone that's familiar with their issues." (*Compare* Doc. 64 at ¶8 *with* Doc. 64-1 at 111:14-111:19.) Similarly, according to Ms. Rios-Andino, "Pete Clarke was not the Hispanic Candidate of Choice." (*Compare* Doc. 64 at ¶10 *with* Doc. 65-1 at 101:14-16.)

3. **Ms. Jasmine Guadalupe** believes there was unlawful Latino vote dilution. (Doc. 66-1 at 37:10-14.) Ms. Guadalupe does not think that Orange County is required to favor Hispanics to create a majority Hispanic district. (*Id*. at 38: 10-13.) Ms. Guadalupe wants a fair map that reflects the community and does not dilute the Latino vote. (*Id*. at 40:24-41:2; 43:6-9; 55:6-14.) Ms. Guadalupe experienced a long-wait when voting early in the 2012 election. (*Compare* Doc. 64 at ¶20 *with* Doc. 66-1 at 61:24-62:2.)

4. **Mr. Ney Rivera Garcia** moved to the U.S. (Orange County) from Puerto Rico just over two years ago, but previously lived in New York, North Carolina, and Chicago for a total of six years. (*Compare* Doc. 64 at ¶21 *with* Doc. 67-1 at 15:20–17:12.) Mr. Garcia challenges the current map because it discriminates against Latinos by diluting their voting

strength. (Doc. 67-1 at 44:14-21.) Mr. Garcia understands the competing interests of redistricting, but does not accept the BCC's balancing of those interests. (*Compare* Doc. 64 at 21 *with* Doc. 67-1 at 73: 8-23.) Mr. Garcia believes that a "pro-Latino" candidate does not have to be Latino. (*Compare* Doc. 64 at ¶24 *with* Doc. 67-1 at 34:24 – 35:5; 73:24-77:16.)

5. **Rosario Martinez** has lived in Orange County since 1994, within District 4, from 1994 to 2007 and District 5 since 2007 (*compare* Doc. 64 at ¶28 *with* Doc. 68-1 at 4:15-5:3), and in the United States for 36 years (Doc. 68-1 at 4:15-5:7). Mr. Martinez joined this lawsuit to ensure that Orange County Latinos have the opportunity to elect a candidate of their choice. (*Id*. at 70:6-8; 14:1-7; 54:7-11.) Mr. Martinez is opposed to Hispanic preferential treatment; instead, he seeks balance in the redistricting process (*Id*. at 43:25-44:10; 52:9-21) while simultaneously avoiding Latino vote dilution (*Id*. at 69:5-13). Mr. Martinez's request to have District 3 geographically remain the same may have been based on the assumption that District 3 had a Hispanic majority before the 2011 map was passed. (*Compare* Doc. 64 at ¶ 29 *with* Doc. 68-1 at 69:23-70:8).

6. **The public did not have sufficient access to the Redistricting Advisory Committee ("RAC").** The RAC received persistent complaints about RAC member selection (*compare* Doc. 64 at ¶63 *with* Decl. Ex. 9 ¶14) and the lack of Puerto Rican representation on the RAC (*Compare* Doc. 64 at ¶63 *with* Doc. 69-5 at 77:13-80:11; 144:8-13; 155:6-16; Decl. Ex 10; Doc. 69-3 at 133:4-17; 141:1-116; 144:18-145:2).

7. RAC members did not receive Citizenship Voting Age Population ("CVAP") data for any of the plans reviewed in connection with the 2011 redistricting process; VAP data was provided. (Doc. 73-1 at 123:22-124:19; Doc. 73-1 and 73-2 at 124:20-125:1.)

8. District 3 witnessed the largest Latino population decrease of the 6 commission districts. (Doc. 62-5 at ¶ 12.) The current 2011 District 3 is 38.3% Latino VAP, while the current 2011 District 4 is 40.0% Latino VAP. (Doc. 58-3 at 9¶18; Decl. Ex. 6 at 4.) The former 2001 District 3 had a Latino VAP of 41.07% and the former 2001 District 4 had a 35.14% Latino VAP. (Decl. Ex. 6 at 4.) There was an 83% increase in total Latino population countywide from 2000 to 2010. (Doc. 62-5 at ¶ 12.) The County approved a plan that moved a large portion of District 3's population into the adjacent District 4. (Doc. 62-5 at ¶ 14.) Members of the Hispanic community communicated their desire for a majority-Latino district to the RAC. (Doc. 73-1 at 173:4-176:15; Decl. Ex. 15.)

