UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

ZORAIDA RIOS-ANDINO,
NEY RIVERA GARCIA,
JASMINE GUADALUPE,
ROSARIO MARTINEZ,

Plaintiffs,

v. Case No. 6:12-CV-1188-ORL-22KRS

ORANGE COUNTY, FLORIDA,

Defendant.
_______________________________________/

**DEFENDANT, ORANGE COUNTY'S REPLY TO PLAINTIFFS' OPPOSITION TO DISPOSITIVE MOTION FOR FINAL SUMMARY JUDGMENT**

Defendant, Orange County, Florida, pursuant to Rule 56 of the Federal Rules of Civil Procedure, files this as its Reply in response to Plaintiffs' Opposition to Orange County's Dispositive Motion for Summary Judgment (Dkt. 83 & 64), and states:

1. In footnote 1, Plaintiffs object to "[paragraphs] 46, 47, 54, 66, 69 as speculative since Defendant fails to cite any authority or attach corresponding exhibits in derogation of Defendant's evidentiary burden." Contrary to Plaintiffs' objection, paragraphs 46, 47, and 54 cite to pages from Mr. Johnstone's deposition transcript and the referenced exhibits.[1] At the time of filing, the CM/ECF system would not accept the deposition

[1] The referenced paragraphs in Orange County's Motion for Summary Judgment provide, in part:

> 46. Exhibit 310 to Johnstone's deposition is a PowerPoint presentation dated May 11, 2011 on Census Data. PJ Depo, p. 100-101. . . .
> 47. Page 41 (OC_000297) of Exhibit 310 is a 2010 Hispanic Population Density Map. . . . PJ Depo, p. 101:24-102:6.

transcript and associated exhibits at the same time. Consequently, Orange County filed the transcript of Mr. Johnstone first (Dkt. 69) and then Exhibit 310 (Dkt. 76 & 76-1). Paragraph 54 identified Exhibit 325 as a copy of Map M-3, which was filed at Dkt. 64-1 and hereto.

2. Also in footnote 1, Plaintiffs deny paragraphs 35, 37, 39, 40, 41, 48; 50, 51, 52, 53, 63, 65, 66, 68, 72, 73, 74 claiming they state legal conclusions. An examination of these paragraphs shows that they relate to facts, not law, and should be read in context. For convenience, the paragraphs at issue are quoted in **Exhibit A**.

3. Paragraph 2 of Plaintiffs' Response alleges that Ms. Rios-Andino testified that "Pete Clarke was not the Hispanic Candidate of Choice" (Dkt. 83, p.2 (citing Dkt. 65-1 at 101)); yet she did testify that she supported Pete Clarke over Lui Damiani for County Commission District 3. Dkt. 65-1, ZRA Depo, p. 25:15-26:1.

4. Paragraph 6 of Plaintiffs' Response claims that "the public did not have sufficient access to the Redistricting Advisory Committee ("RAC")," but the allegation that follows is *non sequitur* because the "lack of Puerto Rican representation on the RAC," more accurately stated as the lack of non-Puerto Rican Hispanics on the RAC, does not support the sweeping, conclusory allegation that there was a lack of access by the public to the RAC. The record shows the opposite: the public had ample opportunity and a variety of avenues of communication to address either the RAC or the BCC. Dkt. 69-5, Evers Depo, p.80:19-84; Dkt. 69-6, Evers Depo, p. 194:13-195:5.

5. Paragraph 12 of Plaintiffs' Response claims that "Dr. Arrington weighed traditional redistricting facts in preparing Illustrative Maps 1 and 2 for his *Gingles I*

---

54. Exhibit 325 is a copy of Map M-3, which is the map that was presented to the BCC and eventually adopted. PJ Depo, p. 215:19-216.

