UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

ZORAIDA RIOS-ANDINO,
NEY RIVERA GARCIA,
JASMINE GUADALUPE,
ROSARIO MARTINEZ,

Plaintiffs,

v. Case No. 6:12-CV-1188-ORL-22KRS

ORANGE COUNTY, FLORIDA,
Defendant.
____________________________________/

**ORANGE COUNTY'S TRIAL BRIEF**

Defendant, Orange County, Florida, pursuant to the Case Management and Scheduling Order, submits this as its Trial Brief.

**OVERVIEW**

It is over 10 years into the new millennium. It is nearly 50 years beyond the enactment of the Civil Rights Act. This is not the same era that it was 50 years ago or 100 years ago.

The President of the United States is African American, even though African Americans do not comprise a majority of the voting population. At the local level, Orange County has seen a Hispanic Chairman, who was elected countywide, and has elected two Hispanics in District 3, even though it was not a Hispanic majority district. Mary I. Johnson, who is half Puerto Rican and half Cuban, was elected for two four-year terms each commencing in 1996 and 2000. Mildred Fernandez, a Puerto Rican, was elected for terms commencing in 2004 and 2008.

Looking at the population figures for Orange County, Florida, the number of "non-Hispanic or Latino Whites" are tallied at 46.0% of the total population, a number that is less than a majority or less than 50%. The number of Whites, Blacks, and Asians, including both Hispanic and non-Hispanic, comprise 63.6%, and 20.8%, and 4.9% of the population. Hispanics comprise 26.9% of the total population. White-only Hispanics are roughly 66.5% of the Hispanics in Orange County, Florida, and total 17.6% of the population.

Can it still be said that non-Hispanic Whites are the majority when the population figures do not support an over 50% non-Hispanic White population? Orange County is indeed a melting pot.

## PROPOSED FINDINGS OF FACT

1. Orange County. The Board of County Commissioners ("BCC") consists of seven elected officials. Six officials are elected from single-member districts. One is elected countywide as the mayor. DWR Depo, p. 61:11-13. The BCC is the governing body of Orange County.

2. Commissioners have a term of four years. Elections are staggered so that three commissioners will be elected every two years. Joint Exhibit 101, Orange County Charter, Section 204.

3. Census. Every ten years, the Census releases population counts per PL 94-171. Each branch of government must redraw its districts. All plans must be equal in population and done in time for candidate qualifying. OC_000176.

4. According to Section 202 of the Orange County Charter, the "districts shall be reconsidered after each decennial census and adjusted by the board after one or more public hearings."

5. Once all of the Federal, State, and County redistricting is completed and approved, the Elections Office redraws the county voting precincts, the voters are notified, ballots created, and the elections (here, the Fall 2012 elections) are based on the new districts. OC_000177.

6. 2010 Census. According to the 2010 Census, the 2010 Demographic Profile of Orange County, Florida consisted of a total population of 1,145,956, with the following numbers and percentages of one race:

| Subject | Number | Percent |
|---|---|---|
| Total population | 1,145,956 | 100.0 |
| One Race | 1,106,631 | 96.6 |
| White | 728,795 | 63.6 |
| Black or African American | 238,241 | 20.8 |
| American Indian and Alaska Native | 4,532 | 0.4 |
| Asian | 56,581 | 4.9 |
| Native Hawaiian and Other Pacific Islander | 1,266 | 0.1 |
| Some Other Race | 77,216 | 6.7 |
| Two or More Races | 39,325 | 3.4 |

7. As for individuals of Hispanic or Latino ethnicity, the 2010 Demographic Profile of Orange County reported:

| Subject | Number | Percent |
|---|---|---|
| HISPANIC OR LATINO | | |
| Total population | 1,145,956 | 100.0 |
| Hispanic or Latino (of any race) | 308,244 | 26.9 |
| Mexican | 36,652 | 3.2 |
| Puerto Rican | 149,457 | 13.0 |
| Cuban | 22,528 | 2.0 |

| | | |
|---|---|---|
| Other Hispanic or Latino [5] | 99,607 | 8.7 |
| Not Hispanic or Latino | 837,712 | 73.1 |
| | | |
| HISPANIC OR LATINO AND RACE | | |
| Total population | 1,145,956 | 100.0 |
| Hispanic or Latino | 308,244 | 26.9 |
| White alone | 202,041 | 17.6 |
| Black or African American alone | 15,041 | 1.3 |
| American Indian and Alaska Native alone | 2,083 | 0.2 |
| Asian alone | 1,040 | 0.1 |
| Native Hawaiian and Other Pacific Islander alone | 228 | 0.0 |
| Some Other Race alone | 70,938 | 6.2 |
| Two or More Races | 16,873 | 1.5 |
| Not Hispanic or Latino | 837,712 | 73.1 |
| White alone | 526,754 | 46.0 |
| Black or African American alone | 223,200 | 19.5 |
| American Indian and Alaska Native alone | 2,449 | 0.2 |
| Asian alone | 55,541 | 4.8 |
| Native Hawaiian and Other Pacific Islander alone | 1,038 | 0.1 |
| Some Other Race alone | 6,278 | 0.5 |
| Two or More Races | 22,452 | 2.0 |

8. According to Ms. Rios-Andino and based upon the 2010 census, the black and Hispanic communities in Orange County are over 50% of the population. ZRA, p. 119:1-17.n[1] The majority group would be the minorities, not Caucasians. ZRA, p. 119:12-17. The population in Orange County that is "white only" is less than 50%. ZRA, p. 119:18-22.

9. Diverse Hispanic Population. Ms. Rios-Andino, one of the Plaintiffs in this case, admitted that Florida has a much greater diversity in the Latino population than other areas. ZRA, p. 151:6-17.

[1] Citations to deposition transcripts are denoted by the deponents acronym followed by the page and line numbers.

10. Dr. Morrison provided background information about Orange County. The Census Bureau "Hispanic" category encompasses voters with distinct ethnic identities, who may be racially White, Black, Asian, or one of numerous other racial categories distinguished on the 2010 Census. Persons who self-identify as "Hispanic" form ethnic clusters of Puerto Rican, Mexican, Cuban, Dominican, and Colombian descent and embryonic clusters whose residents trace their origins to Guatemala, Honduras, El Salvador, Ecuador, Peru, and Venezuela. The political diversity of Hispanics in Orange County is exemplified by the diversity of political party affiliations among Hispanic voters. Mexican-origin registrants are predominantly Democrats, whereas Cuban registrants are predominantly Republicans. In certain precincts most Hispanic registered voters are registered as Democrats, whereas in other precincts most Hispanic registered voters are registered as non-Democrats (i.e., Republican, Independent, etc.). Further, Hispanic subgroups reside in unequal proportions across the County's numerous "Hispanic" spatial clusters.

11. Cubans vs. Puerto Ricans. According to Ms. Rios-Andino, Puerto Ricans, unlike Cubans, are citizens of the United States. ZRA, p. 105:2-6. Ms. Rios-Andino believes that a majority of Cubans are Republican because of the fact that they tend to be more business-oriented (ZRA, p. 116:8-117:7) and the majority of Puerto Ricans are Democrats (ZRA, p. 117:17-21). Similarly, Mr. Garcia thinks that more Cubans are Republicans and the majority or more of Puerto Ricans are Democrats. NRG Depo, p. 24:2-10.

12. The Redistricting Advisory Committee. On March 15, 2011, the Orange County Board of County Commissioners ("BCC") approved Resolution 2011-M-06 creating

a Redistricting Advisory Committee ("RAC"). Joint Exhibit 1-2; OC_001015. Each commissioner appointed two members and the mayor appointed 3 members to the RAC. Joint Exhibit 1-2; OC_001017.

13. The RAC consisted of a diverse cross-section of the community, including three Hispanic members. Joint Exhibit 83. The Hispanic RAC members include Martha Santoni, Bertica Cabrera Morris, and Jose Fernandez. Martha Santoni is a Cuban who is married to a Puerto Rican. ZRA, p. 60:25-61:5. Ms. Bertica Cabrera Morris is Cuban. ZRA, p. 57:10-16. Jose Fernandez is from Nicaragua. ZRA, p. 61:25-62:3.

14. The RAC was empaneled by the BCC (as a result of the decennial census) to evaluate maps and make recommendations to the BCC, with input from the public, on any changes that had to be made as a result of population changes or shifts within the county. DB Depo, p. 37. Then, the BCC took public input and adopted a final redistricting map. DB Depo, p. 37.

15. The RAC held its first meeting on April 7, 2011. Joint Exhibit 2. The meetings continued through September 28, 2011. The RAC made efforts to include the public in the RAC process by holding 18 meetings, six of which were in each of the individual county commission districts, and by providing for a public comment period at every meeting, making sure the public had the ability to email the RAC, and setting up a website. WE Depo, p. 81-82.

16. Derek Bruce was elected as the chairman of the RAC.

17. At the first meeting, the RAC was presented with census information pertaining to the growth of the districts. In terms of growth and based on the district lines in

place in 2010, Districts 1 and 4 increased in population to 242,725 and 254,951, while Districts 2, 3, 5 and 6 had much lower populations of 166,660; 159,387; 167,023; and 155,210, respectively. OC_000209.

18. In order to maintain equal populations in each district (to allow for one person-one vote), the populations of each district needed to be around 190,993 plus or minus 5%. Therefore, Districts 1 and 4 needed to lose 51,732 and 63,958 people, respectively, while the other districts needed to increase in population. OC_000210.

19. During the initial meetings, the RAC heard a number of presentations on the Census Data, Redistricting Software, Redistricting Principles, Development in Orange County, Capital Improvement Programs, among other presentations. Joint Exhibits 32-38.

20. On May 11, 2011, the Geographic Information Systems ("GIS") unit of Orange County gave a presentation to the Redistricting Advisory Committee and presented data on the district profiles, including lists of municipalities and census designated places. Orange Exhibit 32.

21. As shown in the presentation, the municipalities and Census Designated Places in District 3 include Orlando (28.4%). Alafaya (8.9%), Azalea Park, Rio Pinar, and Union Park. OC_000274 t1o OC_000275.

22. As shown in the presentation, the municipalities in District 4 consisted of Belle Isle, Edgewood, and Orlando (17.6%), and the Census Designated Places consisted of: Alafaya (91.1%), Conway, Holden Heights, Lake Hart, Lake Mary Jane, Meadow Woods, Pine Castle, Sky Lake, South Chase, and Taft. OC_000278 to OC_000279.

23. The District 5 municipalities consisted of Maitland (89.7%), Orlando (8.5%),

and Winter Park (98.0%). The District 5 Census Designated Places consisted of Alafaya (0.1%), Bithlo, Christmas, Fairview Shores (43.7%), Goldenrod, University, Wedgefield. OC_000283 to OC_000284.

24. The presentation included a depiction of the population densities for Asians, Blacks, and Hispanics. Joint Exhibit 32. The Hispanic population density map (Joint Exhibit 32, p. OC_000297) shows that the Hispanic population is widely disbursed and is not clustered in one location or district. BW Depo, p. 158:20-23; 159:1- 22; OC_000297 (Hispanic population was widely dispersed); PJ Depo, p. 102:9-12; 102:23.

25. More specifically and as depicted in this map, areas with high Hispanic population include the University census designated place, Union Park, some of Alafaya, Rio Pinar, Azalea Park, parts of Orlando south of Azalea Park, Oak Ridge, Sky Lake, Pine Castle, Meadow Woods, South Chase, and Hunters Creek. PJ Depo, p. 101:24-102:6.

26. Over the six month period, the RAC considered numerous proposals from both its members and the public, heard extensive testimony from the public, and debated the merits of the proposals.

27. The Geographical Information Systems Unit of Orange County supported the RAC and the BCC with the GIS aspects of the redistricting process. PJ Depo, p. 42:13-23 & 48. GIS provided backup information regarding population and demographics for the redistricting proposals, which information included census data on total population, voting age population, and census designated places. PJ Depo, p. 66-67, 78-79. GIS prepared a table showing whether a census designated place was moved or split and how much was moved and where. PJ Depo, p. 80:18-22.

