# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

**ZORAIDA RIOS-ANDINO, NEY RIVERA GARCIA and ROSARIO MARTINEZ,**

**Plaintiffs,**

**v.** **Case No: 6:12-cv-1188-Orl-22KRS**

**ORANGE COUNTY,**

**Defendant.**

---

## MEMORANDUM OPINION AND ORDER

This case presents a challenge to the redistricting plan adopted after the 2010 Census by Orange County, Florida (the "County") for the six single-member districts of the Board of County Commissioners ("BCC"). Plaintiffs Zoraida Rios-Andino, Ney Rivera Garcia, and Rosario Martinez ("Plaintiffs"), three residents of Orange County, argued that the County's redistricting plan violated Section Two of the Voting Rights Act of 1965 by diluting the voting strength of Latino citizens of Orange County. Specifically, Plaintiffs asserted that the County's 2011 Redistricting Plan split a Latino population that comprised a near-majority in one district, and routinely elected the candidate of its choice, between that district and another, adjacent, district, thereby eliminating the Latino population's ability to elect its chosen candidate to the BCC.

After finding material issues of fact that precluded summary judgment in favor of the County, the Court conducted a six-day bench trial. At the conclusion of the parties' evidence on the *Gingles* preconditions,[1] the Court announced its intention to enter Judgment on Partial

---

[1] *Thornburg v. Gingles*, 478 U.S. 30, 106 S. Ct. 2752 (1986).

Findings pursuant to Rule 52(c), Federal Rules of Civil Procedure, in favor of the County.[2] Although the Court gave a brief statement of its reasoning at that time, this Memorandum Opinion and Order, as well as the accompanying judgment, will be entered to satisfy Rule 52(a).

**I. SECTION TWO OF THE VOTING RIGHTS ACT**

"Passage of the Voting Rights Act of 1965 was an important step in the struggle to end discriminatory treatment of minorities who seek to exercise one of the most fundamental rights of our citizens: the right to vote." *Bartlett v. Strickland*, 556 U.S. 1, 10, 129 S. Ct. 1231, 1240 (2009). Section Two of the Act "bars *all* States and their political subdivisions from maintaining any voting 'standard, practice, or procedure' that 'results in a denial or abridgement of the right . . . to vote on account of race or color.'" *Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 479, 117 S. Ct. 1491, 1498 (1997) (alterations in original) (citing 42 U.S.C. § 1973(a)). "The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Thornburg v. Gingles*, 478 U.S. 30, 47, 106 S. Ct. 2752, 2764 (1986). Discriminatory intent need not be demonstrated; discriminatory effect is sufficient. *Bossier Parish Sch. Bd.*, 520 U.S. at 481-82. Under Section Two, a violation occurs when,

> based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally

[2] The Court bifurcated the trial so that both parties presented their cases on the *Gingles* preconditions before either party offered evidence on the totality of the circumstances. Because the Court concluded that Plaintiffs failed to satisfy their burden of proof as to the preconditions, the Court is able to enter judgment on partial findings. Fed. R. Civ. P. 52(c) ("If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue."); *Nipper v. Smith*, 39 F.3d 1494, 1512-13 (11th Cir. 1994) (en banc) (citations omitted) (holding that the *Gingles* preconditions are "threshold factors" that are "prerequisites to a successful" § 2 vote dilution claim).

> open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

42 U.S.C. § 1973(b).

In *Thornburg v. Gingles*, the Supreme Court set out three "necessary preconditions" that courts must find before turning to the "totality of circumstances" standard articulated in the statute: (1) the minority group must be "sufficiently large and geographically compact to constitute a majority in a single-member district," (2) the minority group must be "politically cohesive," and (3) the majority must vote "sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." 478 U.S. at 50-51. These preconditions apply to a § 2 challenge to a single-member district, *Shaw v. Hunt*, 517 U.S. 899, 914, 116 S. Ct. 1894, 1905 (1996) (citing *Growe v. Emison*, 507 U.S. 25, 113 S. Ct. 1075 (1993)), including an allegation that "the manipulation of districting lines fragments politically cohesive minority voters among several districts or packs them into one district or a small number of districts, and thereby dilutes the voting strength of members of the minority population," *id.* (citing *Johnson v. De Grandy*, 512 U.S. 997, 1007, 114 S. Ct. 2647, 2655 (1994)).