9. Orange County precinct lines are drawn after the County Commission redistricting process is complete. As such, existing precinct lines are changed to coincide with the new district boundaries. (Doc. 70-2 at 213:7-214:8; Doc. 74-1 at 80:1-81-17; Doc. 58-3 at ¶30.)

10. **The Hispanic population in Orange County has grown significantly**. According to the 2010 Census, Latinos in Orange County doubled between 2000 and 2010, from 168,361 in 2000 to 308,244 in 2010. (Decl. Ex. 9 ¶9.) By the 2010 Census, Orange County Hispanics numbered 308,244, or 26.9% of the total population. (Decl. Ex 1 at ¶12.) The Hispanic VAP numbered 220,285, or 25.2% of the total population. (*Id.*) The Orange County Hispanic population growth from 2000 to 2010 thus represents 56% of the county's total population growth and 50% of the growth in VAP. (*Id*.)

11. Latinos were 18.78% of the county population in the 2000 census, 26.9% in the 2010 census and increased to 27.5% in the 2011 ACS estimate. (Doc. 59-1 at 67:18-69:14; Doc. 58-3 at 9-10¶22; Doc. 59-4 at ¶65.) Puerto Ricans were the largest subgroup under the

"Hispanic or Latino (of any race) category" at 48.5%. (Decl. Ex. 9¶12; Ex. 1 ¶19.) As a share of all persons eligible to vote, Hispanics comprise 22.4% of the CVAP as of 2009 to 2011, up from 15.1% in 2000. (Doc. 59-1 at 67:18-69:14; Doc. 59-4 at ¶65.) The 2010 U.S. Census undercounted Latinos. (Doc. 58-3 at 9¶22; Doc. 59-2 at 189:24-190:4; Decl. Ex. 38); Doc. 69-3 at 114:15-16.)

12. **Dr. Arrington** weighed traditional redistricting factors in preparing Illustrative Maps 1 and 2 for his *Gingles I* analysis. (Doc. 58-1 at 38:17-39:20.) Race was not the predominant factor underlying Dr. Arrington's design process. (*Id.*) District 3 of Illustrative Plan 1 is 52.7% Latino VAP. (Doc. 58-3 at 8-9¶20; Decl. Exs. 7-8, 36-37.) Illustrative Plan 1 has a smaller total population deviation from the smallest to the largest district than does the current plan, -5.16% in Illustrative Plan 1 as opposed to 7.53% in the current plan. (Doc. 58-3 at ¶26.) Illustrative Plan 1 has a mean Polsby-Popper score of .37, while the current plan has a higher school of .40. The Reock score for Illustrative Plan 1 is .45, which the score for the current plan is only .40. (*Id*. at ¶28.) Illustrative Plan 1 splits the same five incorporate areas as the current plan. (*Id*.) Illustrative Plan 2 has a Latino VAP of 54.6%. (Doc. 58-3 at ¶31; Decl. Ex. 7-8, 36-37.) The total population deviation in the current plan is 7.53%, while in Illustrative Plan 2 it is 7.50%. (Doc. 58-3 at ¶31). Illustrative Plan 2 splits the same five incorporated areas as the other plans. (*Id*.) Illustrative Plan 2 splits 16 precincts (Voter Tabulated Districts) on the border of District 3. (*Id*. at ¶ 30.) The current plan also split pre-existing precincts as precinct lines were changed to coincide with new district boundaries. (*Id*.) The Black opportunity district in the Current Plan is strengthened slightly in Illustrative Plans 1 and 2 than in the current 2011 plan. (*Id*. at ¶ 34.)

13. **Dr. Morrison** admits that use of the ACS five year data sample might not reflect recent Latino population changes. (Doc. 59-1 at 66:16-25; 67:2-17; 69:15-70:14; 70:15-71:21.) Dr. Morrison does not know the margin of error associated with his CVAP calculations. (*Id*. at 119:8-21; 120:15-121-13; 132:19-133:1.) Though Dr. Morrison claims that "[a]ccepted demographic practice posits that the distribution of VAP is the one available measure that can closely reflect the distribution of CVAP across the individual blocks of any given [block group]" (Doc. 59-3at 18, n.9), Dr. Morrison can cite no scholarly articles in support of his position and admits this is a new problem. (Doc. 59-1 at 44:1-44:25; 110:20-111:12.) In the past, Dr. Morrison acknowledged the deficiencies of ACS data. (Doc. 59-1 at 143:16-166:7; 166:5-169:12; Doc. 79-4 a 7-9; 79-17 at 107-108.) Dr. Morrison admitted that there is a 7.5% chance that the District 3 Hispanic CVAP within Illustrative Map 2 exceeds 50%. (Doc. 59-1 at 135:10-13.)