analysis." Dkt. 83, p. 5 (citing Doc. 58-1 at 38-39). Yet, Arrington testified that he was not familiar with communities of interest in Orange County, such as Pine Hills or Rio Pinar (Dkt. 58-1, p. 84-85); he did not know how many unincorporated communities of interest he displaced from one district to another (Dkt. 58-1, p. 83-85); he did not know whether he preserved the cores of Districts 4 or 5 (Dkt. 58-1, p.79-80); he did not do any analysis to determine what the cores of Districts 3, 4, or 5 are (Dkt. 58-1, p. 79); he recognized that his illustrative plans were drastic revisions of the existing districts (Dkt. 58-1, p. 80). Arrington testified that his "**goal was to unify the Latino community as much as is possible**, again, without stretching out the lines and having thin connectors and so forth within the context of a plan which is one person, one vote, et cetera, et cetera." Dkt. 58-1, p. 76:9-13. To maximize the Latino population into one district, Arrington had to grab pockets with a higher concentration of Latinos. Dkt. 58-1, p. 122-130. In *LULAC v. Perry*, 548 U.S. 399, 434 (1996), the court noted that a district that reaches out to grab small and apparently isolated minority communities is not reasonably compact. *See also*, Dkt. 64, ¶¶ 50-52.

6. Paragraph 13 of Plaintiffs' Response argues that "Dr. Morrison does not know the margin of error associated with his CVAP calculations." Dkt. 83, p. 6 (citing Dkt. 59-1 at 119-121 & 132). As a matter of semantics, Dr. Morrison presented the margin of error in Arrington's Map 2 as a confidence level. In this case, Morrison concluded with a 92.5% confidence level, based upon the estimated margin of error, that Hispanics constitute less than 50% of the CVAP in District 3 proposed in Arrington's Map 2. Dkt. 59-3, p. 16, ¶28.

7. In paragraph 14 of Plaintiffs' Response, Plaintiffs misinterpret the third precondition of *Thornburg v. Gingles*, 478 U.S. 30, 51 (1986) ("*Gingles*").

8. Paragraph 16 of Plaintiffs' Response and the statement that Orange County "had to be sued by the Department of Justice to ensure compliance with VRA Section 203" (Dkt. 83, p. 18) is objectionable because the Consent Decree states that "this decree shall not serve as evidence that the county of the Supervisor of Elections violated the Voting Rights Act in any pending or subsequent judicial or administrative proceeding . . . ." Dkt. 83-25, p.4.

9. In response to paragraphs 17 and 18, including the remark that "predominant complaint received by the SOE is aimed at eliminating bilingual materials" and other statements, the documents referenced constitute inadmissible hearsay and should be disregarded. Fed. R. Civ. P. 56(c). In response to paragraph 19, Dr. Silver's statements based upon inadmissible hearsay are the subject of a Motion in Limine. Dkt. 82.

10. **The first factor of *Gingles*** is based upon voting age population ("VAP"), not citizen voting age population ("CVAP"). Plaintiffs rely upon *Bartlett v. Strickland*, 556 U.S. 1 (2009) to support their proposition that VAP, rather than CVAP, should apply. The *Bartlett* court held that "unless minority voters possess the *potential* to elect representatives . . . , they cannot claim to have been injured . . . ." *Id.* at 15 (citing *Gingles*, 478 U.S. at 50 n.17)). Although *Bartlett* involved African Americans, not Latinos, the use of the words "potential" and "voters" denotes eligible voters, meaning citizens. Citizenship is a prerequisite to voting. SOE Depo, p. 235.[2]

[2] *See also Negron v. City of Miami Beach, Florida*, 113 F.3d 1563, 1569 (11th Cir. 1997); *League of United Latin American Citizens ("LULAC") v. Perry*, 548 U.S. 399, 428-29 (2006); *Reyes v. City of Farmers Branch, Tex.*, 586 F.3d 1019, 1023 (5th Cir.2009) (holding that only CVAP is relevant in evaluating first prong of *Gingles* ); *United States v. Osceola County, Florida*, 475 F. Supp. 2d 1220 (M.D. Fla. 2006); *Fabela v. City of Farmers Branch, Tex.*, 3:10-CV-1425-D, 2012 WL 3135545 (N.D. Tex. Aug. 2, 2012); *Benavidez v. Irving Indep. Sch. Dist., Tex.*, 690 F. Supp. 2d 451, 456 (N.D. Tex. 2010).