28. In response to public input, members would try to increase the percentage of Hispanics in District 3 from, say, 35% to something higher. PJ Depo, p. 146. The proposals that came close to 50% combined Hispanics areas that were not contiguous and had never been in the same district, and it would appear that those maps were generated purely with ethnicity or race as the primary focus. PJ Depo, p. 207:10-208. Simply put, the creation of a majority-Hispanic district was not an attainable goal when following the traditional principles of redistricting. PJ Depo, p. 208:5-7; PJ Depo, p. 208:8-20.

29. Ultimately, the RAC recommended two proposals to the BCC: Committee Proposal 12B and Public Proposal E. Exhibit 3-A. Backup data associated with these two proposals was provided to the Board. The data showed that Map 12B split 5 municipalities and CDPs, and Map E split 7 municipalities and CDPs. OC_000649. The data showed that Map 12B moved 7 municipalities and CDPs and Map E moved 15 municipalities and CDPs, respectively. OC_000649. The data showed that Map 12B displaced 238,998 people to a new district and Map E displaced 403,121 people to a new district. OC_000651.

30. Committee Proposal 12 was created by Jose Fernandez. DB Depo, p. 156:9 - 19. According to the RAC Chairman, this proposal had a lot of merit because the maximum population deviation was tight; the districts largely preserved the existing boundaries around major thoroughfares; they were as compact as they could be for six districts; and the Hispanic population was 42% in District 4 and 35% in District 3. DB Depo, p. 156-157.

31. The RAC made changes to Proposal 12 to create Proposal 12A in order to address input from the public. DB Depo, p. 188, 201-202, Exhibit 150. Proposal 12A then became Proposal 12B. DB Depo, p. 200.

32. The RAC worked to insure that there was a significant Hispanic population in two districts allowing Hispanics to elect candidates in two districts, not one. DB Depo, p. 211.

33. Public Proposal E (Map E). According to Map E (County Exhibit 66), the proposed District 3 had a Hispanic population of 52.16% of the total population of 191,641 and 49.30% of the voting age population ("VAP") of 144,552. OC_Ex_66. Tables of the percentage of total population and VAP by race and ethnicity is below.

| **PUBLIC PROPOSAL E: RACE AND ETHNICITY BY TOTAL POPULATION** | | | | | | |
|---|---|---|---|---|---|---|
| | Population | % White | % Black | % Asian | % Other | %Hispanic |
| District 3 | 191,641 | 67.40% | 11.22% | 4.64% | 15.17% | 52.16% |
| District 4 | 188,531 | 73.82% | 10.19% | 6.16% | 9.82% | 27.51% |

| **PUBLIC PROPOSAL E: RACE AND ETHNICITY BY VOTING AGE POPULATION** | | | | | | |
|---|---|---|---|---|---|---|
| | Population | % White | % Black | % Asian | % Other | %Hispanic |
| District 3 | 144,552 | 69.44% | 10.59% | 4.8% | 15.17% | 49.30% |
| District 4 | 147,621 | 75.24% | 10.12% | 6.19%z | 8.45% | 25.29% |

Orange Exhibit 66.

34. According to Map E, the proposed Districts 3 and 4 had a Hispanic population of 52.16% and 27.51% of the total population, respectively, or 49.30% and 25.29% of the VAP, respectively.

35. Mr. Bruce stated that the weakness of Map E is that the entire east side was a re-write. DB Depo, p. 159. This proposal took large communities and moved them to new districts without a lot of consideration for the historical communities of interest or neighborhood alliances. Public Proposal E abandoned the way in which the district boundaries had existed traditionally for years. DB Depo, p. 182-183. "It was literally

blowing up the map as it had existed." DB Depo, p. 183:6-7. Changes should be made more incrementally. DB Depo, p. 183:8-14.

36. Mr. Johnstone shed light onto the complexities of redistricting when he explained the issues involving Public Proposal E. Starting with District 3, he said that it joins "totally different communities":

> . . . . It's like connecting two opposite sides of the city and just drawing a small sliver down the middle. These areas have nothing in common, have never been together. Union Park, Azalea Park, Meadow Woods, Hunters Creek, they're not alike. They're totally different communities. Some are well established. The northeastern portion of this where --some of the core of District 3 being Azalea Park, Union Park, places like that have been in -- are high Hispanic. They're well-established older communities. And then you go to Meadow Woods area and, I forget the other one, I think it's called Southchase. Meadow Woods and Southchase area that also have a high Hispanic population density. Those are newer areas. They don't have the character of that. They've been in District 4 and they've a part of District 4 for a long time. They're part of the core voters of District 4 as well.
>
> And the other thing about this map is you're taking District 5, and many of the voters in District 5 on the east side came out to express their concern that they wanted to be -- remain in District 5. And District 5 completely changes character. . . .
>
> And then if even we have to go back, we have to go back to the west side of the county, District 2 now has -- we've got cities that are split up on here, District 2. Oakland has been in District 1 and they expressed a desire to stay there, and now they're half, they're 36 percent in District 1, 63.6 percent in District 2. Ocoee winds up being almost wholly in District 1 originally winds up being -- you know, 84 percent in District 2, and it goes on. . . .

PJ Depo, p. 212-213; PJ Depo, p. 208:24-25.

37. In addition, Public Proposal E shifted numerous census designated places and communities of interest from one district into another. PJ Depo, p. 211:1-3; Exhibit 326.

One of the factors of redistricting is trying to minimize the breakup of related communities, census designated places, and other communities of interest. PJ Depo, p. 211:9-16.

38. BCC. The BCC held public hearings on November 15, 2011, and November 29, 2011. In addition, the BCC held a Sunshine meeting on November 22, 2011.

39. The BCC worked to boost the percent of Hispanics in Districts 3 and 4 even further as shown in Map M3 adopted by the BCC. DB Depo, p. 211; Exhibit 166.

40. Ordinance. On November 29, 2011, the BCC adopted Ordinance No. 2011-14 revising the boundaries of the six districts for the BCC to account for population changes reflected in the 2010 federal Census.

41. The proposed (now current) Districts 3 and 4 (hereinafter referred to as the 2012 districts) in Map M-3 have a Hispanic population of 41.40% and 41.77% of the total population as shown below.

| **PROPOSED MAP M-3: RACE AND ETHNICITY BY TOTAL POPULATION** | | | | | | |
|---|---|---|---|---|---|---|
| | Population | % White | % Black | % Asian | % Other | %Hispanic |
| District 3 | 199,697 | 73.22% | 10.07% | 3.07% | 13.65% | 41.40% |
| District 4 | 185,352 | 67.73% | 11.63% | 6.85% | 13.79% | 41.77% |

County Exhibit 1.

42. The 2012 Districts 3 and 4 in Map M-3 have a Hispanic voting age population ("VAP") of 38.26% and 39.95% as shown below.

| **PROPOSED MAP M-3: RACE AND ETHNICITY BY VOTING AGE POPULATION** | | | | | | |
|---|---|---|---|---|---|---|
| | Population | % White | % Black | % Asian | % Other | %Hispanic |
| District 3 | 155,001 | 75.45% | 9.31% | 3.17% | 12.07% | 38.26% |
| District 4 | 136,270 | 69.35% | 11.29% | 7.01% | 12.35% | 39.95% |

County Exhibit 1.

43. Map M-3. Ms. Rios-Andino stated that Map M-3 would be acceptable if there were a greater number of Hispanics than non-Hispanic whites. ZRA, p. 120:20-23. However, according to Ms. Rios-Andino, the numbers would have to be based upon citizenship. ZRA, p. 122:4-8. Aside from the adopted map not having a majority citizen voting age population of Hispanics, Ms. Rios-Andino denies there being any objection to Map M-3 at this time. ZRA, p. 54:25-55:6.

44. Prior to the adoption of the 2011 Ordinance, Districts 3 and 4 had a Hispanic population of 44.48% and 37.42% of the total population, respectively, as shown below.

| **THEN-CURRENT: RACE AND ETHNICITY BY TOTAL POPULATION** | | | | | | |
|---|---|---|---|---|---|---|
| | Total Population | % White | % Black | % Asian | % Other | %Hispanic |
| District 3 | 159,389 | 71.78% | 9.97% | 3.59% | 14.65% | 44.48% |
| District 4 | 254,949 | 70.81% | 11.00% | 5.68% | 12.52% | 37.42% |

45. The data tables associated with the maps described each district by race and ethnicity compared to total population and voting age population ("VAP"). The races included White, Black, Asian, and a category for all other races. Because the category for Hispanics is an ethnicity, not a race, a person can be Hispanic and White, Black, Asian or any race. For this reason, if the percentages of each race and ethnicity are added, the total does not equal 100%. For example, the sum of the District 3 percentages for Whites (71.78%), Blacks (9.97%), Asians (3.59%), Others (14.65%), and Hispanics (44.48%) is 144.47%.

46. In terms of voting age population, prior to the adoption of the 2011 Ordinance, Districts 3 and 4 had a Hispanic VAP of 41.07% and 35.14%, respectively, as shown below.

| THEN-CURRENT: RACE AND ETHNICITY BY VOTING-AGE POPULATION | | | | | | |
|---|---|---|---|---|---|---|
| | Population | % White | % Black | % Asian | % Other | %Hispanic |
| District 3 | 125,163 | 74.02% | 9.31% | 3.74% | 12.93% | 41.07% |
| District 4 | 190,837 | 72.76% | 10.44% | 5.72% | 11.08% | 35.14% |

County Exhibit 1.

47. Two Over-Forty Percent Hispanic Districts. Hispanics were not represented by one unified voice.

48. Some members of the Hispanic community expressed that they did not want to be quarantined into one district. DB Depo, p. 210. Instead, they wanted two 40% Hispanic districts. WE Depo, p. 237:17-238:2. Emilio Perez and Bill Negron wanted to draw a map that would be two 40% Hispanic districts. WE Depo, p. 203:6-17. Other individuals asked for a Hispanic majority district.

49. Ms. Rios-Andino, one of the Plaintiffs, admitted that there may have been some Hispanics who thought there was a benefit to having a redistricting plan with two (2) over-forty percent Hispanic districts. ZRA, p. 47:20-48:5.

50. Ms. Rios-Andino admitted that Anthony Suarez may have said that there was a benefit to having a redistricting plan with two (2) over-forty percent Hispanic districts. ZRA, p. 48:11-18. In fact, Anthony Suarez on behalf of the Central Florida Redistricting Council submitted a proposed Orange County map showing percent Latino in the proposed District 3 as 45.25% and in the proposed District 4 at 46.75%. OC_000391-OC_000390.

51. According to Ms. Rios-Andino, José Fernandez, the one who was on the Committee, is from Nicaragua (ZRA, p. 61:25-62:3) and supported the creation of two 40% Hispanic districts. ZRA, p. 62:7-9.

52. According to Ms. Rios-Andino, Ms. Cabrera Morris supported a plan with two 40% Hispanic districts. Page 61:11-13. Ms. Bertica Cabrera Morris is Cuban. ZRA, p. 57:10-16.

53. Bill Negron, who is Puerto Rican, is a friend of Ms. Rios-Andino. ZRA, p. 55:10-25. Ms. Rios-Andino does not recall what he said during the meeting regarding the creation of two 40% Hispanic districts versus one majority district. ZRA, p. 56:23-57:9.

54. Ms. Rios-Andino knows that Mr. Santoni addressed the RAC, but she does not recall whether he supported two 40-percent Hispanic, districts as opposed to one majority district. ZRA, p. 70:7-19.

55. <u>Hispanic Elected Officials on the Board of County Commissioners.</u> Based upon election results, Hispanics have had access to and been elected to office in Orange County, both countywide and within County Commission Districts. WE Depo, p. 143-145:2; Exhibit 630. District 3 has been represented by a Hispanic candidate almost continually since the creation of single-member districts in Orange County, which occurred in about 1988. WE Depo, p. 235:14-19.

56. For the term commencing in 1998, Mel Martinez was elected as the Chairman (now Mayor) of Orange County, which is a countywide position. ZRA, p. 66:9-17.

57. For the four-year terms commencing in 1996 and 2000, Mary I. Johnson, who is half Puerto Rican and half Cuban, was the District 3 Commissioner on the Orange County Board of County Commissioners. ZRA, p. 22:6-23.

58. For the four-year terms commencing in 2004 and 2008, Mildred Fernandez, a Puerto Rican and a Republican, was the District 3 Commissioner on the Orange County Board of County Commissioners. ZRA, p. 21:6-25; ZRA, p. 21:16-25.