Determining whether, based on the totality of circumstances, a state or political subdivision violated Section Two "requires a 'searching practical evaluation of the past and present reality.'" *Ga. State Conference of the NAACP v. Fayette Cnty. Bd. of Comm'rs*, 950 F. Supp. 2d 1294, 1297-98 (N.D. Ga. 2013) (quoting *Gingles*, 478 U.S. at 45). To aid in this evaluation, courts turn to seven key factors set forth in the Senate Judiciary Committee Report accompanying the 1982 amendments to Section Two, commonly referred to as the "Senate factors." *Gingles*, 478 U.S. at 44-45 (citing S. REP. NO. 97-417, at 28-29 (1982), *reprinted in* 1982 U.S.C.C.A.N. 177). Those

factors are:

> 1. The extent of any history of official discrimination in the state or political subdivision that touched the right of members of the minority group to register, to vote, or otherwise to participate in the democratic process;
>
> 2. The extent to which voting in the elections of the state or political subdivision is racially polarized;
>
> 3. The extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;
>
> 4. If there is a candidate slating process, whether the members of the minority group have been denied access to that process;
>
> 5. The extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder the ability to participate effectively in the political process;
>
> 6. Whether political campaigns have been characterized by overt or subtle racial appeals; [and]
>
> 7. The extent to which members of the minority group have been elected to public office in the jurisdiction.

S. REP. NO. 97-417, at 28-29 (1982) (footnotes omitted). Two other factors mentioned in the Senate Report—"evidence demonstrating that elected officials are unresponsive to the particularized needs of the members of the minority group and that the policy underlying the State's or the political subdivision's use of the contested practice or structure is tenuous"—may be relevant in a vote dilution case. *Gingles*, 478 U.S. at 45. This list "is neither comprehensive nor exclusive," but these factors are especially pertinent to vote dilution claims such as that presented in the case at bar. *Id.*

## II. FINDINGS OF FACT

### A. The 2011 Orange County BCC Redistricting Process

The Orange County BCC, which is the governing body of Orange County, consists of seven elected officials: six members who are elected as commissioners from single-member districts, and one member who is elected county-wide as mayor. Each district must be as nearly equal in population as possible. (Orange County Charter (Joint Ex. 1-1), Art. II, § 202.) After each decennial Census, these districts are adjusted by the BCC pursuant to its power to adopt a redistricting plan after one or more public hearings. (*Id.*) The BCC undertook redistricting through the establishment of a Redistricting Advisory Committee ("RAC"), which was made up of fifteen members. (Ordinance No. 2011-14 (Joint Ex. 1).) The RAC held eighteen public meetings from April to September, 2011, including six community meetings held in various locations throughout the county. (Joint Exs. 1, 2-19.) The RAC relied on the 2010 Census information, and designed districts based on the population totals as determined by those Census results. (Joint Ex. 1.) The RAC elected to use the federal Census data as opposed to voter registration totals based on the recommendation of the County Attorney's Office that the Census results are not only the most reliable data, but are also the most legally defensible way to achieve equal population. (*Id.*)

At its first meeting, the RAC considered Census data pertaining to the growth of the six BCC districts. Based on the district lines in place in 2010, Districts 1 and 4 had populations of 242,725 and 254,951, while Districts 2, 3, 5 and 6 had much lower populations of 166,660; 159,387; 167,023; and 155,210, respectively. (Joint Ex. 25.) The population of each district needed to be around 190,993, plus or minus 5%, in order to achieve relatively equal populations in each district. (*Id.*) Therefore, Districts 1 and 4 needed to lose approximately 51,732 and 63,958 people, respectively, while the populations of the other districts needed to increase by around 25,000 to

35,000 each. (*Id.*) The RAC also considered the population densities of various racial and ethnic groups, including Latinos. (Joint Ex. 32.)