14. Using six different forms of statistical analysis (Doc. 62-5 at 7-16), **Dr. Barreto** conducted a *Gingles II* and *III* analysis, in which he reviewed thirty-two non-partisan elections in Orange County, eight endogenous elections and twenty-four exogenous elections, to determine whether Latinos vote differently from non-Latinos and whether non-Latino bloc voting against Latinos is diluting their vote and preventing them from winning office under the recent redistricting plan adopted by the County in 2011. (*Id*. at ¶¶10, 19, 21, 22.) His *Gingles II* analysis revealed "[t]here is no question that Latinos are a cohesive political unit, voting in strong support for Latino candidates." (*Id*. at ¶ 33). In twenty-two instances, the degree of Latino cohesiveness exceeded 70%. (*Id*. at ¶ 35.) Dr. Barreto's *Gingles III* majority block voting analysis determined that non-Latino voters cast a

statistically lower vote for Latino candidates than do Latinos by large margins, constituting bloc voting against Latino-preferred candidates. (*Id*. at ¶42.) This evidence coupled with Latino population decreases to the 2011 District 3 demonstrates that Latino candidates will have a very hard time winning office in the newly drawn District 3. (*Id*. at ¶42.)

15. **Dr. Hood**, only analyzed the eight endogenous elections in Dr. Barreto's analysis, using only one form of statistical analysis, King's EI. (Doc. 61-4 at 13-20.) Dr. Hood concedes that Latinos in Orange County are politically cohesive. (Doc. 61-4 at 3 ("[v]oter polarization is evident in many of the elections analyzed as Hispanics and non-Hispanic voters often have different candidates of choice").)

16. **Anti-Latino sentiment persists within Orange County**. The U.S. Department of Justice ("DOJ") filed suit against County officials in 2002, alleging Section 203 VRA violations. (Decl. Ex. 18-22, 30.) The parties ultimately settled this action with a consent decree. (Decl. Ex. 18 at ¶¶1, 2, 4, 6, 15.) Notwithstanding release from federal supervision (Decl. Ex. 21), the quality of the Spanish translations used by the Orange County Supervisor of Elections ("SOE") remains questionable according to many residents. (Decl. Ex. 24 at 5-6; Ex. 25 at 11; Ex. 26 at 2-4; Ex. 27 at 2.)

17. The predominant complaint received by the SOE remains one of frustration regarding why ballots are printed in Spanish and in English. (Doc. 70-1 at 129:13-130:1; Doc. 70-2 at 224:24-225:24; *see e.g.* Decl. Ex. 23 at 4, 7-22; Ex. 24 at 2-12; Ex. 25 at 2-10, 12-18; Ex. 27 at 2; Ex. 29 at 2, 10, 13; Ex. 30). Some question the financial resources allocated to bilingual ballots, such as "[w]hy are my tax dollars being wasted on multilingual documents?" (Decl. Ex 23 at 7). Many SOE comments, however, suggest a xenophobic anti-immigrant

community bias in Orange County as a whole, such as "[i]f someone cannot speak or read English perhaps they are not citizens and do not have the right to vote. Perhaps INS should station these officers at the polls to check if those requesting a foreign language ballot are truly U.S. Citizens + eligible to vote" (Decl. Ex. 23 at 13.) Such comments are in keeping with societal assumptions that Puerto Ricans and other U.S.-born Hispanics are undocumented and in the U.S. illegally. (Decl. Ex. 1 at ¶46-47.)

18. Xenophobic comments were directed at community efforts to create a Hispanic-majority district, as follows: "I understand that Orange County wants to redraw the voting districts to reflect the fact that there is an 80% increase in the Hispanic population. Do you realize that that huge increase is a rise in the illegal alien population? Do you realize that these people are NOT US citizens? Do you understand that the vast majority of these illegal aliens DO NOT pay taxes? Do you understand that they are here in violation of US laws? Taking all of this into consideration, why are you bending over backward to give a greater voting voice to people who are NOT taxpayers, who DO NOT have permission to be in the USA and are in violation of our laws?") (Decl. Ex. 28 at 2.)