11. This Court should reject the premise that because the difference in citizenship rates for Latinos versus non-Latinos is not significant, VAP rather than CVAP should apply. Even looking at the countywide citizenship rates used in Plaintiffs' Expert's Report, Arrington concludes that the citizenship rates of Anglos and Latinos were 96% and 76%, respectively. Dkt. 58-3, p. 16. Clearly, a delta of 20% is significant, especially here, where Plaintiffs' inaccurate estimate of CVAP resulted in a razor-thin Hispanic CVAP majority.

12. Plaintiffs claim that the difference between Arrington's reliance of a countywide citizenship rate of 76% versus Morrison's rate is trivial, but the table referenced in Plaintiffs' Response shows that the consequence of a several point reduction in CVAP is a Hispanic CVAP of less than 50%, meaning that Plaintiffs failed to meet their burden to prove the existence of the first precondition of *Gingles.* In response to Plaintiffs' argument that CVAP rates have flaws, Dr. Morrison articulated the flaws in Arrington's data, assumptions, and methodology. Dkt. 59-3, 59-4, & 59-5.

13. The Hispanic population density map speaks for itself and shows that the Hispanic population is not clustered in one location. *See,* Dkt. 64, Orange County's Undisputed Facts, ¶74; BW Depo, p. 158:20-23; 159:1- 22; OC_000297 (Hispanic population was widely dispersed).

14. Plaintiffs agree that in order to assess compactness, a court must analyze a proposed remedial district to determine **whether it is drawn consistent with traditional districting principles.** Plaintiffs claim that Arrington weighed multiple factors such as the division of incorporated areas, the need to unify geographic communities of interest, and the

need to maintain "District 5's status as a Black majority district[3]" (Dkt. 83, p.14). As articulated above, Arrington's illustrative maps resulted in drastic changes to the existing district, displacing twice as many individuals to another district, and splitting a significantly greater number of communities of interest. Plaintiffs have not rebutted Mr. Bruce's testimony that Public Proposal E (which is similar to, but not the same as, Arrington's maps), took large communities and moved them to new districts without a lot of consideration for the historical communities of interest or neighborhood alliances. Dkt. 73-2, DB Depo, p. 182-183. "It was literally blowing up the map as it had existed." *Id.* at 183:6-7. Changes should be made more incrementally. *Id.* at 183:8-14. *See also* Dkt. 64, p. 10, ¶¶ 50 & 51.

15. In response to Plaintiffs' argument that the Affidavit of Ms. Evers raised a disputed fact regarding compactness, Plaintiffs presented no evidence to rebut the data quantifying the increase in the number of communities of interest ("COI") that were split[4] and the number of citizens who were displaced[5] by Arrington's proposed maps, using the

[3] Apparently, Plaintiffs do not know which district is the Black majority district.

[4] The data tables generated by the County showed that, as to Arrington's Draft Plan 2, ten COI were split (one was also moved to a new district) when compared to the map previously in place in Orange County; four COI were unified into one district; and 13 COI were moved from one district into another (one of these was also split between two districts). By way of comparison, the data tables of the current map adopted by the Orange County Board on November 29, 2011, showed five COI were split when compared to the map previously in place in Orange County; three COI were unified into one district; and six COI were moved from one district into another. Dkt. 71-6, p.p 2-5.

[5] Regarding the displacement of residents from one district to another, the number of displaced residents in the map adopted by the Board on November 29, 2011, was roughly half of the number of displaced residents in either of the Arrington maps. 201,131 residents were displaced from their current districts into another district; this amounts to 17.55% of the County's population being moved into another district. Considering the fact that, in order to equalize the population, two districts had to shrink in population by approximately 116,000 residents (in order to reach the ideal population), the map the County adopted has much less

County's data and associated tables (Dkt. 71-1).