59. Commissioner Fernandez was suspended in 2010 and Lui Damiani was appointed to fill the vacancy in or around August 2010. Dkt. 23:7-15. Commissioner Fernandez resigned in November 2011. ZRA, p.23:7-9.

60. After Commissioner Fernandez resigned John Martinez was appointed i nor around December 2011. Commissioner Martinez is half Cuban and half Caucasian. ZRA, p. 24:20-21.

61. In the past, Orange County has not had a district with a majority Hispanic citizen voting age population. ZRA, p. 65:14-18. Even so, there have been Hispanic commissioners on the Orange County Board of County Commissioners. ZRA, p. 65:14-66:9.

62. <u>2012 General Election for District 3 Commissioner.</u> In the 2012 General Election for District 3 Commissioner, the final two candidates were Pete Clarke and Lui Damiani. ZRA, p. 101:17-21.

63. Because Ms. Rios-Andino did not live in District 3 at the time of the 2012 election, she was unable to vote for a District 3 County Commissioner.

64. Between the final two candidates for District 3 Commissioner in 2012, Ms. Rios-Andino supported Pete Clarke. ZRA, p. 101:17-21. Ms. Rios-Andino supported Pete Clark for Commissioner of District 3 over Lui Damiani, encouraged others to support him, and believes he prevailed partly because of the Hispanic vote. ZRA Depo, p. 25:15-26:1; 101:2-22.

65. Commissioner Clarke won the election. ZRA, p. 25:15-26:1.

66. Peter Morrison, Ph.D., who is an applied demographer, correctly tabulated the number of Hispanic citizens of voting age in Arrington's Map 2. According to Morrison's correct calculation, the number of Hispanic citizens of voting age ("CVAP") of District 3 in Arrington's Map 2 is only 48.04%. PM's Report, p. 15. Morrison concluded with a 92.5% confidence level, based upon the estimated margin of error, that Hispanics constitute less than 50% of the CVAP in Arrington's Map 2's District 3. PM's Report, p. 16, ¶28.

67. Arrington's erroneous conclusion stems from insufficient data and an unreliable application of accepted demographic methodology. Arrington ignored important documented technical limitations that affect the accuracy of Census Bureau data used to calculate rates of citizenship. Arrington had a single-minded purpose in devising District 3 in his Plan 2. His admitted purpose was to aggregate the most heavily Hispanic spatial clusters within Orange County into one district regardless of the traditional factors of redistricting. Arrington's Maps and Public Proposal E increased the impact to communities of interest and municipalities, thereby failing to preserve the core of Districts 3, 4, and 5; decreased the number of Hispanics in District 4; created oddly shaped or non-linear boundaries; and increased, by almost a factor of two, the number of citizens displaced from their current districts into another district.

68. In essence, Arrington's Maps and Public Proposal E packed Hispanics into one district, rather than allowing Hispanics to have influence in two districts.

69. M.V. Hood, III, Ph.D, is a political scientist. Dr. Hood concluded that Professor Barreto failed to take into account the *Gingles III*, Professor Barreto utilized less

reliable statistical methods for evaluating voter preferences; the statistical estimates produced by Professor Barreto fail to take into account the multi-racial/ethnic nature of the Orange County electorate; the statistical estimates produced by Professor Barreto fail to take into account multi-candidate contests; and Professor Barreto's analysis overemphasizes exogenous elections.

70. As explained by Dr. Hood in his Expert Report, Plaintiffs cannot prove *Gingles III.* In 75% of the elections analyzed, there is no evidence of minority vote dilution. "In sum, Hispanic candidates running for Orange County Commission seats do not usually lose as a result of Anglo bloc voting." In the eight County Commission races analyzed, there was a clear candidate of choice for Hispanic voters in six of the eight elections. In four of the contests, a Hispanic candidate of choice won. Hence, Plaintiffs have failed to establish that the Hispanic candidate of choice is usually defeated by a bloc of Anglo voters.

71. Even if the Hispanic candidate of choice is defeated, one must determine if the defeat is due directly to a majority bloc of Anglo voters favoring another candidate. One must uncover a pattern of vote dilution across a number of elections, however, in order to establish this scenario as being that prevalent electoral condition for the geographic area under study.

72. <u>Dr. Arrington Report and Anticipated Testimony should be stricken or disregarded.</u> Arrington testified that he was not familiar with communities of interest in Orange County, such as Pine Hills or Rio Pinar (Dkt. 58-1, p. 84-85); he did not know how many unincorporated communities of interest he displaced from one district to another (Dkt. 58-1, p. 83-85); he did not know whether he preserved the cores of Districts 4 or 5 (Dkt. 58-

1, p.79-80); he did not do any analysis to determine what the cores of Districts 3, 4, or 5 are (Dkt. 58-1, p. 79); he recognized that his illustrative plans were drastic revisions of the existing districts (Dkt. 58-1, p. 80). Arrington testified that his "goal was to unify the Latino community as much as is possible, again, without stretching out the lines and having thin connectors and so forth within the context of a plan which is one person, one vote, et cetera, et cetera." Dkt. 58-1, p. 76:9-13. To maximize the Latino population into one district, Arrington had to grab pockets with a higher concentration of Latinos. Dkt. 58-1, p. 122-130.

73. Ms. Rios-Andino's Requested Relief. Ms. Rios-Andino would like this Court to approve a district that is primarily Hispanic. According to Ms. Rios-Andino, it is necessary to have more than 50% citizen voting age people who can actually vote and it would be even better if there was a super majority of 55% or 60% or more to be an effective district. ZRA, p. 64; 29:23-30:9. In creating a majority Hispanic district, Ms. Rios-Andino is looking at both voting age population ("VAP") and citizen voting age population ("CVAP"). ZRA, p. 48:19-22. She is looking at "people who can actually vote" because of the thousands of Hispanics that cannot vote" because they are not citizens. ZRA, p. 48:19-49:10.

74. In terms of relief, Ms. Rios-Andino wanted the number of citizens who are Hispanic and who can vote to be greater than the Caucasian group. ZRA, p. 123:5-124:12. She then testified that she wanted the number of Hispanics who are citizens to be greater than all non-Hispanics of every race. ZRA, p. 140:4-21.

75. Ms. Rios-Andino believes that District 6 should remain a majority African-American district. ZRA, p. 75:7-10.

76. Ms. Rios-Andino did not create any maps. Ms. Rios-Andino was never involved in designing the maps and never tried to create a map. ZRA, p. 30:14-18. According to Ms. Rios-Andino, none of the Plaintiffs in this lawsuit submitted a proposed map to the Redistricting Advisory Committee. ZRA, p. 37:6-14. No one submitted a proposed map on her behalf to the RAC or the BCC. ZRA, p. 37:9-14.

77. Ms. Rios-Andino claims that she did support the proposed map identified as Map E as well as a map submitted by Latino Justice as an alternative which was submitted with the actual lawsuit. ZRA, p. 37:15-38:3.

78. Ms. Rios-Andino has not done any analysis on the citizen voting age population of proposed District 3 in Public Proposal E. ZRA, p. 75:18-21. She does not know what the voting age population is in Public Proposal E. ZRA, p. 75:22-25. It would not surprise her if the voting age population was 49.3% because she said the issue is citizenship. She did not know whether the map that she supported had a majority citizen voting age population of Hispanics. ZRA, p. 76:12-15.

79. Ms. Rios-Andino agreed that it in order to create a majority Hispanic district, it was necessary to have a majority of Hispanics living within a certain geographical area. ZRA, p. 78:16-19. When asked if it would be possible to create a majority Hispanic district if the population was too spread out, Ms. Rios-Andino did not know. ZRA, p. 78:20-24.

80. Ms. Rios-Andino recognized that even the black community was getting more dispersed throughout Orange County. ZRA, p. 80:9-23.

81. Ms. Rios-Andino said that complete integration was a positive development. ZRA, p. 80:24-81:10.

82. Although Ms. Rios-Andino has not studied the Hispanic population density maps, she does know that all Hispanics do not reside in the same city in Orange County and all Hispanics do not reside in the same clusters of cities that are physically contiguous. ZRA, p. 81:11-82:2.

83. The Hispanic population density map shows that the Hispanic population is spread out over multiple districts. ZRA, p. 84:13-15.

84. When asked if Orange County should redistrict solely based on race, Rios-Andino said, "If it was a way to help the Hispanic community to a obtain a district, yeah." ZRA Depo, p. 36:5-8. She believes that Orange County needs to treat every citizen the same, regardless of their race or ethnicity, but thought that Hispanics may be treated preferentially depending on the situation. ZRA Depo, p. 110:24-111:19.

85. Plaintiff, Zoraida Rios-Andino's background. Ms.Rios-Andino lives at 10714 Goldfish Circle, Orlando, which was previously in District 3 and has been moved to District 4 due to redistricting. ZRA Depo, p. 6:10-16.

86. Ms. Rios-Andino was born in Chicago, born and raised in the United States, speaks both English and Spanish, and is a Democrat. ZRA Depo, p. 8:25-9:9 & 21:24-25; 111:20-22. She considers herself to be Puerto Rican and she states that her race is Puerto Rican. ZRA Depo, p. 8:4-24.

87. Ms. Rios-Andino considers herself to be very successful. ZRA, p. 17:9-10.

88. She has been approached by others to run for political office, but is not interested at this time. ZRA, p. 17:9-17.

89. Ms. Rios-Andino's Participation in the Redistricting Process. Ms. Rios-Andino attended five (5) or six (6) meetings of the Orange County Redistricting Advisory Committee and spoke at the meetings. ZRA, p.34:18-35:3.

90. Ms. Rios-Andino admitted that other people spoke at the redistricting meetings. Ms. Rios-Andino admitted that some people did not want to use race as a reason to redistrict. ZRA, p.35:7-24. Ms. Rios-Andino thought that redistricting solely based upon race would not be improper and she wanted Orange County to redistrict solely based on race if it was a way to help the Hispanic community to obtain a district. ZRA, p. 35:24-36:8.

91. Ms. Rios Andino recognized that three of the members on the Redistricting Advisory Committee were Hispanic. ZRA, p. 97:23-25. Ms. Rios-Andino specifically wanted a Puerto Rican to be a member on the Redistricting Advisory Committee. ZRA, p. 111:23-112:9.

92. Ms. Rios-Andino's volunteer service or lack thereof. Ms. Rios-Andino has never volunteered to serve on any advisory board for Orange County, as she does not have the time to serve and is not interested. ZRA, p. 109:16-110:13.

93. Ms. Rios-Andino's knowledge or support of County Commissioners. Ms. Rios-Andino knows Mary I. Johnson, who is half Puerto Rican and half Cuban, and recalls that she was a commissioner on the Orange County Board of County Commissioners in 2000 and 1996. ZRA, p. 22:6-23.

94. Ms. Rios-Andino supported Mildred Fernandez, who is Puerto Rican and a Republican, for District 3 Commissioner in 2004 and 2008. ZRA, p. 21:6-25.

95. Ms. Rios-Andino knew Commissioner Fernandez personally and had a connection with her and access to her. ZRA, p. 41:11-19.

96. Ms. Rios-Andino's participation in political campaigns. Ms. Rios-Andino was involved with the campaign of Darren Soto for State Senator, District 14, who defeated William McBride by a wide margin. ZRA, p. 18:3-16. According to Ms. Rios-Andino, Darren Soto is Puerto Rican and Italian. ZRA, p. 18:22-25.

97. Multiple Candidates. Ms. Rios-Andino recognized that when two (2) Hispanic candidates are running against an Anglo (or white) candidate, there is an impact to the overall percentage of voters available for the Hispanic candidates. ZRA, p. 89:22-25. She also confirmed that if there are two (2) Hispanic candidates, the Hispanic vote may be split among the Hispanic candidates, possibly making it easier for the non-Hispanic candidate to win the election. ZRA, p. 89:22-90:6.

98. Candidates supported by Ms. Rios-Andino. Ms. Rios-Andino voted for Leticia Marques for judge and she was successful. ZRA, p. 90:25-91:20.

99. Regarding the candidates running for spots on the Soil and Water Conservation Commission, Ms. Rios-Andino said that the commissioners do not get paid. They do not have any power. They do not send out flyers because they do not have much of any campaign committee. They do not do much advertising. They just appear on the ballot. ZRA, p. 10103:2-21. She votes, but she does not remember who she voted for. It's just "like nobody -- you know." ZRA, p. 102:5-17.