After nearly six months of meetings, the RAC recommended two proposals to the BCC for consideration: Committee Proposal 12B and Public Proposal E. (Joint Ex. 19.) The BCC ultimately adopted Map M-3, which was a modified version of Committee Proposal 12B, on November 29, 2011. (Joint Ex. 1.) Map M-3 (the "proposed" table) modified the racial makeup of the BCC districts as follows:

**CURRENT DISTRICTS - PERCENTAGE OF DISTRICTS BY RACE**

| District (Commissioner) | Current Population | Deviation | White | Black | Asian | Other | Hispanic |
|---|---|---|---|---|---|---|---|
| 1 (Boyd) | 242,688 | 27.07% | 69.78% | 12.54% | 8.28% | 9.40% | 20.34% |
| 2 (Brummer) | 166,697 | -12.72% | 52.69% | 34.45% | 2.80% | 10.06% | 19.24% |
| 3 (Damiani) | 159,389 | -16.55% | 71.78% | 9.97% | 3.59% | 14.65% | 44.48% |
| 4 (Thompson) | 254,949 | 33.49% | 70.81% | 11.00% | 5.68% | 12.52% | 37.42% |
| 5 (Edwards) | 167,023 | -12.55% | 80.19% | 8.58% | 4.37% | 6.87% | 17 27% |
| 6 (Russell) | 155,210 | -18.74% | 27 54% | 59.35% | 2.79% | 10.32% | 20.40% |

**PROPOSED - PERCENTAGE OF DISTRICTS BY RACE**

| District (Commissioner) | Total Population | Deviation | White | Black | Asian | Other | Hispanic |
|---|---|---|---|---|---|---|---|
| 1 (Boyd) | 186,836 | -2.18% | 72.86% | 9.78% | 9.11% | 8.25% | 19.51% |
| 2 (Brummer) | 188,509 | -1.30% | 56.48% | 30.18% | 3.09% | 10.25% | 19.99% |
| 3 (Damiani) | 199,697 | 4.56% | 73.22% | 10.07% | 3.07% | 13.65% | 41.40% |
| 4 (Thompson) | 185,352 | -2.95% | 67.73% | 11.63% | 6.85% | 13.79% | 41.77% |
| 5 (Edwards) | 198,534 | 3.95% | 79.90% | 8.57% | 4.43% | 7.11% | 17.82% |
| 6 (Russell) | 187,028 | -2.08% | 29.85% | 55.82% | 3.28% | 11.05% | 20.65% |
| | | | Maximum Deviation: | 7.51% | | | |

*Id.*

**B. Demographics of Orange County as of the 2010 Census**

Orange County is, by any measure, a racially and ethnically diverse place. As of the 2010 Census, Whites comprised 63.6% of the population, Blacks 20.8%, and Asians 4.9%, with the remainder of the population consisting primarily of persons of "some other race" or of two or more races. (Joint Ex. 27.) Persons identifying as Hispanic or Latino of any race comprised 26.9% of the population of Orange County, according to the 2010 Census. (*Id.*). The Latino population expanded by as much as 83% from 2000 to 2010, (Pls.' Ex. 20), yet the density map that the RAC

considered revealed a dispersed Latino population that was not clustered in any one part of the County:




(Joint Ex. 32.) A member of the County's Geographic Information Systems ("GIS") staff testified that areas with high Hispanic population include the University census-designated place, Union Park, some of Alafaya, Rio Pinar, Azalea Park, parts of Orlando south of Azalea Park, Oak Ridge, Sky Lake, Pine Castle, Meadow Woods, Southchase, and Hunters Creek. (County Ex. 310.) Most of these are older, established neighborhoods in the central and eastern parts of the County, but the last three communities—Meadow Woods, Southchase, and Hunters Creek—were developed relatively recently, and are located in the farthest-south portion of the County. (*Id.*)