19. **Latino societal disadvantages persist**. Latino unemployment (12.1%) is higher than it is for whites (8.1%). (Decl. Ex. 1 at ¶ 28.) Hispanic median household incomes over the past twelve months were more than $19,000 less than for white households, and the percentage of Latino households with income below the poverty level was over three times that of White households. (*Id*. at ¶29.) The percentage of Latinos without a high school-level education was three times that of whites and, at the Bachelor's level, Latinos trailed whites by 17.4%. (*Id*. at ¶30.) An estimated 50.1% of Orange County Hispanic households

own the housing units that they occupy, compared to 67.9% of non-Hispanic white households. (*Id.* at ¶27.) As per Dr. Silver, "[t]he lower socioeconomic status of Hispanics vis-à-vis non-Hispanic whites in Orange County; accumulated experiences of racial discrimination and socioeconomic disrespect; and frequent neglect or non-responsiveness of local government have impeded Hispanic ability to participate in local government on equal footing with non-Hispanics." (*Id.* at 4¶9.)

## ARGUMENT

Summary judgment is only appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law". Fed. R. Civ. P. 56(c). In assessing the record, this Court must resolve all ambiguities and draw all inferences in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *see also WSB-TV v. Lee*, 842 F.2d 1266, 1270 (11th Cir. 1988). Defendant has failed to discharge its initial burden. Accordingly, this Court should deny Defendant's motion.

### I. Plaintiffs' Section 2 VRA Claim Survives Summary Judgment.

To establish vote dilution, Plaintiffs must prove three threshold requirements by a preponderance of the evidence: (1) that the minority group is sufficiently large and geographically compact to constitute a majority in the district ("*Gingles I*"); (2) that the minority group is politically cohesive ("*Gingles II*"); and, (3) that the majority group votes sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate ("*Gingles III*"). *Thornburg v. Gingles*, 478 U.S. 30, 49 (1986). Once complete, the Court determines if, based on the "totality of circumstances," minorities have been denied an equal

opportunity to participate in the political process and to elect the representatives of their choice. *See Abrams v. Johnson*, 521 U.S. 74 (1997).

### A. The Latino Population in Proposed District 3 Is Sufficiently Large and Geographically Compact to Constitute a Majority.

*Gingles I* "require[s] plaintiffs to show that it would be possible to design an electoral district, consistent with traditional districting principles, in which minority voters could successfully elect a minority candidate." *Davis v. Chiles*, 139 F.3d 1414, 1425 (11th Cir. 1998). Accordingly, Plaintiffs' *Gingles I* burden involves demonstrating a possible remedy, not a remedial plan for immediate implementation. *See Chiles*, 139 F.3d at 1425*; see also Sanchez v. Colorado*, 97 F.3d 1301, 1314-15 (10th Cir. 1996).

Consequently, remedial maps drawn with an eye toward addressing racial and ethnic population considerations under Section 2 cannot simply be rejected as unconstitutional race-based redistricting as Defendant claims (*see* Doc. 64 at 21-22). Supreme Court and Eleventh Circuit "precedents *require* plaintiffs to show that it would be possible to design an electoral district, consistent with traditional redistricting principles, in which minority voters could successfully elect a minority candidate." *Chiles*, 139 F.3d at 1425 (emphasis in original). It is for this reason that courts "must first determine whether *Gingles* is met before ensuring that the proposed remedy complies with the Equal Protection Clause." *Ga. State Conference of the NAACP v. Fayette County Bd. of Comm'rs*, No. 3:11-cv-123-TCB, 2013 U.S. Dist. LEXIS 84191, at *30 (N.D. Ga. May 21, 2013). Redistricting "performed with consciousness of race," *Bush v. Vera*, 517 U.S. 952, 958 (1996), does not necessarily trigger strict scrutiny and remedial Section 2 districts have survived strict scrutiny, even where racial considerations "predominated". *See Ga. State Conference of the NAACP*, 2013 U.S. Dist.

LEXIS 84191, at *26-*29 (declining Defendants' invitation to consider as part of a *Gingles I* inquiry whether Plaintiffs' Illustrative Plan subordinates traditional redistricting principles violating equal protection per *Miller v. Johnson*, 515 U.S. 900, 916 (1995)). Defendant does not dispute that curing a Section 2 violation constitutes a compelling state interest. *See Chiles*, 139 F.3d at 1425 n.23. Hence, Orange County's conclusory allegations reveal a fundamental misapprehension of both *Gingles* and the equal protection doctrine.

**i. VAP Statistics Govern The Creation Of Proposed Districts Under *Gingles I*.**

In determining the numerosity requirement of *Gingles I,* the United States Supreme Court in *Bartlett* held that a minority group must constitute more than 50% of the VAP in a proposed majority-minority district. *Bartlett v. Strickland*, 129 S. Ct. 1231, 1242, 1245 (2009) (referring to "voting-age population" fourteen times); *see Broward Citizens for Fair Dists. v. Broward Cnty.*, 12-60317-CIV, 2012 WL 1110053, at *4 (S.D. Fla. April 3, 2012) (citing *Bartlett* for the proposition that VAP is the correct measure for *Gingles I.*) *Bartlett's* omission of the word "citizen" cannot –and should not– be considered insignificant, particularly given the Court's explicit preference "for workable standards and sound judicial and legislative administration."[3] *Bartlett*, 129 S. Ct. at 1244.