16. **The third factor of *Gingles*** requires Plaintiffs to address whether (1) whites vote as a bloc; (2) whether white bloc voting *regularly causes* the candidate preferred by the minority voters to lose; and (3) whether the minority group at issue and whites *consistently* prefer different candidates. *Johnson v. Hamrick (III),* 296 F.3d 1065, 1074 (11th Cir. 2002); *Gingles,* 478 U.S. at 49-51 &56. Instead of comparing the minority group to the white majority bloc, Plaintiffs and their expert, Matthew Barreto, examined Latinos versus all non-Latinos. The Expert Report of Dr. Hood confirms that Plaintiffs failed to establish the third factor of *Gingles.* Dkt. 61-5, pp. 21-22. During his deposition, Dr. Barreto acknowledged that in other expert reports, he separated out minority groups,[6] but he failed to do so here, even though the Black population is almost as large as the Latino population here.[7]

17. The Supreme Court in *Gingles* explained that "in the absence of significant white bloc voting it cannot be said that the ability of minority voters to elect their chosen representatives is inferior to that of white voters." *Thornburg v. Gingles*, 478 U.S. 30, 51 (1986). In *Valladolid v. City of Nat'l City*, 976 F.2d 1293, 1297 (9th Cir. 1992), the court granted summary judgment for the City because there was "no indication whether . . .

---

of an impact on the County's residents and better preserved the core of the prior districts. Dkt. 71-6, p.5.

[6] Barreto performed a multi-regression analysis in the case in San Mateo County where he examined both Asian-American voting patterns and Latino voting patterns. MB Depo, p. 42:18-43:1. In his case in Harris County, Texas, Barreto ran a multi-variant regression (MB Depo, p. 43:2-9) and compared the Latino vote with the white vote (MB Depo, p. 48:15-19), while taking into account the black vote (MB Depo, p. 48:20-22).

[7] According to a screen capture from the U.S. Census QuickFacts for Orange County as of 2011, Orange County consisted of 45.8% of Anglos, 27.5% Hispanic or Latinos, and 21.7% black. Dkt. 62-1, MB Depo, p. 32:3-1 13 & 33:11-34:11; Dkt. 62-12, Exhibit 37. No single group is over 50%. Dkt. 62-1, MB Depo, p. 34:12-13. For the 2012 general election, blacks accounted for 18.5% of total turnout in Orange County. Dkt. 61-4, TH's Report, p. 6.

minority-preferred candidates won or lost, or whether, to the extent that they lost, white bloc voting was responsible for their defeat." Therefore, the court found that the Plaintiffs "failed to present any evidence . . . that their preferred candidates usually lost city council elections as a result of white bloc voting against them." Similarly, in *Aldasoro v. Kennerson*, 922 F. Supp. 339, 375 (S.D. Cal. 1995), the court rejected Plaintiffs' contention that Blacks and Anglos should be combined into a single "non-Hispanic" group for purposes of applying the third *Gingles* precondition, that "non-Hispanic" bloc voting, instead of "white" bloc voting, usually defeats the preferred candidates of Hispanic voters. The *Aldasoro* court held:

> The United States Supreme Court, however, has held that groups cannot be combined unless they are cohesive, as demonstrated by their voting patterns. *Growe v. Emison*, 507 U.S. 25, 41, 113 S.Ct. 1075, 1085, 122 L.Ed.2d 388 (1993) (proof of cohesion necessary for finding of bloc voting of "agglomerated" groups). Numerous cases have refused to combine groups that were shown *not* to be politically cohesive. . . . Blacks and Anglos are not politically cohesive in El Centro elections, as demonstrated by their disparate voting preferences. Plaintiffs' experts, moreover, initially tendered bivariate analyses but later concluded that those analyses generated inaccurate Hispanic preferences, precisely because Blacks and Anglos who were combined into a nonHispanic voting bloc were voting differently from each other. **Given that most voting rights cases concern white bloc voting against Black candidates and the long history of slavery, discrimination and polarized voting between Anglos and Blacks, there is little basis for treating Anglos and Blacks as a cohesive group.**

*Aldasoro v. Kennerson*, 922 F. Supp. 339, 375 (S.D. Cal. 1995) (emphasis added, citations omitted).