100. Ms. Rios-Andino admits that she did not support Marco Rubio, a Republican, for Senate, despite the fact that he is Hispanic. ZRA, p. 106:6-18. Instead, she felt that Maurice Ferre was a better qualified candidate. ZRA, p. 106:18-107:2.

101. Mrs. Rios-Andino supported Alan Grayson for Congress, District 9, not Todd Long. ZRA, p. 107:6-23. Alan Grayson was successful. ZRA, p. 107:24-108:24. Ms. Rios-Andino supported Alan Grayson in the Primary Election, even though there were Puerto Rican candidates with name recognition, because she thought he was the best qualified. ZRA, p. 107:25-108:24.

102. Ms. Rios-Andino admits that even if a candidate is Puerto Rican she would support a more qualified Caucasian candidate. ZRA, p. 108:25-109:3.

103. Plaintiff, Ney Rivera Garcia ("Garcia"), lives at 8346 Golden Chickasaw Circle, Orlando, Florida 32825, which is located in District 3. NRG Depo, p. 4:17-24. He is from Puerto Rico and has lived here for just over two years. NRG Depo, p. 5. He is a Democrat. NRG Depo, p. 22:17-18.

104. Mr. Garcia's Requested Relief. Mr. Garcia did not recognize the map labeled Public Proposal E, but he did not support it. NRG, p. 81:16-24. He also claimed that the original boundaries for the District should have been maintained the way that they were. NRG, p. 82:3-18.

105. Mr. Garcia explained his demand as follows:

> Q. And the main requirement you're asking for is a majority Hispanic district; correct?
> A. No. What I'm asking is that we go back to using the previous map the way it was.
> Q. Regardless of the percentage of Hispanics or Latinos?
> A. Yes.

> Q. So if the original map had, say, 40-some percent Hispanics, would you be satisfied with a new map with 40-some percent Hispanics?
> A. I would agree if you would conduct a new census to see that the population has increased significantly.
> Q. Now, was there any other reason that you are suing Orange County?
> A. No. It's only this.

NRG Depo, p. 83-84.

106. Mr. Garcia's Voting History and Preferences. Mr. Garcia confirmed that he voted in Florida in two (2) elections, one of which was the presidential election and the other for County commissioner. NRG, p. 18:6-9. Mr. Garcia was successfully able to vote in the 2012 elections. NRG, p.19:11-17.

107. Mr. Garcia confirmed that he supported and voted for Commissioner Clarke over former Commissioner Damiani. NRG, p.18:23 - 19:2. He also confirmed that Commissioner Clarke won the election and that he is satisfied with the outcome of the election. NRG, p. 74:1-75:8; NRG, p. 19:4-9.

108. Mr. Garcia claims that he has spoken with District 3's office to request street lights and while they had told him they would provide assistance, they were unable to grant his request due to lack of funds. NRG, p. 69:19-70:9.

109. Mr. Garcia acknowledged that former Commissioner Mildred Fernandez was from Puerto Rico, but he did not vote for her because she was a Republican and he is a Democrat. NRG, p. 22:1-9. Mr. Garcia stated that since Fernandez has a Republican ideology and since he is a Democrat, it does not mean that he had to vote for her because she was Puerto Rican.

110. Mr. Garcia believes that the only Hispanic elected officials in Orange County government are Republicans and that he is bothered by the way that they think. NRG, p. 57:10-13.

111. Mr. Garcia admitted that he did not vote for Marco Rubio because he is a Republican, even though Mr. Rubio is Cuban. NRG, p. 23:11-24.

112. Mr. Garcia supported Darren Soto who is half Puerto Rican and a Democrat. NRG, p. 24:3-25.

113. Mr. Garcia did not support Marco Pena, a Hispanic candidate for state representative District 49, because Mr. Pena is a Republican. NRG, p. 25:16-21.

114. Mr. Garcia confirmed that he supported Joe Biden, Bill Nelson, and Alan Grayson in the 2012 elections because they are Democrats. NRG, p. 27:1-17.

115. Again, Mr. Garcia supported other Democrats such as Darren Soto, who is half Puerto Rican (NRG Depo, p. 24:22-25); Alan Grayson (NRG Depo, p. 27:10-17); and Bill Nelson (NRG Depo, p. 27:6-9), but not Hispanic Republicans, such as Mildred Fernandez (NRG Depo, p. 22-23), Marco Rubio (NRG Depo, p. 23:10-11), or Marco Pena (NRG Depo, p. 25:14-18).

116. Mr. Garcia confirmed that he might vote for a Caucasian or an African American who is a Democrat over a Puerto Rican who is a Republican. NRG, p.23:2-9.

117. <u>Mr. Garcia's definition of "Latino."</u> Mr. Garcia said that the terms Latino or Latina are different from Hispanic because they belong to Latin America. NRG, p. 31:6-25. He said that a Latino or a Latino American may not include those from Spain who would be considered Spanish and not Hispanic. NRG, p. 32:3-17.

118. Mr. Garcia's Participation in the Redistricting Process. Mr. Garcia did not attend any of the public Redistricting Advisory Committee meetings. NRG, p.37:22 – 38:8; NRG, p. 39:23 – 40:24.

119. Mr. Garcia did not meet with anybody about the redistricting process prior to the adoption of the ordinance and did not contact his district commissioner to express his opinion about redistricting, nor has he ever sent any correspondence to any of the County Commissioners or asked anyone to contact a commissioner on his behalf. NRG, p. 38:12-24.

120. Mr. Garcia believes the purpose of redistricting "is to be able to obtain a Latino candidate who will represent us in District 3." NRG, p. 34:21-23. He agrees that it is not necessary for a Latino candidate to be Latino, but instead could just be a Democrat. When asked if it could be a Caucasian Democrat, Mr. Garcia indicated "[i]f he speaks Spanish." NRG, p. 35:1-5.

121. Mr. Garcia has not done any work to determine how the boundaries of District 3 should be modified. NRG, p. 53:2-54:1.

122. Mr. Garcia admits that Latinos don't live in just one city, but instead are spread out. NRG, p. 62:18-22.

123. When asked about his knowledge of redistricting, Mr. Garcia was unable to name any of the principles of redistricting, NRG, p.71:11-16.

124. Mr. Garcia admits that the Board of County Commissioners has the right to make legislative decisions and that part of the legislative function of the County is to balance all of the needs of all of the citizens. NRG, p.72:24-73:23.

125. Plaintiff, Rosario Martinez ("Martinez"), lives at 6005 Bancroft Boulevard, Orlando Florida which is located in District 5. RM, p. 4:16-19. He has lived at this address since 2007. RM, p. 4:23 – 5:1. He was born in the Dominican Republic and immigrated to the United States when he was seventeen years old. RM Depo, p. 5:9-6:10. He speaks both Spanish and English, but did not learn English as a native language. RM, p. 6:15-18. He is an Independent. RM Depo, p. 31:17-18.

126. Mr. Martinez' Requested Relief. Mr. Martinez claims he is suing Orange County because he believes that District 3 had a larger concentration of Latinos before the redistricting process and he would like to have District 3 remain the way that it was before the redistricting. RM Depo, p.14:1-15; 53:24 -54:3; 65:20-66:17. Mr. Martinez's "demand . . . pertains to District 3." RM Depo, p. 66-23-25. He is not objecting to District 5 or Districts 1, 2, 4 or 6. RM Depo, p. 67:1-12.

127. Mr. Martinez agreed that the adoption of a redistricting map would be a legislative decision. RM, p. 132:24-133:3.

128. Mr. Martinez' Involvement in the Redistricting Process. Martinez was not involved in the redistricting process and is not able to support one map or the other. RM Depo, p. 74:5-10. He admits that he did not submit any proposed maps and that he doesn't recall how the previous map was drawn. RM, p. 54:14-17. He did not attend any meetings before the Orange County Board of County Commissioners relating to redistricting and no one attended on his behalf. RM, p. 55:9-15. He did not speak with any elected official or send any e-mail, letters, flyers, or other correspondence to anyone relating to redistricting. RM, p. 55:19-24.

129. Mr. Martinez admits that the Hispanic population is located in different areas of Orange County and that the maps show there to be three main clusters located in District 3, District 4, and the southwestern part of District 6. RM, p. 124:2-11.

130. Mr. Martinez' Voting History and Preferences. Mr. Martinez confirmed that he has successfully voted in every election ever since he became a citizen and was able to vote. RM, p. 113:13-19. He admits that he has requested an absentee ballot which is convenient. He admits that both he and his wife have voted by absentee ballot as well as casting their vote by direct ballot. RM, p. 113:24 – 114:24. He denies ever having trouble casting his ballot. RM, p. 115:3-6.

131. When asked about the 2012 General Election for District 3 Commissioner, while Martinez could not vote for either candidate, Martinez did symbolically support Pete Clarke and called on his community to support Clarke, who was successful. RM Depo, p.60:23-61:17. He felt the Hispanic vote contributed greatly to Commissioner Clarke's victory. RM Depo, p.61:14-61:17.

132. Mr. Martinez admitted that for the 2012 election for District 3 commissioner, there were at least two Hispanic candidates and the Latin vote was split among three or four candidates. RM, p. 101:21-102:6.

133. Mr. Martinez stated that he voted in both the 2008 and 2012 elections and is not certain who his district commissioner was in 2008. RM, p. 28:6-13. He confirmed that District 3 had been represented by Commissioner Mildred Fernandez who was Puerto Rican. RM, p. 28:18 – 29:1.

134. Mr. Martinez stated it is not sufficient for a candidate to be Hispanic in order to be supported by him. RM, p. 32:20-22.

135. Mr. Martinez did not vote for some of the Hispanic candidates running for office, such as Mel Martinez, Marco Rubio, or Leticia Marques for Judge. RM Depo, p. 31-32, 37:4-18; 112.

136. Mr. Martinez admitted that Mel Martinez, who is a Republican Hispanic, held the position of chairman in 1998, but he did not support Mr. Martinez. RM, p. 31:2-10.

137. Mr. Martinez did not support Marco Rubio, who is a Cuban Republican. RM, p. 37:4-18. According to Mr. Martinez, just because Marco Rubio is Hispanic is not enough to gain his support. RM, p. 38:4-6.

138. Mr. Martinez denies that he voted for Leticia Marques for circuit court judge, and instead voted for her opponent Eric Dubois because he wanted to give an opportunity to another judge. He claims that if he sees that an incumbent has been there for a while and has not done the job that he believes should have been done, he would choose to bring in another person with some new ideas. RM, p. 107:19 -108:16. He believes that Leticia Marques is a Cuban Republican, but acknowledged that he voted for a non-Hispanic, Eric Dubois, because there were no other Hispanic candidates that he liked. (RM, p.108:17-109:5)

139. Mr. Martinez voted for Teresa Jacobs, Bill Nelson, Alan Grayson, Earl K. Wood, and Bill Cowles, all of whom won their respective elections. RM Depo, p. 110:12-112; 116:9-117:9.

140. He voted for Teresa Jacobs, for County Mayor and said that a good sector of the Hispanics also voted for her and she was successful. RM, p. 116:9 – 117:9.

141. Mr. Martinez admitted that he voted for Bill Nelson and Alan Grayson, both of whom are Democrats, and that both of the candidates that he voted for won the election. RM, p. 110:12 – 111:8.

142. Mr. Martinez supported Alan Grayson, even though he is not a Hispanic and does not speak Spanish. RM, p. 38:7-15.

143. Mr. Martinez agrees that there are a number of Cuban Republican elected officials. RM, p. 83:11-13. He believes that there are more Puerto Ricans who are Democrat than Republican. RM, p. 84:3-7.

144. Mr. Martinez' Definition of "Latino." Mr. Martinez identifies Latino subgroups as all Spanish-speaking people of the Caribbean, South America, and Central America, but people from those areas that speak English are not considered Latinos. RM, p. 17:11-15.

145. Mr. Martinez denies that Spanish people from Europe are Hispanic, but instead identifies them as European. RM, p. 62:23-25. If people don't identify themselves with the Latino culture and customs then they are not Latino. RM, p. 64:6-18

146. Benefit of Two Forty Percent Districts. Mr. Martinez admits that there may be a benefit to having two districts with over forty-percent Hispanics. RM, p. 70:20-23. He recalls Anthony Suarez as a Hispanic supporter of two forty-percent districts. RM, p. 72:1-3.