**C. Results of Recent BCC Elections**

To inform the Court's consideration of the third *Gingles* precondition, the parties submitted, among other evidence, the results from eight recent elections in which Latino

candidates ran for seats on the BCC. In these eight elections, a Latino candidate was victorious in four (winner denoted in bold):

| Latino Candidate(s) / Opponent(s) | Year | | Office | Dist |
|---|---|---|---|---|
| **County Commissioner** | | | | |
| Michael Aviles (11%) / Eric Armando Lasso (15%) / Pete Clarke (23%) / **Lui Damiani (31%)** / Lydia Pisano (20%) | 2012 | P | County Commission | 3 |
| Mayra Uribe (18%) / **Jennifer Thompson (48%)** / Lydia Pisano (18%) / Pete Clarke (16%) | 2010 | P | County Commission | 4 |
| Mayra Uribe (29%) / **Jennifer Thompson (71%)** | 2010 | G | County Commission | 4 |
| **Mildred Fernandez (57%)** / John Kelly Harris (43%) | 2008 | G | County Commission | 3 |
| J.P. Quiñones (12%) / **Linda Stewart (51%)** / Jennifer Thompson (32%) | 2006 | P | County Commission | 4 |
| **Mildred Fernandez (24%)** / Lui Damiani (21%) / Larry Calabretta (17%) / Jeremy Markman (13%) | 2004 | P | County Commission | 3 |
| **Mildred Fernandez (51%)** / Lui Damiani (49%) / | 2004 | G | County Commission | 3 |
| **Mary Johnson (51%)** / Lou Pendas (33%) / Larry Calabretta (16%) | 2000 | P | County Commission | 3 |

(Pls.' Ex. 20.) Mary Johnson, who is of Cuban and Puerto Rican descent, and Mildred Fernandez, who is of Puerto Rican descent, combined to win three successive general elections for District 3's BCC seat, representing the district from 2000 until 2010, when Fernandez was suspended until her resignation in November, 2011.

## III. CONCLUSIONS OF LAW

Plaintiffs primarily relied on the expert report and testimony of Dr. Theodore Arrington, a retired professor of political science and an expert in redistricting, to make their case on the *Gingles* I precondition. The County countered with the expert testimony of Dr. Peter Morrison, an applied demographer, but also presented relevant testimony from two of the mapmakers involved in the 2011 redistricting process. With respect to the second and third *Gingles* preconditions, Plaintiffs submitted the expert report and testimony of Dr. Matthew Barreto, while the County responded with the report and testimony of Dr. M.V. Hood III. Both experts are political scientists, and teach at the Universities of Washington and Georgia, respectively. All four of these experts passed muster under the standard articulated by the Supreme Court in *Daubert v. Merrell Dow*

*Pharmeceuticals, Inc.* 509 U.S. 579, 113 S. Ct. 2786 (1993). The Court did not reach any findings of fact or conclusions of law as to the second precondition—Latino political cohesion—because cross-examination of Dr. Hood revealed that the County did not seriously dispute that it had been established, and in any event, the Court's findings on the first and third preconditions are dispositive of this case.

**A. *Gingles* I: Insufficiently Numerous and Compact Latino Population**

The first *Gingles* precondition requires Plaintiffs to prove that the Latino population in Orange County is "sufficiently large and geographically compact to constitute a majority in a single-member district." 478 U.S. at 50-51. Members of the relevant minority group must make up more than 50% of the voters in the proposed remedial district in order to satisfy the numerosity element of this precondition. *Bartlett v. Strickland*, 556 U.S. 1, 19-20, 129 S. Ct. 1231, 1249 (2009).[3] The Court held at summary judgment that Latino citizens of voting age (Latino "CVAP") comprise the relevant population for *Gingles* I purposes, reasoning that a proposed remedial district can only satisfy § 2 if it consists of a sufficient number of potential voters, not just persons of the relevant race or ethnicity. *See Growe v. Emison*, 507 U.S. 25, 40, 113 S. Ct. 1075, 1084 (1993) (citation omitted) (explaining that the key inquiry in the *Gingles* I analysis is whether "the

[3] Although five Justices supported the judgment in *Bartlett*, they were split between a three-Justice plurality opinion and a two-Justice concurrence. The plurality held that § 2 permits a vote dilution claim, but such a claim can only succeed if the relevant minority population in the proposed remedial district exceeds 50%. *Bartlett*, 556 U.S. at 19-20. The concurrence argued that § 2 does not authorize any vote dilution claim, regardless of the size of the minority population. *Id.* at 26 (Thomas, J., concurring in the judgment). The remaining Justices dissented based on their objection to the imposition of a bright line for minority representation in proposed remedial districts. *Id.* at 26-27. Although the absence of a majority in *Bartlett* means that the majority-minority rule for remedial districts is not binding precedent, it is clear that a remedial district in which the minority voting age population was not a majority of the total population would not pass muster on appeal.

minority has the potential *to elect* a representative of its own choice in some single-member district" (emphasis added)). The Court reaffirms this conclusion of law in the wake of the bench trial.