Defendant's reliance on *LULAC v. Perry*, 548 U.S. 399 (2006), is, therefore, unavailing. Prior to *Bartlett,* the U.S. Supreme Court in *LULAC* determined that the Texas Legislature's District 23 redrawing violated VRA Section 2 as it caused the Latino share of the CVAP to drop from 57.5% to 46%. *Id. at* 447. However, the parties, in that action, did

[3] "Requiring [VAP] as the population basis for a section 2 claim avoids all the data problems inherent in employing ambiguous and contestable citizenship estimates." Nathaniel Persily, *The Law of the Census: How to Count, What to Count, Whom to Count, and Where to Count*, 32 Cardozo L. Rev. 755, 780 (2011).

not dispute the use of citizenship data over VAP data in assessing the viability of *proposed* plans under *Gingles I*. *Id.* As such, *LULAC* cannot be read to have created a bright line rule requiring the use of CVAP at the preliminary *Gingles I* stage. *Id.* at 427-428.

Assuming *arguendo* that *Bartlett* does not require the exclusive use of VAP data, the facts of this case still require its application. Even per *Negron v. City of Miami Beach*, 113 F.3d 1563 (11th Cir. 1997), cited by Defendant, VAP data remains the appropriate *Gingles I* metric as there is no significant difference in citizenship rates between the Latino and Non-Latino populations in Orange County. *Negron* clearly limited the use of citizenship data "*only* where there is reliable information indicating a significant difference in citizenship rates between the majority and minority populations." *Negron*, 113 F.3d at 1569 (emphasis added); (*see also* Doc. 64 at 17-18).

Specifically, the Eleventh Circuit found a "significant difference" in city-wide citizenship rates of Miami Beach residents where the Hispanic citizenship rate was 50.16% and the non-Hispanic citizenship rate was 88.18%, representing a 38.02 percentage point differential. 113 F.3d at 1567. Here, in contrast, the Latino citizenship rate in Orange County is 76%, a significantly higher rate than that in *Negron*.[4] (*See* Doc. 58-3 at 16, Table 2.) Contributing to the high Latino citizenship rate in Orange County is its large Puerto Rican population – all of whom are U.S. citizens. (*See Facts* ¶11, *supra*.) Second, the 14.73 percentage point differential between the county-wide Latino citizenship rate (76%) and the

[4] Although Defendant criticizes Dr. Arrington's reliance on the 76% Latino citizenship rate in Orange County, (*see* Doc. 64 at 18), Defendant's expert, Dr. Morrison, relies on a Latino citizenship rate in proposed District 3 of 73.28%. (*See* Doc. 59-3 at 15, Table 1.) The differential between the two is trivial.

non-Latino citizenship rate (90.73%), which is almost half of the differential in *Negron*, cannot be considered significant as a matter of law.

Accordingly, Dr. Arrington, Plaintiffs' *Gingles I* expert, proposed two separate illustrative configurations for District 3, both of which have majority Latino VAP. (*See Facts* ¶12, *supra*.) Defendant's expert, Dr. Morrison has not challenged this VAP calculation (*See* Docs. 59-3—59-5; Doc. 59-1 at 40:11-41:25) but instead advocated the use of CVAP, which presents severe accuracy flaws already detailed in Plaintiffs opposition to Defendant's *Daubert* motion (*see* Doc. 79 at § IV at 9-17).

**ii. The Latino Population In Proposed District 3 Is Geographically Compact.**

To assess compactness, a court must analyze a proposed remedial district to determine whether it is drawn consistent with traditional districting principles *Rodriguez v. Harris County*, No. 4:11-2907, 2013 U.S. Dist. LEXIS 110839, at *113 (S.D. Tex. Aug. 1, 2013); *Ga. State Conference of the NAACP*, 2013 U.S. Dist. LEXIS 84191, at *35-37 (same).

To assess remedial plan compactness "Section 2 litigants whenever possible should try to 'adduce evidence systematically comparing proposed redistricting plans to either the plan being challenged or the predecessor plan in effect during the last relevant election.'" *Harris County*, 2013 U.S. Dist. LEXIS 110839, at *118-119 (citations omitted). Plaintiffs have done precisely that with the report and testimony of Dr. Theodore Arrington who used several methods "for objectively measuring the compactness of individual districts and of entire plans." *Harris County*, 2013 U.S. Dist. LEXIS 110839, at *118-119; (*see also*, *Facts* ¶12, *supra*.)