18. Contrary to Barreto's testimony, the "extent to which minority group members have been elected to public office in the jurisdiction" is an important factor and is part of the Section 2 analysis. *Thornburg v. Gingles*, 478 U.S. 30, 51 (1986). According to Plaintiffs' expert, it doesn't matter if the Hispanic candidate won. On page 78 of his

deposition transcript, Barreto testified:

> Q. In your analysis, did it make a difference that the Hispanic candidate was elected?
> A. Do you mean did it make a difference to the conclusion of whether or not racial polarization existed?
> Q. For any of the Gingles factors, did it make a difference?
> A. Not in my conclusions as to whether or not Latinos vote cohesively and non-Latinos are bloc-voting, no.

Dkt. 62-1, MB Depo, p. 78. The record shows that Hispanic candidates have had considerable success in Orange County.[8] Because Hispanic voters are able to elect candidates of their choice, Plaintiffs are unable to establish legally significant racial bloc voting that usually defeats the minority's preferred candidate.

19. The cases cited by Plaintiffs are distinguishable. In *Garza v. Cnty. of Los Angeles, Cal*., 756 F. Supp. 1298, 1337 (C.D. Cal. 1990), *aff'd*, 918 F.2d 763 (9th Cir. 1990), *cert. denied*, 498 U.S. 1028 (1991) ("*Garza*"), the trial court recognized that "the potential distorting effect of this construct [i.e., the lack of evidence of white bloc voting and combining Anglos, Blacks and Asians] is lessened by the fact that for most of the elections analyzed, the Black and Asian percentage of the electorate was not significant." In contrast, Orange County is a diverse population with many minority groups. In *Ruiz v. City of Santa Maria*, 160 F.3d 543, 550 n.14 (9th Cir. 1998), the court did discuss the "white" majority voting bloc in the context of a minority preferred-majority candidate. In *De Grandy v.*

[8] Regarding Orange County District 3, starting from year 2000, Mary I. Johnson, a Hispanic, won the primary election. Dkt. 62-1, MB Depo, p. 73:24-74:2. Mildred Fernandez, a Hispanic, won the same seat in 2004. Dkt. 62-1, MB Depo, p. 74:3-5. In 2008, Mildred Fernandez was re-elected. Dkt. 62-1, MB Depo, p. 75:8-11. Currently, Peter Clarke is the County Commissioner for District 3. All of the Plaintiffs testified that they supported Pete Clarke. Dkt. 65-1, ZRA Depo, p. 25:15-26:1; 101:2-22; Dkt. 68-1, RM Depo, p. 60:17-61:17; Dkt. 66-1, JG Depo, p. 56:18-57:22 & p. 57:13-15); Dkt. 67-1, NRG Depo, p. 73-75.

*Wetherell*, 815 F. Supp. 1550, 1571-74 (N.D. Fla. 1992), the court recited the *Gingles* preconditions, including the requirement of that "the minority group must be able to demonstrate that the **white majority** votes sufficiently as a block to enable it . . . usually to defeat the minority's preferred candidate."

20. In response to Plaintiffs' claim that in the 2012 Primary Election for District 3 Commissioner, the Latinos had a clear preference, Michael Aviles, the Plaintiffs omitted the fact that there were two Hispanic candidates, three other candidates, and the majority of Hispanics voted for someone other than Aviles. Dkt. 61-4, p.16 (Hood's Report, p. 15).

21. Senate Factors. **If** Plaintiffs can establish the three *Gingles* preconditions, which they did not, then the court looks to the totality of circumstances to determine whether Hispanics have less opportunity than do other members of the electorate. *LULAC v. Perry*, 548 U.S. 399, 425-426 (2006). Contrary to the Response (p. 17), Orange County did contest Silver's findings through a Motion in Limine and through the record cited in the Motion at Dkt. 64, p. 23-24, including the testimony from the School Board attorney that all children are educated the same (Dkt. 69-8, p. 90:9-12), testimony from the Supervisor of Elections that Hispanics and non-Hispanics register and vote in the same manner and ballots are in English and Spanish (Dkt. 70-1, SOE, p. 234-236), the report and testimony from Hood, etc.