147. Employment. Mr. Martinez admits that employment opportunities are better in Orange County and the United States than they are in the Dominican Republic. (RM, p. 99:1-6)

148. Diego ("Woody") Rodriguez, Esq., is General Counsel for Orange County Public Schools in Orlando, Florida. DWR Depo, p. 19:6-7. He has held that position since June 2010. DWR Depo, p. 19:8-9. Prior to that he was in private practice. DWR Depo, p. 21:8-18. Before private practice, he was an assistant county attorney for Orange County, Florida. DWR Depo, p. 21:20-22:6. Prior to his employment with Orange County, he was a staff analyst with the Florida Senate. DWR Depo, p. 25:21-26:6. Mr. Rodriguez has an impressive history of volunteer positions, community service, and board work. DWR Depo, p. 22:19-25:16.

149. Mr. Rodriguez was involved in Orange County's 2000 redistricting process as counsel for the redistricting advisory committee. DWR Depo, p. 28:12-29:20. Mr. Rodriguez testified that the redistricting process in 2011 was very similar to the process utilized by Orange County in 2001. DWR Depo, p. 87:2-17.

150. Regarding Orange County's public schools, educational opportunities are the same for Hispanics and non-Hispanics. All students are treated the same. There are additional opportunities for Hispanics if they are non-English speakers, including special courses. DWR Depo, p. 89-90.

151. Beverly Willis is employed with the Supervisor of Elections as a mapping supervisor. Ms. Willis explained that the Hispanic population was widely dispersed based upon the census numbers. BW Depo, p. 158:20-23;. 159:1- 22; OC_000297.

152. In 2002, Hispanics comprised 26.2% of the registered voters in District 3 (or 18,114 of 69,176) and 13.3% of the total voters in Orange County (or 58,316 of 438,984). OC_000231-OC_000232.

153. In 2010, the percentage of Hispanics increased to 32.0% of the registered voters in District 3 (or 28,809 of 87,719) or 18.5% of the total voters in Orange County (or 112,955 of 610,201). OC_000231-OC_000232.

154. In terms of registered voters, Whites, Blacks and Hispanics in the 2010 District 3 comprised 48.7%; 7.8%; and 34.2% of the registered voters as tabulated by the Supervisor of Elections as of April 1, 2011. OC_000225.

155. Early voting is a time period prior to election day when a person can go to a designated early voting location and cast a ballot. BW Depo, p. 175:12-18. Early votes were not counted within a precinct in 2000, 2002, or 2004. BW Depo, p. 175:21- 176:4.

156. Absentee voting refers to voting on a ballot received by mail or picked up by or for a person who is unable or cannot go to the polls to vote during early voting or Election Day. A person does not have to be absent from his or her county of residence or have another reason to vote absentee. A request must be made to receive an absentee ballot. An absentee ballot is a ballot that is returned to the Supervisor of Elections. BW Depo, p. 176:24-177:3. In 2000, 2002, and 2004, absentee ballots were not counted within precincts. BW Depo, p. 177:4-12. The results cannot be put back into the precincts for that period of time. BW Depo, p. 177:15-22.

157. For the last 20 years, the Supervisor of Elections has published the ballots in both English and Spanish. BW Depo, p. 178:24-179:2.

158. Supervisor of Elections Bill Cowles. The prerequisites to voting, such as being a United States citizen and 18 years of age or older, apply to Hispanics and non-

Hispanics alike. SOE Depo, p. 235. Both Hispanics and non-Hispanics can register and vote in the same manner. SOE Depo, p. 234-236.

159. Election Results. Further, based upon election results, Hispanics have had access to and been elected to office in Orange County, both countywide and within County Commission Districts and in Orlando districts. WE Depo, p. 143-145:2; Exhibit 630.

## CONCLUSIONS OFLAW

### I. OVERVIEW OF THE THREE PRE-CONDITIONS TO A SECTION 2 CLAIM

Section 2 of the Voting Rights Act of 1965, codified in 42 U.S.C. § 1973, provides:

> **(a)** No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right **of any citizen** of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.
>
> **(b)** A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided*, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C.A. § 1973 (emphasis added). Plaintiffs bear the burden of proof to show a violation of Section 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. 1973.

There are three threshold conditions for establishing Section 2 violation: (1) the racial group must be sufficiently large and geographically compact to constitute a

majority in a single-member district; (2) the racial group must be politically cohesive; and (3) the majority must vote sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate. *Thornburg v. Gingles,* 106 S. Ct. 2752, 2766-67 (1986). These conditions are known as the *Gingles* factors and will be referred to as *Gingles I, Gingles II and Gingles III* for simplicity.

Significantly, a court cannot find vote dilution unless the plaintiffs prove *all* of the necessary factors. If any one of the *Gingles* prongs is not established, there is no vote dilution. *See, e.g., Gingles,* 478 U.S. at 50, 106 S.Ct. at 2766 (describing the three factors as "necessary preconditions" for finding vote dilution); *Negron*, 113 F.3d at 1567 ("Because we hold that the district court correctly determined that plaintiffs had failed to establish the first *Gingles* precondition, ... it is unnecessary for us to review its other determinations."); *Johnson v. Hamrick*, 296 F.3d 1065, 1073-74 (11th Cir. 2002) (holding that there was no vote dilution primarily on its finding that the plaintiffs could not show white bloc voting under the third *Gingles* factor).

Even if the plaintiffs prove that the three conditions are met, a court cannot find a Section 2 violation unless it looks at the "totality of the circumstances" and determines that there has been impermissible vote dilution. *Negron v. City of Miami Beach*, 113 F.3d 1563, 1566 (11th Cir.1997); *Johnson v. DeGrandy*, 114 S. Ct. 2647, 2657-58 (1994).

**A. *GINGLES I:* Compactness and Numerosity**

As required by *Gingles I,* Plaintiffs must prove that the Hispanic population is "sufficiently large and geographically compact to constitute a majority in a single member

district." "Unless minority voters possess the potential to elect representatives in the absence of the challenged structure or practice, they cannot claim to have been injured by that structure or practice. . . ." *Thornburg v. Gingles,* 478 U.S. 30, 50 n. 17 (1986).

The first threshold factor of *Gingles* for establishing vote dilution claim, namely, the possibility of a remedy, requires that in judicial cases there be a remedy that does not undermine administration of justice. In *Nipper v. Smith*, 39 F.3d 1494, 1530-31 (11th Cir. 1994), *cert. denied*, 514 U.S. 1083 (1995), the district court rejected §2 vote dilution claims asserted by black registered voters and by black attorneys who had challenged Florida's system for electing judges in the Fourth Judicial Circuit Court and in Duval County Court. On rehearing en banc, the Eleventh Circuit held that state's interest in maintaining its judicial election scheme precluded implementation of proposed remedies, so relief could not be granted. In analyzing *Gingles I,* the Eleventh Circuit quoted from *Growe v. Emison*, 507 U.S. 25 (1993) that "[t]he 'geographically compact [minority]' and 'minority political cohesion' showings [in the *Gingles* threshold test] are needed to establish that the minority has the potential to elect a representative of its own choice from some single-member district." In other words:

> The inquiries into remedy and liability, therefore, cannot be separated: A district court must determine as part of the *Gingles* threshold inquiry whether it can fashion a permissible remedy in the particular context of the challenged system.

*Nipper v. Smith*, 39 F.3d 1494, 1530-31 (11th Cir. 1994). "Federal courts may not, however, alter the state's form of government itself when they cannot identify 'a principled reason why one [alternative to the model being challenged] should be picked over another as a benchmark for comparison.'" *Nipper*, 39 F.3d at 1532. Thus, "the existence of a workable

remedy within the confines of the state's system of government is critical to the success of a vote dilution claim." Similarly, the absence of an available remedy precludes a finding of liability. *Id.* at 1533.

In the first part of *Gingles I* regarding numerosity, Plaintiffs must establish that there is a potential single member district in which a majority of the citizen voting age population ("CVAP") is Hispanic. *Negron v. City of Miami Beach, Florida*, 113 F.3d 1563, 1569 (11th Cir. 1997) (holding that the proper statistic for deciding whether a minority group is sufficiently large and geographically compact is voting age population as refined by citizenship). *See also League of United Latin American Citizens ("LULAC") v. Perry,* 548 U.S. 399, 428-29 (2006); *Reyes v. City of Farmers Branch, Tex.*, 586 F.3d 1019, 1023 (5th Cir.2009) (holding that only CVAP is relevant in evaluating first prong of *Gingles* ); *Perez v. Pasadena Indep. Sch. Dist.*, 165 F.3d 368, 372 (5th Cir.1999) ("[C]ourts must consider the citizen voting-age population of the group challenging the electoral practice when determining whether the minority group is sufficiently large and geographically compact to constitute a majority"); *United States v. Osceola County, Florida*, 475 F. Supp. 2d 1220 (M.D. Fla. 2006); *Fabela v. City of Farmers Branch, Tex.*, 3:10-CV-1425-D, 2012 WL 3135545 (N.D. Tex. Aug. 2, 2012); *Benavidez v. Irving Indep. Sch. Dist., Tex.*, 690 F. Supp. 2d 451, 456 (N.D. Tex. 2010).

The second part of *Gingles I* requiring compactness "refers to the compactness of the minority population, not to the compactness of the contested district." *League of United Latin Am. Citizens v. Perry (LULAC)*, 126 S. Ct. 2594, 2618 (2006) (quoting *Bush v. Vera*, 116 S. Ct. 1941, 1971 (1996) (Kennedy, J., concurring)). In order for a minority group to

meet the first *Gingles* factor, the minority group must be geographically compact, taking into account traditional districting principles such as maintaining communities of interest and traditional boundaries. *League of United Latin American Citizens ("LULAC") v. Perry,* 548 U.S. 399, 428-29 (2006). *See also Bush v. Vera*, 517 U.S. 952, 979, (1996) (plurality) (if, "because of the dispersion of the minority population, a reasonably compact majority-minority district cannot be created, § 2 does not require a majority-minority district").

**1. There is a significant difference in citizenship rates between Hispanics, Blacks, and Anglos.**

In Orange County, Florida, the citizenship rate among Hispanics is significantly lower than other races or groups. Even according to Plaintiffs' expert, Theodore Arrington, the countywide Hispanic citizenship rate in was 76% of voting age Latinos compared to 96.15% of Anglos. Dkt. 58-3, Arrington's Report, p. 9. During his deposition, Dr. Arrington calculated the Black citizenship rate at 86% of the voting age population. Dkt. 58-1, p. 173-176. Clearly, a differential of 20% is significant.

The 20% delta in citizenship rates is even more material where, as is the case here, the ability to create a remedy is tenuous, if not impossible, without abandoning the existing district boundaries on the entire east side of Orange County in Districts 3, 4, and 5, thereby failing to preserve the core of the district, displacing nearly twice as many citizens from one district to another.

Even Plaintiffs recognize that CVAP has been applied where there is a significant noncitizen population. *See Barnett v. City of Chicago,* 141 F.3d 699, 705 (7th Cir.1998) (stating that VAP should apply where "noncitizens [are] not a significant part of the relevant population"); *Negron v. City of Miami Beach,* 113 F.3d 1563, 1568 (1 1th Cir.1997) ("Of

course, [a previous Section 2 decision] did not address [CVAP], because there was no indication in that case that there was any disparity between black and white citizenship rates. Nor is there likely to be any disparity in citizenship rates, except in a case, such as this one, where the minority population includes a substantial number of immigrants."); *Rodriguez v. Pataki*, 308 F.Supp.2d 346, 369 (S.D.N.Y.2004) (noting that the use of CVAP instead of *total population* changed disputed districts from overpopulated to significantly underpopulated); *France v. Pataki,* 71 F.Supp.2d 317, 326 (S.D.N.Y.1999) (finding that the challenged areas "contain[ ] a high-proportion of immigrants who are non-citizens who are ineligible to vote under the Voting Rights Act"); *United States v. Village of Port Chester,* 704 F.Supp.2d 411, 419–20 (S.D.N.Y.2010) (requiring CVAP statistics for a community that was more than one third noncitizen).