In *Negron v. City of Miami Beach, Florida*, a panel of the Eleventh Circuit held that "the proper statistic for deciding whether a minority group is sufficiently large and geographically compact is voting age population as refined by citizenship." 113 F.3d 1563, 1569 (11th Cir. 1997) (citing *Romero v. City of Pomona*, 883 F.2d 1418, 1424-26 (9th Cir. 1989), *abrogated on other grounds by Townsend v. Holman Consulting Corp.*, 914 F.2d 1136, 1141 (9th Cir. 1990) (en banc)). However, this requirement "applies only where there is reliable information indicating a significant difference in citizenship rates between the majority and minority populations," and "such a disparity is unlikely except in areas where the population includes a substantial number of immigrants." *Id. Negron* considered a challenge by a group of Latino voters to city commission districts in Miami Beach. Ultimately, the panel found that reliable information (the 1990 Census) showed a 38% gap between the non-Hispanic citizenship rate and the Hispanic citizenship rate, and this gap was significant enough to make CVAP the relevant population for § 2 purposes. *Id.* at 1567, 1571. Other circuits have adopted CVAP as the relevant metric for *Gingles* I without requiring a "significant" discrepancy in citizenship rates. *See Reyes v. City of Farmers Branch, Tex.*, 586 F.3d 1019, 1023-25 (5th Cir. 2009); *Barnett v. City of Chi.*, 141 F.3d 699, 704-05 (7th Cir. 1998) ("We think that citizen voting-age population is the basis for determining equality of voting power that best comports with the policy of the statute."). In another § 2 case from this district, Judge Presnell applied the *Negron* holding to Osceola County, but used voter registration data in lieu of CVAP. *See United States v. Osceola Cnty., Fla.*, 475 F. Supp. 2d. 1220, 1229-30 (M.D. Fla. 2006).

In the case at bar, Plaintiffs admit that the county-wide Latino citizenship rate is 76% and the non-Latino rate is 90.73%, yielding a difference of 14.73%. The Court finds as a matter of law and fact that this difference is significant. To hold otherwise, and use Latino VAP as the operative population, could result in a finding that a proposed remedial district satisfied *Gingles* I without ensuring that Latino voters in that remedial district would have the potential to elect a representative of their own choice. Accordingly, the Court will look to the proposed remedial districts' CVAP to determine whether they satisfy *Gingles* I.

To meet their burden, Plaintiffs submitted the expert report and testimony of Dr. Arrington. (*See* Pls.' Ex. 50.) Dr. Arrington based his analysis in part on "the 94-171 data for the 2010 U.S. Census and the standard geographic data (T.I.G.E.R. line shapefiles) on Orange County available from the Bureau of the Census," which "include computer definitions of census blocks, precinct or Voting Tabulation Districts (VTDs), town and city boundaries, water features, etc." as well as "race and ethnicity data for the total population and the voting age population (VAP)." (Pls.' Ex. 50 ¶ 13.) The Census data does not include data on citizenship rates in Orange County by race and ethnicity, so Dr. Arrington had to consult the American Community Survey ("ACS") to obtain them. (Pls.' Ex. 50 ¶ 14.) Using these data, Dr. Arrington generated two illustrative Maps (Map 1 and Map 2) to serve as prospective redistricting plans. Plaintiffs claim that under each of these plans, proposed District 3 would satisfy their *Gingles* I burden of presenting a single-member district in which the Latino CVAP is "sufficiently large and geographically compact to constitute a majority." 478 U.S. at 50-51. Some background information on the ACS is necessary to understand the Court's conclusions of law with respect to this precondition.