Dr. Arrington simultaneously weighed multiple factors, including the need to avoid the division of incorporated areas; the need to unify geographic communities of interest to the extent possible; and the need to maintain District 5's status as a Black majority district within proposed plans. (*See* Doc. 58-1 at 38:17-39:20.) Specifically, addressing compactness factors, Dr. Arrington compared his Illustrative plans 1 and 2 with the County Commission plan currently in effect in Orange County using multiple analyses. (*See Facts* ¶12, *supra*.) Defendant's expert, Dr. Morrison, in turn, fails to address how Dr. Arrington's plan runs afoul of compactness. (Doc. 59-1 at 34:3-38:22.) And Dr. Morrison cannot because he offers no compactness analysis in his own expert report. (Docs. 59-3—59-5.)

Additionally, throughout his deposition testimony, Dr. Arrington insisted that race was not the predominant factor underlying his design process. (*See Facts* ¶12, *supra*); *see also Chiles*, 139 F.3d at 1426 (finding relevant the trial testimony of plaintiffs' expert during which he "insisted that race was not the predominant factor motivating his design process"). Given Dr. Arrington's adherence to traditional redistricting criteria, as well as his deposition testimony, Plaintiffs' proposed remedy neither runs afoul of compactness nor constitutes a racial gerrymander.

Instead, in support of their challenge to the compactness of the plans presented, Defendant offers the affidavit of Whitney Evers (Doc. 71-6) which at best raises the issue of compactness as a contested issue of material fact in this case. Ms. Evers, comments on the geographic shape of Dr. Arrington's maps (Doc. 71-6 at 3¶8(b); 4¶9(b)) ignore that courts have found that visual geometric assessments of districts are imprecise and of limited utility, favoring instead tests like those utilized by Dr. Arrington . *Harris County*, 2013 U.S. Dist.

LEXIS 110839, at *118-119. The Court need look no further than Ms. Evers' own presentation on compactness for examples of districts whose shapes run afoul of her standard. (*See* Doc. 71-7 at OC_000633-39.) Plaintiffs' proposed remedial District 3 bears no resemblance to these examples. (Decl. Exs. 7-8; 36-37) Instead, Plaintiffs need only show a "well-developed, legally-adequate plan that can be adjusted during [the remedial stage]." *Harris County*, 2013 U.S. Dist. LEXIS 110839, at *118-119 (quoting *Fairley v. Hattiesburg*, 584 F.3d 660, 671 n.14 (5th Cir. 2009).

**B. The Latino Population In Orange County Is Politically Cohesive.**

Because Defendant does not dispute that the Latino population in Orange County is politically cohesive (*see generally* Doc. 64) and Dr. Barreto found as such, Plaintiffs have satisfied *Gingles II*. (*See Facts* ¶¶14-15, *supra*.)

**C. Latinos In Orange County Vote As A Block; And, Non-Latinos, In Turn, Block Vote Against Latinos, Defeating Latino-Preferred Candidates.**

Notwithstanding Defendant's arguments, courts have frequently structured a *Gingles III* majority block voting analysis as one comparing a minority group's voting patterns against those of all other non-minority groups, i.e. Latinos versus non-Latinos, as is the case here.[5] *See Garza v. Cnty. of Los Angeles, Cal.*, 756 F. Supp. 1298, 1337 (C.D. Cal. 1990), *aff'd*, 918 F.2d 763 (9th Cir. 1990), *cert. denied*, 498 U.S. 1028 (1991) ("*Garza*") (explicitly confronted the issue of proving racial polarization through the comparison of Latinos against non-Latinos); *see also Ruiz v. City of Santa Maria*, 160 F.3d 543, 546-47 (9th Cir. 1998) (the Ninth Circuit repeatedly referred to the issue of racial polarization and bloc voting in terms of Hispanics against non-Hispanics); *De Grandy v. Wetherell*, 815 F. Supp. 1550, 1571-74

[5] For a more complete discussion of Defendant's misconstruction of *Gingles III*. (*See* Doc. 80 at 3-13.)

(N.D. Fla. 1992) (finding racial polarization and bloc voting when blacks routinely joined with Anglos to vote against Latino-preferred candidates and when plaintiffs' expert characterized the polarization as between Latinos and non-Latinos), *rev'd on other grounds sub nom., Johnson v. De Grandy*, 512 U.S. 997 (1994).