22. Standing. Plaintiffs concede that Mr. Martinez lives in District 5. Thus, he lacks standing. As for Ms. Rios-Andino, she lives in District 4, comprised of 40.0% Hispanic VAP (Dkt. 83, p.4, ¶8), rather than District 3, comprised of 38.3% Hispanic VAP (*Id.*). Thus, Rios-Andino's alleged injury is speculative. *U.S. v. Hays,* 515 U.S. 737 (1995).

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this _16th_ day of January 2014, I presented the foregoing to the Clerk of the Court for filing and uploading via the CM/ECF system of the United States District Court, Middle District of Florida.

I HEREBY CERTIFY that on this _16th_ day of January 2014, a true and correct copy of the foregoing was transmitted **by Email** to:

**Juan Cartagena. Esq.**
**Nancy Trasande, Esq.**
LatinoJustice PRLDEF
99 Hudson St., 14th Floor
New York, NY 10013
jcartagena@latinojustice.org;
ntrasande@latinojustice.org;

**Octavio Gustavo Padron, Esq.**
517 W. Colonial Dr.
Orlando, FL 32804
Gpadron@suarezcti.com;
ncostas@suarezcti.com;

***/s/ Linda S Brehmer Lanosa***
Linda S. Brehmer Lanosa
Assistant County Attorney
Florida Bar No. 901296
Orange County Attorney's Office
201 S. Rosalind Avenue, 3rd Floor
Orlando, Florida 32801
Telephone:(407) 836-7320
Facsimile: (407) 836-5888
Linda.BrehmerLanosa@ocfl.net

Reply to Rsp to MSJ FINAL

**EXHIBIT A**
**QUOTATION OF PARAGRAPHS IN ORANGE COUNTY'S MOTION FOR SUMMARY JUDGMENT THAT PLAINTIFFS INCORRECTLY CHARACTERIZE AS LEGAL CONCLUSIONS.**

The following paragraphs in Orange County's Dispositive Motion for Final Summary Judgment (Dkt. 64) were disputed by Plaintiffs based upon the claim that they are conclusions of law.

> 35. According to Mr. Bruce, the principle redistricting factor is one person, one vote. Other factors include the contiguousness of districts, preserving boundaries and neighborhoods, and not displacing large communities, neighborhoods, or cities. DB Depo, p. 121.
>
> 37. Committee Proposal 12, attached as Exhibit 142, was created by Jose Fernandez. DB Depo, p. 156:9 -19. This proposal had a lot of merit because the maximum population deviation is tight; the districts largely preserve the existing boundaries around major thoroughfares; they are as compact as they can be for six districts; and the Hispanic population was 42% in District 4 and 35% in District 3. DB Depo, p. 156-157.
>
> 39. Public Proposal E is attached to the deposition transcript of Mr. Bruce as Exhibit 143. DB Depo, p. 158. Its weakness is that the entire east side was a re-write. DB Depo, p. 159. This proposal took large communities and moved them to new districts without a lot of consideration for the historical communities of interest or neighborhood alliances. Public Proposal E abandoned the way in which the district boundaries had existed traditionally for years. DB Depo, p. 182-183. "It was literally blowing up the map as it had existed." DB Depo, p. 183:6-7. Changes should be made more incrementally. DB Depo, p. 183:8-14.
>
> 40. The RAC worked to insure that there was a significant Hispanic population in two districts allowing Hispanics to elect candidates in two districts, not one. DB Depo, p. 211.
>
> 41. The BCC worked to boost the percent of Hispanics in Districts 3 and 4 even further, as shown in Map M3 adopted by the BCC. DB Depo, p. 211; Exhibit 166.
>
> 48. The Hispanic population is clustered in certain areas. PJ Depo, p. 102:9-12. There are three major clusters. PJ Depo, p. 102:23.

50. No map was presented that had a voting-age population of Hispanics that exceeded 50%. PJ Depo, p. 207:10-24. The proposals that came close to 50% combined Hispanics areas that were not contiguous and had never been in the same district, and it would appear that those maps were generated purely with ethnicity or race as the primary focus. PJ Depo, p. 207:10-208.