**2. Dr. Morrison concluded that Arrington's illustrative plans did not create a Hispanic district with a majority of CVAP.**

Peter A. Morrison, Ph.D., is an applied demographer. He concluded that Plaintiffs have failed to show that Hispanics are sufficiently large and geographically compact to constitute a majority in a single-member district. His analysis discredits Professor Arrington's conclusion that Hispanics constitute a majority of the citizen voting-age population in District 3 of Plaintiffs' Illustrative Plans 1 and 2. Instead, Dr. Morrison concludes that Hispanics are *less* than a majority (48%) of the citizen voting-age population, and an even smaller share (45%) of the registered voters in either District 3. Professor Arrington's erroneous conclusion stems from insufficient data and an unreliable application of accepted demographic methodology. Professor Arrington ignored important documented technical limitations that affect the accuracy of Census Bureau data used to calculate rates of

citizenship. And, Professor Arrington's purpose in creating District 3 in his Plan 2 was to aggregate the most heavily Hispanic spatial clusters within Orange County to boost the number of Hispanics, without regard to the existing boundaries of Districts 3, 4, and 5, or preserving the core of the districts.

Dr. Morrison correctly tabulated the number of Hispanic citizens of voting age in his table 1 on page 15 of his Report. Dkt. 59. According to Dr. Morrison's correct calculation, the Hispanic CVAP of District 3 in Arrington's Map 2 is less than a majority, or only 48.04%. PM's Report, p. 15. Morrison concluded with a 92.5% confidence level, based upon the estimated margin of error, that Hispanics constitute less than 50% of the CVAP in Map 2's District 3. PM's Report, p. 16, ¶28.

As described in Orange County's Daubert Motion to Exclude Theodore Arrington's Report and Testimony (Dkt. 57), Arrington's assumption that the Hispanic citizenship rate within all of Orange County was 76% is not based upon the best available data and results in an overly simplistic methodology and an unreliable result. Arrington failed to examine the margin of error in his conclusions, ignored important documented technical limitations, and was oblivious to the limitations as reflected in his deposition. In essence, Arrington's estimated Hispanic CVAP in District 3 is akin to estimating the average temperature of the United States is 65 degrees, but that average temperature does not apply to a particular state. PM's Depo, p. 141:4-20.

Thus, Plaintiffs failed to establish that there is a potential single member district in which a majority of the citizen voting age population ("CVAP") is Hispanic. In *Negron v.*

*City of Miami Beach, Florida*, 113 F.3d 1563, 1569 (11th Cir. 1997), the Eleventh Circuit held:

> We agree with the Ninth Circuit that because "a section 2 claim will fail unless the plaintiff can establish that the minority group constitutes an effective voting majority in a single-member district," *Romero,* 883 F.2d at 1426, the proper statistic for deciding whether a minority group is sufficiently large and geographically compact is voting age population **as refined by citizenship**. *Id.* at 1424–26. Of course, the requirement that voting age population data be further refined by citizenship data applies only where there is reliable information indicating a significant difference in citizenship rates between the majority and minority populations.

*Id.* Even in *Bartlett v. Strickland,* 556 U.S. 1 (2009), a case relied upon by Plaintiffs, the court held that "unless minority voters possess the *potential* to elect representatives . . . , they cannot claim to have been injured . . . ." *Id.* at 15 (citing *Gingles,* 478 U.S. at 50 n.17)). Although *Bartlett* involved African Americans, not Latinos, the use of the words "potential" and "voters" denotes eligible voters, meaning citizens. Citizenship is a prerequisite to voting. SOE Depo, p. 235.

### 3. <u>The Hispanic population is not geographically compact.</u>

The *Gingles I* factor pertaining to compactness "refers to the compactness of the minority population, not to the compactness of the contested district." *League of United Latin Am. Citizens v. Perry (LULAC)*, 126 S. Ct. 2594, 2618 (2006) (quoting *Bush v. Vera*, 116 S. Ct. 1941, 1971 (1996) (Kennedy, J., concurring)). In order for a minority group to meet the compactness requirement of *Gingles I*, the minority group must be geographically compact, taking into account traditional districting principles such as maintaining communities of interest and traditional boundaries. In *League of United Latin American Citizens ("LULAC") v. Perry,* 548 U.S. 399, 428-29 (2006), the Supreme Court held that

"[w]hile no precise rule has emerged governing § 2 compactness, the 'inquiry should take into account 'traditional districting principles such as maintaining communities of interest and traditional boundaries.' " *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 433-34 (2006) (citing *Abrams v. Johnson*, 521 U.S. 74, 91 (1997)).

In *Abrams v. Johnson*, 521 U.S. 74, 91 (1997), the Supreme Court held that the District Court's failure to create a second majority-black district did not result in dilution of the black voting strength in violation of the Voting Rights Act. The court reiterated the trial court's finding that "to create a second majority-black district in Georgia would require subordinating Georgia's traditional districting policies and allowing race to predominate." *Id.* at 91 (citing *Johnson v. Miller*, 922 F. Supp. 1556, 1566 (S.D. Ga. 1995)[2]). Accordingly, the Supreme Court concluded that the determination was well founded and stated that "[i]f race is the predominant motive in creating districts, strict scrutiny applies . . . and the districting plan must be narrowly tailored to serve a compelling governmental interest in order to

[2]The trial court in *Johnson v. Miller*, 922 F. Supp. 1556, 1567 (S.D. Ga. 1995) *aff'd sub nom. Abrams v. Johnson*, 521 U.S. 74 (1997), described the location of the minority population as follows:

> There are heavy minority concentrations in south Dekalb and Fulton counties, east central Georgia (most of which is in the new Eleventh District), southeast Georgia in the coastal region (all of which are included in the new First District), the southwest corner of Georgia, and a concentration in the west-central portion of the state. Pl.Exhs. 17–23, 36–40. *Cf.* Def.Exh. 17; U.S.Exhs. 8–16. The only way Georgia could draw a majority-minority district in the southwest corner of the state was to use "narrow land bridges ... and ... a number of irregular appendages." *Johnson III*, at 1554. The only way Georgia could create a majority-minority district out of the minority concentrations in east-central Georgia was to link that rural minority population, again using land bridges and appendages, to the large urban minority population in south Dekalb County. *See* 1992 Plan. We will not repeat the same mistake.

*Id.*

survive." *Abrams v. Johnson*, 521 U.S. 74, 91 (1997) (citing *Bush v. Vera*, 517 U.S. 952, 962 (1996)). Quoting from *Bush v. Vera*, 517 U.S. 952, 962 (1996), the *LULAC* court held that a district that "reaches out to grab small and apparently isolated minority communities" is not reasonably compact. *LULAC,* 547 U.S. 399, 433 (quoting *Vera*, 517 U.S., 952, 977 & 979).

"The recognition of nonracial communities of interest reflects the principle that a State may not 'assum[e] from a group of voters' race that they 'think alike, share the same political interests, and will prefer the same candidates at the polls.''" *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 433-34 (2006). Accordingly, the Supreme Court held that there was "no basis to believe a district that combines two farflung segments of a racial group with disparate interests provides the opportunity that § 2 requires or that the first *Gingles* condition contemplates." *LULAC,* 548 U.S. at 434. The Supreme Court reasoned:

> "The purpose of the Voting Rights Act is to prevent discrimination in the exercise of the electoral franchise and to foster our transformation to a society that is no longer fixated on race." *Georgia v. Ashcroft,* 539 U.S., at 490, 123 S.Ct. 2498, 156 L.Ed.2d 428; cf. *post*, at 2663 (opinion of ROBERTS, C. J.). We do a disservice to these important goals by failing to account for the differences between people of the same race.

*League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 433-34 (2006). *See also Bush v. Vera,* 517 U.S. 952, 979, (1996) (plurality) (if, "because of the dispersion of the minority population, a reasonably compact majority-minority district cannot be created, § 2 does not require a majority-minority district").

In application, the Hispanic Population Density map shows that the Hispanic population is widely disbursed throughout the county, rather than one compact cluster. Orange Exhibit 32, p. 41; BW Depo, p. 158:20-23; PJ Depo, p. 10; 2:23. From a GIS

perspective, in response to public input, members would try to increase the percentage of Hispanics in District 3 from 35% to something higher. PJ Depo, p. 146. In order to have a majority Hispanic district, you have to find higher density areas of Hispanics and replace them with the lower density areas, regardless of following lines such as roadways and natural boundaries. PJ Depo, p. 208:8-20. Even the map proposed by Anthony Suazrez on behalf of on behalf of the Central Florida Redistricting Council listed the percent Latino in the proposed District 3 as 45.25% and in the proposed District 4 at 46.75%. Orange Exhibit 35, OC_000391.

**4. <u>The illustrative maps proposed by Plaintiffs' expert, Professor Arrington, did not take into account traditional principles of redistricting.</u>**

Plaintiffs have not established that the minority group is geographically compact taking into account traditional districting principles such as maintaining communities of interest and traditional boundaries. Districts drawn with race as the predominant factor are subject to strict scrutiny. In *Bush v. Vera*, 517 U.S. 952, 958-59 (1996), the Supreme Court struck down three majority-minority districts because they were drawn with race as the predominant factor. Although the Governor attempted to justify the districts with the urban character of the district, incumbency protection, and other factors, the Court found that the predominant reason for the contours was race. *Id.* at 972. For strict scrutiny to apply, the plaintiffs must prove that other, legitimate districting principles were "subordinated" to race.

In application, Plaintiffs' sole purpose is to obtain a majority-Hispanic district without regard to the input for the other members of the public. The proposals that came close to 50% combined Hispanics areas that were not contiguous and had never been in the

same district, and it would appear that those maps were generated purely with ethnicity or race as the primary focus. Public Proposal E (which is similar to Arrington's Maps) abandoned the way in which the district boundaries had traditionally been. DB Depo, p. 182-183. Changes should be made more incrementally. DB Depo, p. 183:8-14. In essence, Arrington's Maps and Public Proposal E were drawn with race as the predominant factor. By looking at race, to the exclusion of the objective principles of redistricting such as preserving the core of the districts, Arrington's proposed maps packed Hispanics into one district, thereby diminishing the Hispanic vote in District 4. If a government creates a majority-minority district by ignoring the traditional principles of redistricting by focusing predominately on race, then that government may appease one set of Plaintiffs at the expense of another set of Plaintiffs whom may argue that their vote was diluted due to packing, rather than fracturing.

**B. *GINGLES II:* Polarized Voting.**

The Plaintiffs' recognized that that they would not support a Hispanic simply because the candidate was Hispanic. Ms. Rios-Andino admits that even if a candidate is Puerto Rican she would support a more qualified Caucasian candidate. ZRA, p. 108:25-109:3. Ms. Rios-Andino admits that she did not support Marco Rubio, a Republican, for Senate, despite the fact that he is Hispanic. ZRA, p. 106:6-18. Instead, she felt that Maurice Ferre was a better qualified candidate. ZRA, p. 106:18-107:2. Mrs. Rios-Andino supported Alan Grayson for Congress, District 9, not Todd Long. ZRA, p. 107:6-23. Alan Grayson was successful. ZRA, p. 107:24-108:24. Ms. Rios-Andino supported Alan Grayson in the Primary Election, even though there were Puerto Rican candidates with name recognition, because she thought he

was the best qualified. ZRA, p. 107:25-108:24. Mr. Garcia supported other Democrats such as Darren Soto, who is half Puerto Rican (NRG Depo, p. 24:22-25); Alan Grayson (NRG Depo, p. 27:10-17); and Bill Nelson (NRG Depo, p. 27:6-9), but not Hispanic Republicans, such as Mildred Fernandez (NRG Depo, p. 22-23), Marco Rubio (NRG Depo, p. 23:10-11), or Marco Pena (NRG Depo, p. 25:14-18).

Mr. Garcia acknowledged that former Commissioner Mildred Fernandez was from Puerto Rico, but he did not vote for her because she was a Republican and he is a Democrat. NRG, p. 22:1-9. Mr. Garcia stated that since Fernandez has a Republican ideology and since Mr. Garcia is a Democrat, it does not mean that he had to vote for her because she was Puerto Rican.