According to a Census Bureau guide, the ACS is "a nationwide survey designed to provide communities with reliable and timely demographic, social, economic, and housing data every

year." (Pls.' Ex. 57.) Until 2010, the decennial Census consisted of a "short form," which asked very basic questions, and a "long form," which included more questions that sought more detailed demographic, socioeconomic, and housing data. (*Id.*) Starting in 2010, the ACS replaced the "long form" portion of the Census. The Census Bureau conducts the ACS continuously, by sampling "nearly 3 million addresses each year, resulting in nearly 2 million final interviews." (*Id.*) Because the annual ACS sample is much smaller than the decennial long form sample, "the ACS needs to combine population or housing data from multiple years to produce reliable numbers for small counties, neighborhoods, and other local areas." (*Id.*) Thus, the Census Bureau publishes estimates based on one, three, and five years of ACS data. (*Id.*) The one-year estimates are reliable for communities with populations in excess of 65,000 people, the three-year estimates are reliable for populations exceeding 20,000, and the five-year estimates are reliable for communities of any size—all the way down to the "census tract" and "block group" level. (*Id.*) In other words, the ACS offers meaningful data about a large community, such as Orange County, every year, but can only provide useable data for small communities in five-year increments. For this reason, researchers must choose between currency and accuracy when studying the demographics of a small population.

Returning to the matter at hand, Dr. Arrington estimated the Latino CVAP of each of his proposed districts by multiplying the five-year ACS Latino citizenship rate for all of Orange County by the number of persons in each proposed district who identified themselves as Latino in the 2010 Census. (Pls.' Ex. 50 ¶ 21.) Using this method, Dr. Arrington estimated the Latino CVAP in proposed District 3 to be 48.28% under Map 1 and 50.19% under Map 2. (Pls. Ex. 50 p. 16.) Map 1 can be disregarded, because the Latino CVAP in proposed District 3 would be below the 50% threshold required in light of *Bartlett v. Strickland*. 556 U.S. 1, 25-26, 129 S. Ct. 1231, 1249

(2009). But, according to Dr. Arrington's method, the Latino CVAP in Map 2's proposed District 3 is sufficient.

The County's *Gingles* I expert, Dr. Morrison, disputed Dr. Arrington's CVAP calculations. Like Dr. Arrington, Dr. Morrison used the 2010 Census "94-171 data" to determine the voting age population of each Census block group or portion thereof comprising District 3 in each of the illustrative Maps. (Pls.' Ex. 77 ¶ 19.) But, instead of using the county-wide Latino citizenship rate to calculate the Latino CVAP for each illustrative district, Dr. Morrison multiplied the 2007-2011 five-year ACS Latino citizenship rates for each block group by its Census-reported voting age population. (*Id.* ¶¶ 30-33.) Dr. Morrison claimed that this method is more reliable, and produces a more accurate estimate of the Latino CVAP in each illustrative district, because it recognizes that citizenship rates are not uniform across a large and diverse population such as Orange County. (*Id.* ¶ 26.) In this case, the population comprising Dr. Arrington's illustrative District 3 has a Latino citizenship rate that is less than the overall County rate; thus, taking Dr. Arrington's "shortcut," and using the greater County-wide rate, overstates the true Latino CVAP for illustrative District 3. (*Id.* ¶¶ 26-29.) Using the ACS citizenship rate estimate for only those Latinos who actually reside in the illustrative District 3, Dr. Morrison's calculation of the Latino CVAP comprised just 46.4% of District 3 in Illustrative Map 1 and 48.0% in Illustrative Map 2. (*Id.* ¶ 14.) Focusing specifically on Map 2, Dr. Morrison estimated the Latino citizenship rate for illustrative District 3 to be 73.28%, which is less than the County-wide rate of 76%. (*Id.* p. 15.) This difference accounts for the discrepancy between the two experts' calculations of the Latino CVAP for illustrative District 3.