In support of its *Gingles III* characterization, Defendant cites *Johnson v. Hamrick*, 296 F.3d 1065, 1074 (11th Cir. 2002), a case involving a large black and white population. Nowhere did the *Johnson* court state that (1.) the relevant minority group must only be compared to Anglos, and (2.) an expert report that compares the minority group to all other groups is inadmissible.

Further, Defendant's focus on the outcomes of these eight elections analyzed by Dr. Hood ignores that statistical data demonstrates for the 2012 Commissioner District 3 election that Latinos had a clear preference: Michael Aviles. (Doc 62-5 at.19.) Aviles, in turn, received only 2.64% of votes among non-Latinos. (*Id*.) Dr. Barreto's analysis indicates that this election presents "strong evidence of polarization" (*Id.* at 19-20.)

**D. The Totality of the Circumstances Inquiry Here Favors Plaintiffs.**

Having established that Plaintiffs meet each of the three *Gingles* preconditions, a review of the Senate Factors guiding the "totality of the circumstances" inquiry similarly reveals that Latinos in Orange County have been denied an equal opportunity to participate in the political process and to elect the representatives of their choice. Specifically, the Senate Factors range from evidence of lower socio-economic indicia for the minority group, to evidence of a history of official discrimination in voting, to racial appeals in prior elections. *See Gingles*, 478 U.S. at 36-37 (1986) (quoting S. Rep. No. 97-417, at 28-29 (1982),

reprinted in 1982 U.S.C.C.A.N. 177); *see also Solomon v. Liberty Cnty. Comm'n*, 221 F.3d 1218, 1225-26 (11th Cir. 2000).

"Although no factor is indispensable, the legislative history of the amendment to section 2 indicates that racially polarized voting will ordinarily be the keystone of a dilution case." *McMillan v. Escambia County*, 748 F.2d 1037, 1043 (11th Cir. 1984). It not only explicitly addresses the second of the enumerated Senate Factors but it has also been found to be the best evidence of County Commission political responsiveness. *Marengo County Comm'rs*, 731 F.2d at 1573 (citing *NAACP v. Gadsden County School Bd.*, 691 F.2d 978, 983 (11th Cir. 1982) ("[t]he continuing pattern of polarization is therefore strong evidence that the elected officials are not meeting the political needs" of a minority group). As per Dr. Silver's uncontested findings, this reality is supported by the fact that low Latino voter rates are due, in part, to "a feeling of futility stemming from the strong sense . . . that those seeking elected office use Hispanics for their votes, but are not truly interested in their welfare." (Decl. Ex. 1 at ¶67.)

"Past discrimination can severely impair the present-day ability of minorities to participate on an equal footing in the political process." *Marengo County Comm'rs*, 731 F.2d at 1567. Additionally, many Florida jurisdictions have ignored bilingual election requirements mandated by Sections 203 and 4(f)(4) of VRA and the Voting Rights Language Assistance Act of 1992, codified at 42 U.S.C. § 1973b(e)-(f) and 42 U.S.C. § 1973aa-1a.[6] Central Florida counties are among them,[7] corroborating Dr. Silver's own findings that

---

[6] U.S. Comm' on Civil Rights, Voting Irregularities in Fla. During the 2000 Presidential Election: Ch. 6 Accessibility Issues (2001), *available at* http://www.usccr.gov/pubs/vote2000/report/ch6.htm#_ftnref33.

[7] For example, the U.S. Commission on Civil Rights found that "[i]n some central Florida counties, Spanish-speaking voters did not receive bilingual assistance and some of these counties were subject to section 203 of

language issues for Latinos have been a constant in Orange County and central Florida. (Decl. Ex. 1 at ¶48.) As noted above, (*Facts* ¶16, *supra*), Orange County, had to be sued by the Department of Justice to ensure compliance with VRA Section 203.

In light of the foregoing history, Defendants' cursory arguments regarding equal election practices in Orange County, (*see* Doc. 64 at 23), do not erase Florida's history of discrimination or Orange County's own troubling election practices. In fact, tensions regarding bilingual election materials in Orange County continue to run high such that the predominant complaint received by the SOE is aimed at eliminating bilingual materials because they enable increased Latino voter participation. (*Facts*, *supra* at ¶¶17-18.) A great many of the comments suggest an anti-immigrant bias in Orange County. (*See e.g. Facts*, *supra* at ¶17.) Some were directed at the redistricting process and community efforts to create a Hispanic majority district. (*Facts*, *supra* at ¶18.)