51. Mr. Johnstone does not know if it was an attainable goal in the first place. PJ Depo, p. 208:5-7. Mr. Johnstone explained that you have to find higher density areas of Hispanics and replace them with the lower density areas, regardless of following lines such as roadways and natural boundaries. PJ Depo, p. 208:8-20.

52. Exhibit 326 is Public Proposal E. PJ Depo, p. 208:24-25. Mr. Johnstone shed light onto the complexities of redistricting when he explained the issues involving Public Proposal E. Starting with District 3, he said that it joins "totally different communities":

> . . . . It's like connecting two opposite sides of the city and just drawing a small sliver down the middle. These areas have nothing in common, have never been together. Union Park, Azalea Park, Meadow Woods, Hunters Creek, they're not alike. They're totally different communities. Some are well established. The northeastern portion of this where --some of the core of District 3 being Azalea Park, Union Park, places like that have been in -- are high Hispanic. They're well-established older communities. And then you go to Meadow Woods area and, I forget the other one, I think it's called Southchase. Meadow Woods and Southchase area that also have a high Hispanic population density. Those are newer areas. They don't have the character of that. They've been in District 4 and they've a part of District 4 for a long time. They're part of the core voters of District 4 as well.
>
> And the other thing about this map is you're taking District 5, and many of the voters in District 5 on the east side came out to express their concern that they wanted to be -- remain in District 5. And District 5 completely changes character. . . .
>
> And then if even we have to go back, we have to go back to the west side of the county, District 2 now has -- we've got cities that are split up on here, District 2. Oakland has been in District 1 and they expressed a desire to stay there, and now they're half, they're 36 percent in District 1, 63.6 percent in District 2. Ocoee winds up being almost wholly in District 1 originally winds up being -- you know, 84 percent in District 2, and it goes on. . . .

PJ Depo, p. 212-213.

53. In addition, Public Proposal E shifts numerous census designated places and communities of interest from one district into another. PJ Depo, p. 211:1-3; Exhibit 326. One of the factors of redistricting is trying to minimize the breakup of related communities, census designated places, and other communities of interest. PJ Depo, p. 211:9-16.

63. The public, including Hispanics, had sufficient access to RAC. WE Depo, p. 80. RAC made efforts to include the public in the RAC process by holding 18 meetings, six of which were in each of the individual county commission districts, and by providing for a public comment period at every meeting, making sure the public had the ability to email the RAC, and setting up a website. WE Depo, p. 81-82.

65. District 3 has been represented by a Hispanic candidate almost continually since the creation of single-member districts in Orange County, which occurred in about 1988. WE Depo, p. 235:14-19.

66. There have been Hispanic members on the Soil and Water Conservation Board.

68. The empirical evidence shows that Hispanic members have been elected to office and shows that Hispanics have had access to and have been elected to office in Orange County. WE Depo, p. 236:9-15.

72. Peter Morrison, Ph.D., who is an applied demographer, correctly tabulated the number of Hispanic citizens of voting age in Arrington‟s Map 2. According to Morrison's correct calculation, the number of Hispanic citizens of voting age ("CVAP") of District 3 in Arrington's Map 2 is only 48.04%. PM's Report, p. 15. Morrison concluded with a 92.5% confidence level, based upon the estimated margin of error, that Hispanics constitute less than 50% of the CVAP in Arrington's Map 2's District 3. PM's Report, p. 16, ¶28.

73. M.V. Hood, III, Ph.D. As explained by Dr. Hood in his Expert Report, Dr. Hood concludes that in the eight County Commission races analyzed, there was a clear candidate of choice for Hispanic voters in six of the eight elections. In four of the contests, a Hispanic candidate of choice won. TH's Report, p. 20. In 75% of the elections analyzed, there is no evidence of minority vote dilution. TH's Report, p. 20-21. "In sum, Hispanic candidates running for Orange County Commission seats do not usually lose as a result of Anglo bloc voting." TH's Report, p. 21.

74. Beverly Willis is a cartographer with the Supervisor of Elections. Ms. Willis said that the Hispanic population was widely dispersed based upon the census numbers. BW Depo, p. 158:20-23; 159:1- 22; OC_000297.