Mr. Garcia confirmed that he might vote for a Caucasian or an African American who is a Democrat over a Puerto Rican who is a Republican. NRG, p.23:2-9. Mr. Garcia admitted that he did not vote for Marco Rubio because he is a Republican, even though Mr. Rubio is Cuban. NRG, p. 23:11-24. Mr. Garcia supported Darren Soto who is half Puerto Rican and a Democrat. NRG, p. 24:3-25. Mr. Garcia did not support Marco Pena, a Hispanic candidate for state representative District 49, because Mr. Pena is a Republican. NRG, p. 25:16-21. Mr. Garcia confirmed that he supported Joe Biden, Bill Nelson, and Alan Grayson in the 2012 elections because they are Democrats. NRG, p. 27:1-17.

Mr. Martinez stated it is not sufficient for a candidate to be Hispanic in order to be supported by him. RM, p. 32:20-22. Mr. Martinez did not vote for some of the Hispanic candidates running for office, such as Mel Martinez, Marco Rubio, or Leticia Marques for Judge. RM Depo, p. 31-32, 37:4-18; 112. Mr. Martinez did not support Marco Rubio, who

is a Cuban Republican. RM, p. 37:4-18. According to Mr. Martinez, just because Marco Rubio is Hispanic is not enough to gain his support. RM, p. 38:4-6.

Mr. Martinez denies that he voted for Leticia Marques for circuit court judge, and instead voted for her opponent Eric Dubois because he wanted to give an opportunity to another judge. He claims that if he sees that an incumbent has been there for a while and has not done the job that he believes should have been done, he would choose to bring in another person with some new ideas. RM, p. 107:19 -108:16. He believes that Leticia Marques is a Cuban Republican, but acknowledged that he voted for a non-Hispanic, Eric Dubois, because there were no other Hispanic candidates that he liked. (RM, p.108:17-109:5)

Mr. Martinez voted for Teresa Jacobs, Bill Nelson, Alan Grayson, Earl K. Wood, and Bill Cowles, all of whom won their respective elections. RM Depo, p. 110:12-112; 116:9-117:9. He voted for Teresa Jacobs, for County Mayor and said that a good sector of the Hispanics also voted for her and she was successful. RM, p. 116:9 – 117:9.

Mr. Martinez admitted that he voted for Bill Nelson and Alan Grayson, both of whom are Democrats, and that both of the candidates that he voted for won the election. RM, p. 110:12 – 111:8. Mr. Martinez supported Alan Grayson, even though he is not a Hispanic and does not speak Spanish. RM, p. 38:7-15.

### C. ***GINGLES III:*** **Whether Whites vote as a bloc such that the White bloc regularly causes the minority candidate to lose; and that whites and Hispanics consistently prefer different candidates.**

To establish the third *Gingles* factor, Plaintiffs must show white bloc voting sufficient to defeat the minority's preferred candidates. *Gingles*, 478 U.S. at 49, 56. This requires that Plaintiffs show: (1) that whites vote as a bloc; (2) that white bloc voting *regularly causes* the

candidate preferred by Hispanic voters to lose[3]; and (3) that Hispanics and whites *consistently* prefer different candidates. *Johnson v. Hamrick (III)*, 296 F.3d 1065, 1074 (11th Cir. 2002); *Gingles*, 478 U.S. at 49, 56.

**1. Preliminary Issue: Since the Non-Hispanic White population is only 46% of the total population, is there a White majority voting bloc?**

As a preliminary issue, are whites still the majority bloc? Based upon the 2010 Census, Non-Hispanic Whites are only 46% of the population and are no longer the numerical "majority" or more than 50% of the population. Hispanics of any race are 26.9% of the total population, while Hispanic Whites are 17.6% of the total population or roughly two-thirds of all Hispanics. Because *Gingles I* requires the existence of a white majority bloc, the question must be asked: Does *Gingles III* fail because Non-Hispanic Whites are no longer a numerical majority? Assuming the test means what it says, the answer is simple. There can be no vote dilution if Hispanics and Non-Hispanic Whites have an equal opportunity at the polls or if neither group has a majority. Even examining the demographic profile of District 4, which is Ms. Rios-Andino's district, with the 2010 Census data, the number of Whites and Hispanics are 68% and 42% of the voting age population, but if one reduces the number of Whites by the number of Hispanic Whites (at the countywide rate of

[3] Different circuits have developed divergent acceptable thresholds of minority success. *Compare Old Person v. Cooney*, 230 F.3d 1113, 1122 (9th Cir.2000) (recognizing that "usually" could mean "more than half of the time") *with Lewis v. Alamance Cnty.*, 99 F.3d 600, 606 (4th Cir.1996) ( "Suffice it to say that ['usually,' 'normally,' and 'generally'] mean something more than just 51%").

roughly 66.5%)[4] , the number of Non-Hispanic Whites goes down by 28% or to 40%. Thus, the percentage of Non-Hispanic Whites in District 4 is less than the percentage of Hispanics of any race.

**2. Plaintiffs' interpretation of *Gingles III* ignores the other minority groups, including African Americans.**

Instead of comparing the minority group to the white majority bloc, Plaintiffs and their expert, Professor Barreto, examined Latinos versus all non-Latinos. During his deposition, Professor Barreto acknowledged that in other expert reports, he separated out minority groups, but he failed to do so in this case, even though the Black population is almost as large as the Latino population here.[5] Professor Barreto performed a multi-regression analysis in the case in San Mateo County where he examined both Asian-American voting patterns and Latino voting patterns. MB Depo, p. 42:18-43:1. In his case in Harris County, Texas, Professor Barreto ran a multi-variant regression (MB Depo, p. 43:2-9) and compared the Latino vote with the white vote (MB Depo, p. 48:15-19), while taking into account the black vote (MB Depo, p. 48:20-22).

The Supreme Court in *Gingles* explained that "in the absence of significant **white bloc voting** it cannot be said that the ability of minority voters to elect their chosen

[4] Using, but not condoning, Professor Arrington's rudimentary use of countywide data, one can approximate the percent of White Hispanics in District 4. The District 4 Hispanic population is 77,430. Using the countywide rate of White Hispanics of 66.5%, the number of White Hispanics is 51,491. With a population of 185,352 in District 4, the percentage of Hispanic Whites is roughly 28%.

[5] According to a screen capture from the U.S. Census QuickFacts for Orange County as of 2011, Orange County consisted of 45.8% of Anglos, 27.5% Hispanic or Latinos, and 21.7% black. Dkt. 62-1, MB Depo, p. 32:3-1 13 & 33:11-34:11; Dkt. 62-12, Exhibit 37. No single group is over 50%. Dkt. 62-1, MB Depo, p. 34:12-13. For the 2012 general election, blacks accounted for 18.5% of total turnout in Orange County. Dkt. 61-4, TH's Report, p. 6.

representatives is inferior to that of white voters." *Thornburg v. Gingles*, 478 U.S. 30, 51 (1986) (emphasis added). In *Valladolid v. City of Nat'l City*, 976 F.2d 1293, 1297 (9th Cir. 1992), the court granted summary judgment for the City because there was "no indication whether . . . minority-preferred candidates won or lost, or whether, to the extent that they lost, white bloc voting was responsible for their defeat." Therefore, the court found that the Plaintiffs "failed to present any evidence . . . that their preferred candidates usually lost city council elections as a result of **white bloc voting** against them." Similarly, in *Aldasoro v. Kennerson*, 922 F. Supp. 339, 375 (S.D. Cal. 1995), the court rejected Plaintiffs' contention that Blacks and Anglos should be combined into a single "non-Hispanic" group for purposes of applying the third *Gingles* precondition, that "non-Hispanic" bloc voting, instead of "white" bloc voting, usually defeats the preferred candidates of Hispanic voters. The *Aldasoro* court held:

> The United States Supreme Court, however, has held that groups cannot be combined unless they are cohesive, as demonstrated by their voting patterns. *Growe v. Emison*, 507 U.S. 25, 41, 113 S.Ct. 1075, 1085, 122 L.Ed.2d 388 (1993) (proof of cohesion necessary for finding of bloc voting of "agglomerated" groups). Numerous cases have refused to combine groups that were shown *not* to be politically cohesive. . . . Blacks and Anglos are not politically cohesive in El Centro elections, as demonstrated by their disparate voting preferences. Plaintiffs' experts, moreover, initially tendered bivariate analyses but later concluded that those analyses generated inaccurate Hispanic preferences, precisely because Blacks and Anglos who were combined into a nonHispanic voting bloc were voting differently from each other. **Given that most voting rights cases concern white bloc voting against Black candidates and the long history of slavery, discrimination and polarized voting between Anglos and Blacks, there is little basis for treating Anglos and Blacks as a cohesive group.**

*Aldasoro v. Kennerson,* 922 F. Supp. 339, 375 (S.D. Cal. 1995) (emphasis added, citations omitted).

Moreover, Professor Barreto seemed to think that it did not matter if the Hispanic candidate won. On page 78 of his deposition transcript, Professor Barreto testified:

> Q. In your analysis, did it make a difference that the Hispanic candidate was elected?
> A. Do you mean did it make a difference to the conclusion of whether or not racial polarization existed?
> Q. For any of the *Gingles* factors, did it make a difference?
> A. Not in my conclusions as to whether or not Latinos vote cohesively and non-Latinos are bloc-voting, no.

Dkt. 62-1, MB Depo, p. 78.

Contrary to Barreto's testimony, the "extent to which minority group members have been elected to public office in the jurisdiction" is an important factor and is part of the Section 2 analysis. *Thornburg v. Gingles*, 478 U.S. 30, 51 (1986). The record shows that Hispanic candidates have had considerable success in Orange County. Regarding Orange County District 3, starting from year 2000, Mary I. Johnson, a Hispanic, won the primary election. Dkt. 62-1, MB Depo, p. 73:24-74:2. Mildred Fernandez, a Hispanic, won the same seat in 2004. Dkt. 62-1, MB Depo, p. 74:3-5. In 2008, Mildred Fernandez was re-elected. Dkt. 62-1, MB Depo, p. 75:8-11. Currently, Peter Clarke is the County Commissioner for District 3. All of the Plaintiffs testified that they supported Pete Clarke. Dkt. 65-1, ZRA Depo, p. 25:15-26:1; 101:2-22; Dkt. 68-1, RM Depo, p. 60:17-61:17; Dkt. 66-1, JG Depo, p. 56:18-57:22 & p. 57:13-15); Dkt. 67-1, NRG Depo, p. 73-75. Because Hispanic voters are able to elect candidates of their choice, Plaintiffs are unable to establish legally significant racial bloc voting that usually defeats the minority's preferred candidate.

A district in which minority voters have elected their preferred candidates is considered an effective minority district, even if the district contains less than a majority of

the minority population. Jurisdictions are not required to create majority-minority districts in areas where minority voters have been successful in electing their preferred candidates. "Only if apportionment . . . has the effect of denying a protected class the opportunity to elect its candidate of choice does it violate § 2; where such an effect has not been demonstrated, § 2 simply does not speak to the matter." If minority voters were able to elect candidates of their choice from a district, minority plaintiffs would be unable to establish legally significant racial bloc voting that usually defeats the minority's preferred candidate. *Gingles*, 478 U.S. at 50-51.

The cases cited by Plaintiffs are distinguishable. In *Garza v. Cnty. of Los Angeles, Cal.*, 756 F. Supp. 1298, 1337 (C.D. Cal. 1990), *aff'd*, 918 F.2d 763 (9th Cir. 1990), *cert. denied*, 498 U.S. 1028 (1991) ("*Garza*"), the trial court recognized that "the potential distorting effect of this construct [i.e., the lack of evidence of white bloc voting and combining Anglos, Blacks and Asians] is lessened by the fact that for most of the elections analyzed, the Black and Asian percentage of the electorate was not significant." In contrast, Orange County is a diverse population with many minority groups. In *Ruiz v. City of Santa Maria*, 160 F.3d 543, 550 n.14 (9th Cir. 1998), the court did discuss the "white" majority voting bloc in the context of a minority preferred-majority candidate. In *De Grandy v. Wetherell*, 815 F. Supp. 1550, 1571-74 (N.D. Fla. 1992), the court recited the *Gingles* preconditions, including the requirement of that "the minority group must be able to demonstrate that the **white majority** votes sufficiently as a block to enable it . . . usually to defeat the minority's preferred candidate."