At trial, Dr. Arrington confessed to a *mea culpa* of sorts: while he still believed that the Latino CVAP was "about" 50% in District 3 of his illustrative Map 2, he admitted for the first time

that Dr. Morrison's method was reliable, and stated that he was uncertain as to whether Latino citizens of voting age were actually a majority in District 3 of his illustrative Map 2. The Court finds Dr. Morrison's method to be the more reliable one, and accordingly adopts his estimate of the Latino CVAP for District 3 of illustrative Map 2. Based on this estimate, and Dr. Arrington's uncertainty as to his own conclusions, the Court concludes that Plaintiffs have not met their burden of proof with respect to the numerosity element of the first *Gingles* precondition.[4]

**B. *Gingles* III: Absence of Bloc Voting that Usually Defeats Latinos' Candidates of Choice**

To satisfy their burden of proof as to the third *Gingles* precondition, Plaintiffs must not only prove that Latinos in District 3 encounter bloc voting, but also that such "bloc voting *regularly causes* the candidate preferred by [Latino] voters to lose." *Johnson v. Hamrick*, 296 F.3d 1065, 1074 (11th Cir. 2002) (emphasis in original). Even assuming, without deciding, that Plaintiffs can establish bloc voting by non-Latinos, they are unable to meet the demands of the third *Gingles* precondition because they cannot demonstrate that bloc voting *regularly causes* their candidate of choice to be defeated.

Dr. Barreto analyzed thirty-two elections featuring thirty-seven candidates in order to assess the overall degree of racially polarized voting in Orange County. (Pls.' Ex. 20 ¶ 21.) Of these, only eight were "endogenous" BCC elections, or those that "represent the exact type of election in [Plaintiffs'] lawsuit." (*Id.*) The Court finds the remaining "exogenous" elections—for school board, clerk of court, judgeships, and soil and water districts—to be of lesser probative

[4] Dr. Morrison admits that his method is new, and has only been standard practice for "a year or two." This likely reflects the relative novelty of the ACS and the inherent difficulties in determining best practices for using ACS data. Nevertheless, Dr. Morrison's method may not be the correct one for every case of this kind, and the Court's holding is necessarily limited to the facts of this particular case.

value. First, the electorates are inconsistent—some elections are county-wide, or even cross county lines, and all have district boundaries differing from the BCC election district boundaries. Second, the County's expert, Dr. Hood, persuasively testified that "down ballot" elections, such as for soil and water supervisors, are prone to undervoting and other problems.

Focusing on the endogenous BCC elections, the Court concludes that bloc voting does not usually cause Latinos' preferred candidates to be defeated. As discussed in the Court's findings of fact, Latino candidates won four of the eight BCC elections that Dr. Barreto analyzed. Plaintiffs protest that these elections were conducted under the old BCC district boundaries, and cannot be compared to the new version of District 3. This argument is unconvincing, because the Court heard substantial testimony to the effect that in 2002 and 2004, Latino voters' candidates of choice won BCC elections in District 3 despite Latinos' comprising a smaller percentage of District 3's registered voters than they did after the 2011 redistricting process. In other words, Latinos' preferred candidates were able to win BCC elections in the mid-2000s even though Latino voters comprised a smaller share of the District 3 electorate then than they do now. Many other explanations arose at trial for Latino candidates' lack of success in recent BCC elections: the political party affiliations of the candidates, low Latino turnout relative to voter registration, and former Commissioner Fernandez's legal troubles. Whatever the case may be, the Court concludes that Plaintiffs have not met their burden of proving that racially polarized bloc voting regularly causes Latinos' candidates of choice to be defeated.

## IV. CONCLUSION

Plaintiffs have failed to prove by a preponderance of the evidence that the Latino population in Orange County is sufficiently large and geographically compact to constitute a

majority in a single-member district, or that a non-Latino majority votes sufficiently as a bloc to enable it usually to defeat Latinos' preferred candidates in BCC elections.

Based on the foregoing, it is ordered as follows:

1. The Clerk is directed to enter a final judgment providing that Plaintiffs Zoraida Rios-Andino, Ney Rivera Garcia, and Rosario Martinez are not entitled to any relief on their claims in this case. The judgment shall further provide that Orange County shall recover its costs of action.

2. The Clerk is directed to **CLOSE** this case.

**DONE** and **ORDERED** in Chambers, in Orlando, Florida on August 21, 2014.

Anne C. Conway

ANNE C. CONWAY
United States District Judge

Copies furnished to:

Counsel of Record
Unrepresented Parties