"Past discrimination may also lead to present socioeconomic disadvantages, which in turn can reduce participation and influence in political affairs." *Marengo County Comm'rs*, 731 F.2d at 1567. Dr. Silver has shown that in Orange County Latinos live in lower socioeconomic conditions compared to whites in, which negatively affects their political participation as reflected in lower employment rates, lower incomes, and higher rates of poverty among Latinos. (*See Facts* ¶19, *supra*.) That Orange County claims to not be "aware" of any complaints or concerns regarding socioeconomic issues has no merit, (*see* Doc. 64 at 24) as statistics compiled by Dr. Silver speak for themselves. *See also Osceola*

---

the VRA. This failure to provide proper language support led to widespread voter disenfranchisement of possibly several thousand Spanish-speaking voters in central Florida." U.S. Comm' on Civil Rights, Voting Irregularities in Fla. During the 2000 Presidential Election: Ch. 9 Findings and Recommendations (2001), available at http://www.usccr.gov/pubs/vote2000/report/ch9.htm; *see also United States v. Osceola County*, 6:05-cv-1053-Orl-31DAB, 475 F. Supp. 2d 1220, 1226 (M.D. Fla. 2006)

*County*, 475 F. Supp. 2d at 1234 (finding the Section 2 socioeconomic disparities factor satisfied where Hispanics in Osceola County had lower levels of education and income, and were more likely to be living in poverty than whites).

**E. Plaintiffs Have Standing to Bring Their Section 2 Claim.**

Defendant contends that Plaintiff Rios-Andino failed to demonstrate an "injury in fact" given that she does not reside in District 3 as redrawn by the 2010 redistricting process. Yet Defendant (*see* Doc. 64 at 24) admits that as a result of its current redistricting plan, Ms. Rios-Andino currently resides in District 4, which used to be in District 3. (*See* Doc. 64 at 3¶3.) Defendant also does not dispute that, under Public Proposal E, Ms. Rios-Andino is a resident of District 3 – the proposed Latino-majority district. Her removal, therefore, constitutes a concrete injury. *See e.g. Scott v. Taylor*, 470 F.3d 1014, 1018 (11th Cir. 2006) (finding that plaintiff's removal from the district in which she lived due to a reapportioned map was a "concrete injury"); *see also Woullard v. Mississippi*, No. 3:05-CV-97, 2006 U.S. Dist LEXIS 46561, at *5 (S.D. Miss. June 29, 2006) ("[T]he Supreme Court suggests that a person who does not presently live in the challenged district, but who was removed from the challenged district on account of his race, would have standing."). Accordingly, because Ms. Rios-Andino lives in the proposed district that is the "primary focus" of her Section 2 claim, *U.S. v. Hays*, 515 U.S. 737, 739 (1995), and is affected "in a personal and individual way," *Lujan*, 504 U.S. at 560 n.1, she has standing.

Similarly, Plaintiff Rosario Martinez has alleged a harm that is particular to him because he is a Latino registered voter in the County – facts that Defendant has also not disputed. Mr. Martinez asserts that given his "concern for my community", (Doc. 68-1 at

14:1-7), he sued to ensure that District 3 would have a larger share of Latinos to increase the "possibility", (*id.)*, of having a Latino elected. Mr. Martinez continued to assert a "personal" concern, (Doc. 68-1 at 15:3-12), in this regard that went beyond representation to him and included representation of his family. (*Id*.) In the context of this Section 2 lawsuit, this particularized harm, due to his race and ethnicity, places the claim of Mr. Martinez separate and apart from the claims of the plaintiffs in *Hays, supra*, relied upon by Defendant. Unlike the plaintiffs in *Hays,* who failed to allege nothing more than a harm to all Louisiana voters, Mr. Martinez, like all Latino voters in the County, have also been denied an equal opportunity to elect a candidate of choice because of their race and ethnicity. Votes cast by members of the Board of Commissioners directly affect county-wide projects and are not limited to the geographic scope of any one district.

Respectfully submitted, Dated: January 2, 2014

s/ Nancy M. Trasande

Juan Cartagena (*Pro hac vice*)
Nancy M. Trasande (*Pro hac vice*)
LatinoJustice PRLDEF
99 Hudson St. - 14th Floor
New York, NY 10013
Tel: (212) 219-3360
Fax: (212) 431-4276
Email: jcartagena@latinojustice.org
Email: ntrasande@latinojustice.org

Octavio Gustavo Padron
Florida Bar # 0012401
517 W. Colonial Dr.
Orlando, FL 32804
Tel: (407) 841-7373, ext. 204
Email: Gpadron@suarezcti.com

*Attorneys for Plaintiffs*