In response to Plaintiffs' claim that in the 2012 Primary Election for District 3

Commissioner, the Latinos had a clear preference, Michael Aviles, the Plaintiffs omitted the fact that there were two Hispanic candidates, three other candidates, and the majority of Hispanics voted for someone other than Aviles. Dkt. 61-4, p.16 (Hood's Report, p. 15).

This Court should reject Plaintiffs' attempt to modify *Gingles III* by looking examining the Hispanic vote against all non-Hispanics, including Blacks, Asians, other minorities, and Whites, even though they have provided no evidence to show that Blacks, Whites, or any other group, except for Hispanics, vote in the same manner.

The Expert Report of Dr. Hood confirms that Plaintiffs failed to establish the third factor of *Gingles.* Dkt. 61-5, pp. 21-22. Dr. Hood analyzed eight endogenous elections[6]. TH's Report, p. 15. Dr. Hood concludes that in the eight County Commission races analyzed, there was a clear candidate of choice for Hispanic voters in six of the eight elections. In four of the contests, a Hispanic candidate of choice won. TH's Report, p. 20. In 75% of the elections analyzed, there is no evidence of minority vote dilution. TH's Report, p. 20-21. "In sum, Hispanic candidates running for Orange County Commission seats do not usually lose as a result of Anglo bloc voting." TH's Report, p. 21.

A district in which minority voters have elected their preferred candidates is considered an effective minority district, even if the district contains less than a majority of the minority population. Jurisdictions are not required to create majority-minority districts in

---

[6] In *United States v. Vill. of Port Chester*, 704 F. Supp. 2d 411, 430 (S.D.N.Y. 2010), the Court concentrated its analysis on the endogenous elections in the Village and reasoned that "the evidence from all of the endogenous contests studied here was both more convincing and less fraught with factual disputes about, for example, whether candidates were or were not perceived to be Hispanic and how that may or may not have factored into the electoral outcomes. Further, it is clear to this Court that in general, countywide and statewide elections interject a host of different influences and variables into the electoral analysis, not the least of which is that those elections are held "on cycle" in November."

areas where minority voters have been successful in electing their preferred candidates. "Only if apportionment . . . has the effect of denying a protected class the opportunity to elect its candidate of choice does it violate § 2; where such an effect has not been demonstrated, § 2 simply does not speak to the matter." If minority voters were able to elect candidates of their choice from a district, minority plaintiffs would be unable to establish legally significant racial bloc voting that usually defeats the minority's preferred candidate. *Gingles*, 478 U.S. at 50-51.

**D. THE TOTALITY OF THE CIRCUMSTANCES FACTORS**

Even if this Court examines the totality of the circumstances, Plaintiffs are not entitled to the requested relief. To aid courts in evaluating the totality of the circumstances, *Gingles* identified a non-exhaustive list of other factors, derived from the Senate Report accompanying the 1982 amendment to Section 2 that may be considered. *Thompson v. Glades Cnty. Bd. of Cnty. Comm'rs*, 200-CV-212-FTM-29DNF, 2004 WL 5616892 (M.D. Fla. Aug. 27, 2004) *rev'd*, 493 F.3d 1253 (11th Cir. 2007) *reh'g en banc granted, opinion vacated*, 508 F.3d 975 (11th Cir. 2007) and *on reh'g en banc,* 532 F.3d 1179 (11th Cir. 2008) and *aff'd*, 532 F.3d 1179 (11th Cir. 2008). Those factors include:

> (1) The extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process; (2) The extent to which voting in the elections of the state or political subdivision is racially polarized; (3) The extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group; (4) If there is a candidate slating process, whether the members of the minority group have been denied access to that process; (5) The extent to which members of the minority group in the state or political

> subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process; (6) Whether political campaigns have been characterized by overt or subtle racial appeals; (7) The extent to which members of the minority group have been elected to public office in the jurisdiction; (8) Whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group; and (9) Whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous. *Solomon IV,* 221 F.3d at 1225–26. Courts should also consider the number of majority-minority voting districts and minority members' share of the relevant population. *Hamrick III*, 296 F.3d at 1073 n. 1.

*Thompson v. Glades Cnty. Bd. of Cnty. Comm'rs*, 200-CV-212-FTM-29DNF, 2004 WL 5616892 (M.D. Fla. Aug. 27, 2004) rev'd, 493 F.3d 1253 (11th Cir. 2007) *reh'g en banc granted, opinion vacated,* 508 F.3d 975 (11th Cir. 2007) and *on reh'g en banc,* 532 F.3d 1179 (11th Cir. 2008) and *aff'd*, 532 F.3d 1179 (11th Cir. 2008)

In *Solomon v. Liberty Cnty. Comm'rs*, 221 F.3d 1218, 1221-22 (11th Cir. 2000), the Eleventh Circuit concluded that even after a plaintiff offered proof of the three *Gingles* factors, the defendant can rebut the plaintiff's claim under the totality of the circumstances. The Eleventh Circuit reheard *en banc* the issue concerning the proper application of the Senate factors after a plaintiff establishes the *Gingles* preconditions. The Eleventh Circuit noted that the court was originally divided in the interpretation of *Gingles* with respect to whether the totality-of-the-circumstances test means that the defendant can rebut the plaintiff's claim—even after the plaintiff has offered proof of the three *Gingles* factors. *Id.* at 1221. The Eleventh Circuit affirmed the district court’s opinion, which found “that ‘[n]otwithstanding the remaining vestiges of official discrimination in Liberty County, there is no evidence that the ability of blacks to participate in the political process has been

hindered by that discrimination.' *Solomon v. Liberty Cnty. Comm'rs*, 221 F.3d 1218, 1221-22 (11th Cir. 2000) (quoting *Solomon v. Liberty County, Florida*, 957 F.Supp. 1522, 1559 (N.D.Fla.1997)). The *Solomon* court reasoned:

> This is because it is entirely possible that bloc voting (as defined by *Gingles* ) could exist, but that such bloc voting would not result in a diminution of minority opportunity to participate in the political process and elect representatives of the minority group's choice. Other circumstances may indicate that both the degree and nature of the bloc voting weigh against an ultimate finding of minority exclusion from the political process. The degree of racial polarization may be not be sufficiently intense, for example; or what appears to be bloc voting on account of race may, instead, be the result of political or personal affiliation of different racial groups with different candidates. "[T]o be actionable, a deprivation of the minority group's right to equal participation in the political process must be on account of a classification, decision, or practice that depends on race or color, not on account of some other racially neutral cause." *Nipper v. Smith*, 39 F.3d 1494, 1515 (11th Cir.1994) (en banc) (Tjoflat, C.J., plurality opinion).

*Solomon v. Liberty Cnty. Comm'rs*, 221 F.3d 1218, 1225 (11th Cir. 2000).

In application, a consideration of the Senate factors does not support the finding of vote dilution. Regarding election practices, the Supervisor of Elections has published the ballots in both English and Spanish for the last 20 years. BW Depo, p. 178:24-179:2. The prerequisites to voting apply to Hispanics and non-Hispanics alike. SOE Depo, p. 235. Hispanics can register and vote in the same manner as non-Hispanics. SOE Depo, p. 234-236.

Regarding the extent to which Hispanics in Orange County bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process, educational opportunities regarding Orange County public schools are the same for Hispanics and non-Hispanics. All students are treated

the same. There are additional opportunities for Hispanics if they are non-English speakers, there are special courses that the school provides. DWR Depo, p.s 89-90. Further, Orange County is not aware of any complaints or concerns raised regarding access by Hispanics to Orange County's housing programs (LW Depo, p. 212), to Orange County's Health Department or PCAN clinic (LW Depo, p. 213:20-25), or to employment with Orange County (LW Depo, p. 290-291).

Regarding the extent to which Hispanics have been elected to public office in Orange County, Hispanics have successfully been elected to the Board of County Commissioners, even without a majority Hispanic district. Hispanics have had access to and been elected to office in Orange County, both countywide and within County Commission Districts, even without a majority-Hispanic District. WE Depo, p. 143-145:2; Exhibit 630. Such success undercuts Plaintiffs' claims that Hispanics have been denied equal access to the political process in Orange County.

As to whether there is a significant lack of responsiveness on the part of elected officials in Orange County to the particularized needs of Hispanics, the facts show that the Orange County Redistricting Advisory Committee included three Hispanics. The record of the public meetings and hearings before the RAC as well as the Board of County Commissioners shows that both the RAC and the BCC were very responsive to the concerns of all members of the public.

In terms of population, Hispanics comprise 26.9% of the total population. Even so, Chairman Martinez, a Cuban, was elected as County mayor in a countywide election in 1998.

At that time, two of the seven members of the Board of County Commissioners were Hispanic.

After considering the factors discussed above, Plaintiffs have not met their burden of showing that the challenged electoral scheme had the effect of depriving them of an equal measure of political and electoral opportunity to participate in the political process and to elect representatives of their choosing.

**E. STANDING.**

Under the Voting Rights Act, any "aggrieved person" may institute a proceeding to enforce the right to vote. 42 U.S.C. § 1973a(a). The constitutional standing analysis requires a plaintiff to demonstrate that: (1) the plaintiff suffered an injury in fact; (2) the injury was causally connected to the defendant's action; and (3) the injury will be redressed by a judgment in the plaintiff's favor. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

Other courts have held that to demonstrate an injury in fact, a vote dilution plaintiff must show that he or she (1) is registered to vote and resides in the district where the discriminatory dilution occurred; and (2) is a member of the minority group whose voting strength was diluted. *Broward Citizens for Fair Districts v. Broward Cnty*., 12-60317-CIV, 2012 WL 1110053 (S.D. Fla. Apr. 3, 2012) (citing *Comm. for a Fair & Balanced Map v. Ill. Bd. of Elections*, No. 1:11–CV–5065, 2011 WL 5185567, at *1 n. 1 (N.D.Ill. Nov.1, 2011) (citing *Perry–Bey*, 678 F.Supp.2d at 362–65; *Hall v. Virginia*, 276 F.Supp.2d 528, 531–32 (E.D.Va.2003); *Ill. Legislative Redistricting Comm'n v. LaPaille*, 782 F.Supp. 1267, 1271 (N.D.Ill.1991)).

Here, because Plaintiff Martinez lives in District 5, he does not reside in the district where the alleged dilute occurred. He has not suffered an injury that is related to Plaintiffs' demand for a majority Hispanic District 3 and any redress will not impact him. RM, p. 4.

As for Zoraida Rios-Andino, she now lives in District 4, not District 3. According to the census data, District 3 in 2010, prior to the adoption of the 2011 redistricting Ordinance, had a Hispanic VAP of 41.07%. OC_000014. After the adoption of the redistricting order, the new 2012 District 4 is 39.95% Hispanic VAP. OC_000014. The total difference in Hispanic VAP when comparing her former district with her current district is only 1%. This difference is insignificant and does not amount an injury in fact or vote dilution.

**F. PARTICULARIZED FINDINGS.**

In vote dilution cases, the Eleventh Circuit requires a district court to explain *with particularity* both the reasons for its ultimate decision as well as its subsidiary findings of fact. *Solomon v. Liberty County Commissioners*, 221 F.3d 1218, 1227–28 (11th Cir.2000).

**G. CONCLUSION**

Accordingly, this Court should enter a judgment in favor of Orange County and against Plaintiffs.

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 19th day of March 2014, the foregoing was electronically filed with the Clerk of the Court by using the CM/ECF system. I HEREBY CERTIFY that on this 19th day of March 2014, the foregoing was electronically filed with the Clerk of the Court by using the CM/ECF system.

**Octavio Gustavo Padron, Esq.**

517 W. Colonial Dr.
Orlando, FL 32804
Gpadron@suarezcti.com;
ncostas@suarezcti.com;

**Juan Cartagena. Esq.**
**Nancy Trasande, Esq.**
LatinoJustice PRLDEF
99 Hudson St., 14th Floor
New York, NY 10013
jcartagena@latinojustice.org;
ntrasande@latinojustice.org;

***/s/ Linda S. Brehmer Lanosa***
Linda S. Brehmer Lanosa
Assistant County Attorney
Florida Bar No. 901296
ORANGE COUNTY ATTORNEY'S OFFICE
201 S. Rosalind Avenue, Third Floor
Orlando, Florida 32801
Telephone: (407) 836-7320
Facsimile: (407) 836-5888
Linda.BrehmerLanosa@ocfl.net;
Martina.Desjardins.@ocfl.net;